No. 2014-1656

# United States Court of Appeals
### *for the*
# Federal Circuit

———————

PROGRESSIVE CASUALTY INSURANCE CO.,

*Appellant*,

v.

LIBERTY MUTUAL INSURANCE CO.,

*Appellee*.

———————

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeals Board in Case CBM2012-00004
(Judge Jameson Lee, Judge Joni Y. Chang, Judge Michael R. Zecher)

## APPELLANT PROGRESSIVE CASUALTY INSURANCE CO.'S OPENING BRIEF

Gary M. Ropski
Cynthia A. Homan
James A. Collins
Laura A. Lydigsen
Nicholas A. Restauri
BRINKS GILSON & LIONE
455 N. Cityfront Plaza Drive, Ste. 3600
Chicago, Illinois 60611

*Counsel for Appellant*,
*Progressive Casualty Insurance Co.*

October 31, 2014

# United States Court of Appeals for the Federal Circuit

### 2014-1656

### PROGRESSIVE CASUALTY INSURANCE v. LIBERTY MUTUAL INSURANCE CO.

## CERTIFICATE OF INTEREST

Counsel for Appellant certifies the following:

1.   The full name of every party or amicus represented by me is:

Progressive Casualty Insurance Co.

2.   The name of the real parties in interest (if the party named in the caption is not the real party in interest) represented by me are:

Not applicable.

3.   All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

The Progressive Corporation
Drive Insurance Holdings, Inc.

4.   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by this firm in the trial court or agency or are expected to appear in this court are:

| | |
|---|---|
| Gary M. Ropski | Calvin P. Griffith |
| Cynthia A. Homan | James L. Wamsley, III |
| James A. Collins | John V. Biernacki |
| Laura A. Lydigsen | JONES DAY |
| Nicholas A. Restauri | North Point |
| Joseph S. Hanasz (formerly | 901 Lakeside Avenue |
| with the firm) | Cleveland, Ohio 44114 |
| BRINKS GILSON & LIONE | |
| 455 N. Cityfront Plaza Drive | |
| Chicago, Illinois 60611 | |

October 31, 2014          */s/ Gary M. Ropski*_____
                                         Gary M. Ropski

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... v

TABLE OF ABBREVIATIONS ............................................................ viii

STATEMENT OF RELATED CASES .................................................... x

JURISIDICTIONAL STATEMENT ....................................................... 1

STATEMENT OF THE ISSUES ............................................................ 1

STATEMENT OF THE CASE SETTING OUT
THE FACTS RELEVANT TO THE ISSUES .......................................... 2

I.    PROGRESSIVE'S USAGE-BASED INSURANCE INVENTION ............... 2

    A.    Progressive Pioneers Usage-Based Insurance ....................................... 2

    B.    Progressive's Usage-Based Insurance Patents ...................................... 4

    C.    The '970 Patent ................................................................................. 6

        1.    Background Regarding Determination of Automobile
                Insurance Premiums ................................................................... 6

        2.    The Patent's Disclosure ............................................................. 7

        3.    Prosecution And Reexamination History ................................... 9

II.    LIBERTY'S FILING OF CBMPR PETITIONS CHALLENGING
    THE '970 PATENT ..................................................................................... 11

    A.    Liberty's CBMPR Strategy ............................................................... 11

    B.    Liberty's Petition Challenging The '970 Patent ................................ 12

    C.    The Alleged Prior Art ....................................................................... 13

        1.    Bouchard ................................................................................. 13

        2.    Pettersen ................................................................................. 14

        3.    Herrod ..................................................................................... 15

        4.    Florida Guide ........................................................................... 16

III.    THE BOARD'S DECISIONS ...................................................................... 16

    A.    Institution Decision .......................................................................... 16

    B.    Final Written Decision ...................................................................... 17

        1.    The Board's Claim Constructions ............................................. 17

                a.    "Actuarial Class" ............................................................. 17

b.   "Insured Profile"..................................................18

2.   The Board's Erroneous Obviousness Holdings......................20

a.   Claims Requiring An "Insured Profile" (Claims 4-5 And 16-17)..................................20

b.   Claims Requiring A Vehicle "Log" (Claims 1 and 3)..................................21

c.   Claims Requiring An "Actuarial Class" (Claims 1, 3, 6-15, And 18)..........................22

SUMMARY OF THE ARGUMENT ....................................................23

ARGUMENT .........................................................................25

I.   STANDARD OF REVIEW ...............................................25

II.   THE BOARD ERRED IN ITS OBVIOUSNESS DETERMINATION FOR CLAIMS 1, 3, 6-15, AND 18, ALL OF WHICH REQUIRE AN "ACTUARIAL CLASS OF INSURANCE"........25

A.   The Prior Art Does Not Disclose The Claimed "Actuarial Class"..................................................27

1.   Herrod Does Not Disclose The Required "Expected Loss" For An "Actuarial Class" In An Insurance Context ..................................................27

2.   Bouchard And Pettersen Do Not Disclose An "Actuarial Class of Insurance" ......................29

B.   The Purported Knowledge Of A Person Of Ordinary Skill Does Not Fill The Prior Art's Gap On "Expected Loss"....................30

III.   THE BOARD'S FINDING OF OBVIOUSNESS OF CLAIMS 1 AND 3 RESTS ON IMPROPERLY READING OUT THE "LOG" LIMITATION ......................................................34

IV.   THE BOARD ERRED IN FINDING CLAIMS 4-5 AND 16-17 OBVIOUS WITHOUT ARTICULATING A REASON TO COMBINE ......................................................38

V.   THE BOARD IMPROPERLY RELIED ON NEW GROUNDS AND EVIDENCE IN ITS OBVIOUSNESS DETERMINATION ..............41

A.   At A Minimum, Progressive Is Entitled To A Remand To Respond To The New Rejection Grounds ..........................41

1.    The Board's Finding That Bouchard's "Black Box"
Meets The "Log" Limitation Of Claims 1 And 3 Is An
Improper New Ground For Rejection ...................................... 43

2.    The Board Improperly Relied On New Grounds With
Respect To "Actuarial Class" ................................................... 45

B.    The Board Erred By Not Excluding Evidence That Should
Have Previously Been Presented In Liberty's Petition ....................... 47

CONCLUSION ..................................................................................... 52

# TABLE OF AUTHORITIES

CASES

*Alco Standard Corp. v. Tennessee Valley Authority*,
  808 F.2d 1490 (Fed. Cir. 1986) ........................................................................40

*CFMT, Inc. v. Yieldup Intern. Corp.*,
  349 F.3d 1333 (Fed. Cir. 2003) ........................................................................34

*Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*,
  754 F.2d 404 (1st Cir. 1985) ............................................................................47

*Dayco Prods., Inc. v. Total Containment, Inc.*,
  329 F.3d 1358 (Fed. Cir. 2003) ........................................................................37

*Dickinson v. Zurko*,
  527 U.S. 150 (1999) ..........................................................................................42

*Ex Parte Burrowes*,
  110 O.G. 599 (Comm'r Pat. 1904) ....................................................................42

*In re Biedermann*,
  733 F.3d 329 (Fed. Cir. 2013) .................................................................. 25, 42

*In re Glatt Air Techniques, Inc.*,
  630 F.3d 1026 (Fed. Cir. 2011) ........................................................................26

*In re Kahn*,
  441 F.3d 977(Fed. Cir. 2006) ................................................................... 33, 38

*In re Leithem*,
  661 F.3d 1316 (Fed. Cir. 2011) ........................................................... 42, 46, 47

*In re Royka*,
  490 F.2d 981 (CCPA 1974) ...............................................................................34

*In re Stepan*,
  660 F.3d 1341 (Fed. Cir. 2011) ................................................... 42, 44, 45, 46, 47

*In re Zurko*,
  258 F.3d 1379 (Fed. Cir. 2001) ........................................................................39

*InTouch Techs., Inc. v. VGo Commc'ns, Inc.*,
  751 F.3d 1327 (Fed. Cir. 2014) ........................................................................41

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007) ............................................................... 33, 34, 38

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  694 F.3d 51 (Fed. Cir. 2012). ..................................................... 25

*Leo Pharm. Prods., Ltd. v. Rea*,
  726 F.3d 1346 (Fed. Cir. 2013) .................................................. 25

*Motorola, Inc. v. InterDigital Tech. Corp.*,
  121 F.3d 1461(Fed. Cir. 1997) .................................................. 38

*Platronics, Inc. v. Aliph, Inc.*,
  724 F.3d 1343 (Fed. Cir. 2013) .............................................. 39, 41

*Rambus Inc. v. Rea*,
  731 F.3d 1248 (Fed. Cir. 2013) .............................................. 41, 42

STATUTES

5 U.S.C. §§ 551-559 ................................................................. 41, 42

28 U.S.C. § 1295 ............................................................................. 1

35 U.S.C. § 6 ................................................................................... 1

35 U.S.C. § 103 ............................................................................. 25

35 U.S.C. § 142 ............................................................................... 1

35 U.S.C. § 329 ............................................................................... 1

REGULATIONS

37 C.F.R. § 42.223 ........................................................................ 49

37 C.F.R. § 42.304 ........................................................................ 36

37 C.F.R. § 90.3 .............................................................................. 1

OTHER AUTHORITIES

157 Cong. Rec. S1362 (daily ed. Mar. 8, 2011) (statement of Sen.
  Leahy) .......................................................................................... 11

157 Cong. Rec. S5428 (daily ed. Sept. 8, 2011) (statement of Sen.
  Pryor) ........................................................................................... 11

Amy Danise, *Control Your Own Car Insurance Costs: Pay as You Drive*, Insure.com (May 29, 2009), *available at* http://www.insure.com/car-insurance/usage-based.html ......................................4

Morton & Prange, *Patent owners beware, your patent has a 15 percent chance (or less) of surviving the PTAB, Inside Counsel* (Mar. 19, 2014), *available at* http://www.insidecounsel.com/2014/03/19/patent-owners-beware-your-patent-has-a-15-percent ............................................................................12

Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756 (Aug. 14, 2012) ...................................................... 49, 50, 51

# TABLE OF ABBREVIATIONS

***Parties***

| | |
|---|---|
| Progressive | Progressive Casualty Insurance Company (Appellant) |
| Liberty | Liberty Mutual Insurance Company (Appellee) |

***Patents, Patent Applications, And Printed Publications***

| | |
|---|---|
| the '929 application | U.S. Patent Application No. 13/617,929 (filed Sep. 14, 2012, allowed Sep. 5, 2014) |
| the '958 application | U.S. Patent Application No. 08/592,958 (filed Jan. 29, 1996, issued Aug. 18, 1998) |
| the '358 patent | U.S. Patent No. 8,140,358 (filed Jun. 3, 2008, issued Mar. 20, 2012) |
| the '598 patent | U.S. Patent No. 8,090,598 (filed Jan. 23, 2004, issued Jan. 3, 2012) |
| the '970 patent | U.S. Patent No. 6,064,970 (filed Aug. 17, 1998, issued May 16, 2000) (A7079-96) |
| Bouchard | U.S. Patent No. 5,465,079 (issued Nov. 7, 1995) (A7097-132) |
| Black Magic | "An Interest in Black Magic – Motor Technology," *Insurance Age Magazine* (Jan. 1, 1994) |
| Camhi | U.S. Patent No. 5,430,432 (issued Jul. 4, 1995) (A7205-212) |
| Dorweiler | Paul Dorweiler, *Notes on Exposure and Premium Bases in* XVI, Part II, PROCEEDINGS OF THE CASUALTY ACTUARIAL SOCIETY 319-343 (1930) (A7171-204) |
| Florida Guide | 1998 Automobile Insurance Shoppers' Guide, Florida Department of Insurance (A7151-70) |

| Herrod | UK Patent Application GB 2 286 369 (published Aug. 16, 1995) (A7145-50) |
| Kosaka | JP H4/182868 (Jun. 30, 1992) |
| Pettersen | PCT Patent Pub. No. WO 90/02388 (Mar. 8, 1990) (A7133-44) |

### *Defined Terms*

| AIA | Leahy–Smith America Invents Act |
| APA | The Administrative Procedure Act |
| ASOP | Actuarial Standard Of Practice |
| Board | Patent Trial and Appeal Board |
| CBM | Covered Business Method |
| CBMPR | Covered Business Method Patent Review |
| CRU | Central Reexamination Unit |
| PHOSITA | Person Having Ordinary Skill In The Art |
| PTAB | Patent Trial and Appeal Board |
| PTAB Practice Guide | Office Patent Trial Practice Guide |
| USPTO | United States Patent and Trademark Office |

## STATEMENT OF RELATED CASES

Pursuant to Fed. Cir. R. 47.5, Progressive Casualty Insurance Co.

("Progressive") identifies the following cases that will directly affect or be directly

affected by this Court's decision in the present appeal.

1. *Progressive Cas. Ins. Co. v. Safeco Ins. Co.*, No. 1:10-cv-1370 (N.D. Ohio).

2. *Progressive Cas. Ins. Co. v. Allstate Ins. Co.*, No. 1:11-cv-00082 (N.D. Ohio).

3. *Progressive Cas. Ins. Co. v. State Farm Mut. Auto Ins. Co.*, No. 1:12-cv-1068 (N.D. Ohio).

4. *Progressive Cas. Ins. Co. v. Liberty Mut. Ins. Co.*, No. 2014-1466 (Fed. Cir.) (appeal from CBM 2012-00002).

The following are identified as appeals from the Board's decisions in

covered business method reviews of patents that are related to, but distinct from,

U.S. Patent No. 6,064,970 ("'970 patent") that is the subject of the present appeal.

All are currently pending before this Court.

1. *Progressive Cas. Ins. Co. v. Liberty Mut. Ins. Co.*, No. 2014-1586 (Fed. Cir.) (appeal from CBM2013-00004 involving U.S. Patent No. 8,090,598) ("'598 patent")

2. *Progressive Cas. Ins. Co. v. Liberty Mut. Ins. Co.*, Nos. 2014-1636, -1637 (Fed. Cir.) (appeals from CBM2012-00003 involving U.S. Patent No. 8,140,358) ("'358 patent").

3. *Progressive Cas. Ins. Co. v. Liberty Mut. Ins. Co.*, No. 2014-1639 (Fed. Cir.) (appeal from CBM2013-00009 involving the '358 patent).

# JURISIDICTIONAL STATEMENT

The Board purported to exercise jurisdiction over Liberty Mutual Insurance Company's ("Liberty's") Petition under 35 U.S.C. § 6 and Section 18 of the Leahy-Smith America Invents Act ("AIA").  The Board issued a Final Written Decision on January 23, 2014.  A7000.  Progressive timely appealed on June 2, 2014.  A11671-74; 37 C.F.R. § 90.3; 35 U.S.C. § 142; *see also* Fed. R. App. P. 4(a)(1).  This Court has jurisdiction over Progressive's appeal pursuant to 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 329.  The decision appealed from is final.

# STATEMENT OF THE ISSUES

1.    Whether the Board erroneously found that substantial evidence supported the obviousness of claims 1, 3, 6-15, and 18, which require "actuarial classes of insurance," in light of the fact that none of the prior art relied upon by the Board discloses groupings related to "expected loss."

2.    Whether the Board erred in rendering a determination of obviousness of claims 4-5 and 16-17, which require the generation of an "insured profile," without articulating a reason to combine and in reliance on forbidden hindsight.

3.    Whether the Board erred in reading out the limitation of claims 1 and 3 requiring "a corresponding log of vehicle speed for the time and location" by finding this limitation was disclosed by references that purported only to separately measure "time" and "location."

4.     Whether the Board erred in basing its obviousness determination for claims 1 and 3-18 at least in part on: (i) improper new grounds raised for the first time in its Final Written Decision; and (ii) new evidence presented by Liberty at the end of the briefing schedule, which improperly precluded Progressive from providing a meaningful response and requires remand.

### STATEMENT OF THE CASE SETTING OUT
### THE FACTS RELEVANT TO THE ISSUES

## I.     PROGRESSIVE'S USAGE-BASED INSURANCE INVENTION

### A.     Progressive Pioneers Usage-Based Insurance

Progressive owns a family of patents directed to its invention of usage-based insurance, which Progressive pioneered with its "Snapshot" program.  A10749-50. Progressive's custom-built Snapshot device is shown below:



A10755.  The Snapshot device plugs into a car's onboard diagnostic port (i.e., an electronic connection to the vehicle's computer), where it records information transmitted across a vehicle's internal data communication system (i.e., a vehicle bus) such as time of day, vehicle speed, miles driven, and sudden stops.  *See*

2

A7089, 6:23-65; A7090, 7:9-8:25.  With Snapshot, Progressive can remotely access the recorded information through a wireless link.  A7090, 7:18-20. Likewise, a Snapshot user can access the recorded information and view premium information via an online services interface.  *E.g.*, A7084-86, Figs. 4 and 6; A7092, 11:4-7.

Due to Snapshot, Progressive overcame market skepticism and individual privacy concerns to become "one of the early leaders" in the field of usage-based insurance.  A10755.  Although gathering vehicle usage data was known prior to Progressive's invention (A7087-88, 2:38-3:2), the form of the collected usage data was such that it could not practically be used to determine a cost of vehicle insurance.  *See* A7088, 3:3-24.  For example, conventionally collected data often included demographic data, such as a driver's age or marital status (A7087, 1:35-39) or information obtained through a personal interview or public records (*id.* at 1:16-22; 2:43-47).  However, the conventionally collected data did not include actual vehicle usage-based information that correlated to an expected insurance loss or insurance cost, and thus could not be used to predict future usage of a vehicle.  *Id.* at 2:43-53.

Other insurers, such as Liberty, have not been blind to Progressive's accomplishments with usage-based insurance and have sought to replicate Progressive's success.  *See* A10755-56.  One commentator noted: "While

3

Progressive was first out of the gate in implementation of usage-based car insurance, there's a pack forming at the starting line."[1]

### B.    Progressive's Usage-Based Insurance Patents

On January 29, 1996, Progressive filed U.S. Patent Application No. 08/592,958 ("'958 application") seeking protection for its usage-based insurance inventions.  A7079.  Progressive subsequently filed several continuation and continuation-in-part patent applications, which culminated in the issuance of patents related to Progressive's invention, including the '970 patent (highlighted in red in the patent family tree below), a continuation of the '958 application.

---

[1] Amy Danise, *Control Your Own Car Insurance Costs: Pay as You Drive*, Insure.com (May 29, 2009).

**Figure 1: Progressive's Usage-Based Insurance Patent Family**



On September 5, 2014, the USPTO allowed a related application of the '970 patent, U.S. Patent Application No. 13/617,929 ("'929 application").  Notably, the USPTO allowed the '929 application over each and every one of the references cited to the Board in this case.

### C.    The '970 Patent

#### 1.    Background Regarding Determination of Automobile Insurance Premiums

Automobile insurance involves the transfer of risk of financial loss arising from ownership and operation of an insured vehicle.  A10942, ¶ 23; A10898.  An automobile insurance premium is determined so as to reasonably reflect both the degree of risk (also called "expected loss") being transferred, and the operational expenses associated with insurance, e.g., expected operational and administrative expenses and the insurer's cost of capital.  A10943-44, ¶¶ 25-26.

"Expected loss" in the insurance context is the probability of an expected claim under an insurance contract due to a covered loss or accident multiplied by the expected claim severity under that insurance contract.  *See* A11215, ¶ 11; A10941, ¶ 18.  Notably, the probability of an expected claim is different than the probability of an accident because an insured may not submit a claim for an accident.  *See* A10941, ¶ 18.

Insurers group insureds with similar risk characteristics and expected losses.  A10940, ¶ 16.  These risk groupings are called "actuarial classes."  *Id*.  Insurers use actuarial class claims data to determine expected loss.  *Id.*  Prior to Progressive's invention of the subject matter of the '970 patent, actuarial classes were generated based on gathering relevant historical data from a personal interview and collecting an applicant's public motor vehicle record.  A7087, 1:17-22.  Conventional

actuarial classes were based on classifications such as the age, type, and value of the vehicle, and the driver's age, marital status, and gender. *Id.* at 1:28-58.

### 2.     The Patent's Disclosure

In the usage-based insurance system of the '970 patent, actual operator and vehicle driving characteristics are acquired to derive data elements that can be used to determine a cost of vehicle insurance.  A7088, 3:60-4:30.  This system provides an insurance cost based on an insured's actual driving behavior and operational characteristics, as opposed to conventional practices that estimate insurance cost based on demographic data or historical metrics, like prior traffic violations. A7087, 1:16-27; A7088, 3:40-50; *see also* A7095, 1:32-33; A7095, 2:31-32; A7095, 2:59-62; A7095, 1:60-61; A7095, 2:14-17.  By determining insurance costs or insurance ratings from actual driving data, the system allows vehicle operators to directly control insurance costs and pay for insurance based on how they actually drive.  A7089, 6:24-43.  The system processes monitored vehicle data to determine those insurance costs and ratings.  *Id.* at 5:34-47.

The '970 patent has 17 claims directed to telematics-based methods to generate, communicate, and process data reflecting actual driver behavior and vehicle operating characteristics used to determine insurance ratings or insurance costs.  *Id.*; A7095-96.

1. A method of generating a database comprising data elements representative of operator or vehicle driving characteristics, the method comprising:

*generating acturial classes of insurance, which group operators or vehicles having a similar risk characteristic, from actual monitored driving characteristics during a selected time period* as represented by recorded data elements representative of an operating state of the vehicles or an action of the operators; and

monitoring a plurality of the data elements representative of an operating state of a vehicle or an action of [the] *an* operator during a *latter* selected time period; and,

recording selected ones of the plurality of data elements into the database when said ones are determined to be appropriate for recording relative to determining a cost of insurance for the vehicle during the *latter* selected time period, said ones including, a time and location of vehicle operation and a corresponding log of vehicle speed for the time and location.

4. A method of insuring a vehicle operator for a selected period based upon operator driving characteristics during the period, comprising, steps of:

generating an initial operator profile;

*generating an insured profile for the vehicle operator prior to any monitoring of any of the vehicle operator's driving characteristics wherein the insured profile comprises coverage information, including limits and deductibles, for determining a base cost of vehicle insurance for the vehicle operator;*

monitoring [operator] *the vehicle operator's* driving characteristics during the selected period; and deciding a *total* cost of vehicle insurance for the *selected* period based upon the [operating] *vehicle operator's driving* characteristics monitored in that *selected* period *and the base cost of insurance.*

5. A method of determining a cost of vehicle insurance for a selected period based upon monitoring, recording and communicating data representative of operator and vehicle driving characteristics during said period, whereby the cost is adjustable by relating the driving characteristics to predetermined safety standards *that are related to a safe operation of a vehicle,* the method comprising:

determining an initial insured profile *for the operator of the vehicle prior to any monitoring of any data elements representative of an operating state of the vehicle or an action of the operator of the vehicle* and *determining* a base cost of *the* vehicle insurance based on said *initial* insured profile *wherein the initial insured profile comprises coverage information, including limits and deductibles;*

monitoring a plurality of *the* data elements representative of [an] *the* operating state of [a] *the* vehicle or [an] *the* action of the operator *of the vehicle* during the selected period;

recording selected ones of the plurality of data elements when said ones are determined to have a preselected relationship to the safety standards;

consolidating said selected ones for identifying a surcharge or discount to be applied to the base cost; and,

producing a final cost of vehicle insurance for the selected period from the base cost and the surcharge or discount.

6. A method of monitoring a human *operator* controlled power source driven vehicle, the method comprising:

extracting one or more data elements *by a computer programmed to monitor sensor data* from at least one sensor wherein the one or more elements are *actual driving characteristics* of at least one operating state of the and [the] at least one [human's] *human operator's* actions during a data collection period;

analyzing, grouping, and storing the one or more data elements as group data values in a first memory related to a predetermined group of elements; and,

correlating the group data values to preset values in a second memory and generating an output data value based on the correlation wherein the output data value is used to compute an insurance rating for the vehicle [FOR the data collection period] *for the data collection period that is based on an actuarial class of insurance which groups other human operator controlled power source driven vehicles having a similar operator or vehicle risk characteristic and which also represents the actual driving characteristics of the vehicle monitored and recorded from the at least one sensor.*

18. A method of monitoring a human operator controlled power source driven vehicle, the method comprising:

extracting one or more data elements by an on-board computer from at least one sensor wherein the one or more elements are actual driving characteristics of at least one operating state of the vehicle and at least one human operator's actions during a data collection period;

analyzing, grouping, and storing the one or more data elements as group data values in a first memory related to a predetermined group of elements;

correlating the group data values to preset values related to safety standards in a second memory and generating an output data value based on the correlation; and

computing an insurance rating based upon the output data value for the vehicle for the data collection period, in which the insurance rating is also based on an actuarial class of insurance wherein said actuarial class of insurance groups other human operator controlled power source driven vehicles having a similar operator or vehicle risk characteristic as well as represents the actual driving characteristics of the vehicle monitored and recorded from the at least one sensor, and setting prospective insurance premiums based on the actuarial class of insurance.

8 (facing)

Claims 1, 4-6, and 18 are independent claims, and claims 3 and 7-17 are dependent claims.[2]  A7095-96.  Claim 1 is directed to generating a database that stores operator or vehicle driving characteristic data related to a cost of insurance.  A7095, 1:27-29; 1:40-46.  The data include a time and location of a vehicle's operation and a corresponding log of vehicle speed for that time and location (the "log" limitation).  *Id.* at 1:44-46.  Claims 4-5 refer to methods that generate and process an insured's profile to determine an initial base cost of insurance (the "insured profile" limitations).  *Id.* at 1:54-59; 2:6:13.   The methods of claims 4-5 monitor vehicle operating data to identify a surcharge or discount and generate a final cost of vehicle insurance for a selected time period.  A7095, 1:60-65, 2:14-25.  Claims 1, 6, and 18 refer to methods that generate an insurance rating based on actuarial classes of insurance (the "actuarial class" limitations).  *Id.* at 1:30-36, 2:37-48; A7096, 3:4-4:5.

Portions of independent claims 1, 4, 5, 6, and 18 particularly relevant to issues in this appeal are highlighted on the facing page.  *See* A7095-96 (highlighting added).  Italicized portions of the claims were added, and bracketed portions were deleted during the ex parte reexamination of the '970 patent.  *Id.*; *see also* A7597-603.

---

[2] Claim 2 was cancelled during reexamination.  A7597; A7095, 1:16.

### 3. Prosecution And Reexamination History

As shown in Figure 1, *supra* Section I.B, at 5, the '970 patent issued from a continuation of the '958 application, now U.S. Patent No. 5,797,134. A7079; A7087, 1:5-7.

The '970 patent was reexamined at length in a reexamination Liberty requested. A10218-19; A10282. After more than a year of repeated and rigorous examinations based on many of the same references and arguments Liberty raised before the Board, including arguments relating to U.S. Patent No. 5,465,079 ("Bouchard"), PCT Patent Pub. No. WO 90/02388 ("Pettersen"), JP H4/182868 ("Kosaka"), and "An Interest in Black Magic – Motor Technology," *Insurance Age Magazine* ("Black Magic"), the claims of the '970 patent were found novel and nonobvious by a panel of highly trained and experienced examiners in the Central Reexamination Unit ("CRU"). *See* A10287-89; A7094-96.

During reexamination, claims 1 and 3-6 were amended; claim 2 was canceled; and claims 16-18 were added. A7095-96. Specifically, independent claim 1 was amended to recite *"generating actuarial classes of insurance . . . from actual monitored driving characteristics"* (A7095, 1:30-36), and independent claims 6 and 18 were amended to recite "comput[ing] an insurance rating for the vehicle . . . *based on an actuarial class of insurance*" which "*groups other human operator controlled power source driven vehicles having a similar operator or*

9

*vehicle risk characteristic*" and "*represents the actual driving characteristics of the vehicle*." A7095, 2:41-48; A7096, 3:4-4: 6 (italicized portions added during reexamination).

In its Notice of Intent to Issue Ex Parte Reexamination Certificate, the CRU held that one of skill in the art would understand that *actual driving data is used to generate the actuarial classes*. A7604-07. Consequently, the CRU concluded that neither Bouchard, Kosaka, nor Black Magic disclosed the features of amended claim 1. A7608-09. Specifically, with respect to claim 6 and pending claim 70 (now issued claim 18), the CRU likewise determined that their features were not disclosed by Bouchard. A7615-16.

Claims 4-5 were amended during reexamination to include the italicized limitations shown below relating to an "insured profile":

| Claim 4 | Claim 5 |
|---|---|
| *generating an insured profile for the vehicle operator prior to any monitoring of any of the vehicle operator's driving characteristics wherein the insured profile comprises coverage information, including limits and deductibles, for determining a base cost of vehicle insurance for the vehicle operator.* A7095, 1:54-59. | determining an initial insured profile *for the operator of the vehicle prior to any monitoring of any data elements representative of an operating state of the vehicle or an action of the operator of the vehicle* and *determining* a base cost of *the* vehicle insurance based on said *initial* insured profile *wherein the initial insured profile comprises coverage information, including limits and deductibles.* A7095, 2:6-13. |

In allowing claims 4 and 5, the CRU explained that "Kosaka '868 . . . does not clearly and explicitly teach [these limitations] . . . . The prior art. . .[of] Bouchard '079 and Black Magic also do not teach such insured profile determination/generation and vehicle insurance base cost determination based thereon." A7611-12.

## II. LIBERTY'S FILING OF CBMPR PETITIONS CHALLENGING THE '970 PATENT

### A. Liberty's CBMPR Strategy

On the very first day of the CBMPR program, September 16, 2012, Liberty filed the first of ten CBMPR petitions attacking Progressive's patents covering its usage-based insurance and online servicing inventions.[3] These CBMPR petitions followed Liberty's prior ex parte reexamination attacks against three Progressive patents, including its attack against the '970 patent.[4]

Liberty's serial attacks on Progressive's portfolio include six Covered Business Method ("CBM") petitions directed to the '970 patent family alone. *See*

---

[3] In addition to the CBMPRs underlying the appeals listed in the Statement of Related Cases, Liberty also filed CBM2012-00011, CBM2013-00001, and CBM2013-00003 for which trials were denied. *See supra*, at x.

[4] Liberty's strategy is contrary to the Congressional intent behind CBMPR to target a class of patents that are commonly associated with non-practicing entities. 157 Cong. Rec. S1362 (daily ed. Mar. 8, 2011) (statement of Sen. Leahy). "Section 18 is not intended to allow owners of valid patents to be harassed or subjected to the substantial cost and uncertainty of the untested review process." *See* 157 Cong. Rec. S5428 (daily ed. Sept. 8, 2011) (statement of Sen. Pryor).

'970 patent (CBM2012-00002, -00004); '358 patent (CBM2012-00003,

CBM2013-00009); and '598 patent (CBM2013-00003, -00004).

Like most patents reviewed by the Board in the initial months of the

CBMPR program, not one claim of any patent challenged by Liberty has ultimately

survived CBMPR.  Indeed, it has been reported that of the 357 claims evaluated

under the CBMPR program between its inception and March 2014, only 13 claims

survived.[5]

## B.    Liberty's Petition Challenging The '970 Patent

Liberty's CBMPR Petition listed six grounds for institution.  A7215-18;

A10832-33.  The Board instituted on four of those grounds.  A10854.  The Board

instituted review of independent claims 1, 6, and 18 based on the combination of

Bouchard, Pettersen, and UK Patent Application GB 2 286 369 ("Herrod").  *Id.*

Review of independent claims 4-5 was instituted based on the combination of

Bouchard, Pettersen, and 1998 Automobile Insurance Shoppers' Guide ("Florida

Guide").  *Id.*; A7007.[6]

---

[5] Morton & Prange, *Patent Owners Beware, Your Patent has a 15 Percent Chance (or Less) of Surviving the PTAB*, Inside Counsel (Mar. 19, 2014).

[6] The Board also instituted review of dependent claims 9, 12, and 15 based on two grounds involving combinations of Bouchard, Pettersen, and Herrod with U.S. Patent No. 5,430,432 ("Camhi") and Paul Dorweiler, *Notes on Exposure and Premium Bases in* XVI, Part II, Proceedings of the Casualty Actuarial Society 319-343 (1930) ("Dorweiler").  A10854.

In instituting review against claims 1, 6, and 18, the Board rejected Liberty's argument that the combination of Bouchard and Pettersen discloses all of the elements of these claims – including the "actuarial class" limitations of independent claims 1, 6, and 18 and their dependents (claims 3 and 7-15). A10854; A7215-18.  As a result, Liberty's patentability challenges to claims 1, 3, 6-15 and 18 rested on whether Herrod suggests the claimed actuarial class of insurance.  *See* A10854; A7007.  Its challenge to claim 1 further relied on Bouchard's Figure 18 for allegedly disclosing storage of time and vehicle location, and a corresponding log of vehicle speed, for time and location.  A7258-59.

Similarly, the Board rejected Liberty's argument that the combination of Bouchard and Pettersen suggests all of the elements of claims 4-5 – including the "insured profile" limitation.  A10854.  As a result, Liberty's patentability challenges to claims 4-5 rested on the Florida Guide for allegedly disclosing an "insured profile" that determines a base cost of vehicle insurance.  *See id.*; A7007.

## C.    The Alleged Prior Art

### 1.    Bouchard

Bouchard, a reference that was overcome during the reexamination of the '970 patent (*see* A7611-12), discloses a device for evaluating a driver's performance.  A7097 (Abstract).  The Bouchard device monitors and compares a particular driver's patterns against that driver's past driving patterns.  A7118,

5:13-29. Bouchard never mentions insurance. *See generally* A7118, 5:6-6:39 (Summary of the Invention). Bouchard also does not disclose actuarial classes: (1) as recognized in the reexamination, (2) which Liberty did not dispute in its Reply to the Patent Owner Response, and (3) as indicated by the Board's refusal to institute review based on Bouchard and Pettersen alone. *See* A7608-09; A7612-16; A10854; A11187. While Bouchard makes a passing reference to using geographic positioning information, it does not explain how this information is used. *See, e.g.*, A7120, 9:38-50.

### 2. Pettersen

Pettersen discloses an apparatus for registering the driving pattern of a vehicle. A7133. The apparatus records information regarding "speeds and the accelerations/retardations of the motor vehicle." *Id.* More specifically, Pettersen's apparatus connects to a vehicle's wheels or gear box and generates signals proportional to the vehicle's speed. A7136. The apparatus contains a number of counters (e.g., 0-10 km/h, 10-20 km/h, etc.). *Id.* The proportional speed signals generated by the Pettersen apparatus cause the respective counters to increment. *Id.* The sum of all of the counters equals the total distance traveled. *Id.* Based on the speed signals, Pettersen's apparatus generates a signal representing the accelerations/retardation of the vehicle that is recorded in the appropriate counters. *Id*.

The Board did not rely on or cite any passages in Pettersen for alleged disclosure of actuarial classes of insurance, and it rejected Liberty's argument that Bouchard and Pettersen alone taught generating an "actuarial class." *See* A7032-43; A10854. Pettersen does not describe any process for rating insurance. *See* A10948-49, ¶¶ 36-39. Virtually the entire reference describes the circuit designs recording vehicle speed and the process of calculating acceleration/retardation (the time derivative of speed). A7133; A7136-41. Pettersen theorizes that insurance companies may have an interest in recording driving patterns to determine a "bonus arrangement," but does not provide any details of such an arrangement. *See* A7135; *see also* A10948, ¶¶ 36-37.

Pettersen describes using "speed counters" to measure distance travelled but does not disclose monitoring the location of vehicle operation. *See* A7137-38. Likewise, it does not disclose storing a time and location of vehicle operation and a corresponding log of vehicle speed for both the time and location. Thus, Pettersen would not distinguish between driving 50 mph in a school zone and driving 50 mph on the highway. A10948, ¶ 38.

### 3.    Herrod

Herrod measures driver-acceleration patterns. A7145. The four-page published application reports on the needs for continued driving education and driver-performance evaluations. A7146. By monitoring driver acceleration,

15

Herrod provides feedback to the driver on how to change driving habits to reduce accident risk. *Id.* Like Bouchard, Herrod does not mention actuarial classes, expected insurance losses, or maintaining a log of vehicle speed for time and location, nor does it explain how it could be used for insurance rating.

### 4.    Florida Guide

The Florida Guide is a "shoppers' guide" that provides general information about auto insurance in Florida. *See* A7151-52. Based on historical information and statutory requirements, the Florida guide explains when insurance coverage is required and, generally, the expected costs for various types of coverage. *See, e.g.,* A7154-59; A7162-68. It provides "shopping tips" for the consumer, but does not disclose how insurance costs are generated. *See, e.g.,* A7160. The Florida Guide describes the same conventional, non-usage based insurance practices discussed in the Background of the Invention section of the '970 patent. *See* A7087, 1:17-2:37.

## III.    THE BOARD'S DECISIONS

### A.    Institution Decision

In deciding to institute review of the '970 patent, the Board construed nine different claim terms, including "actuarial class" and the related terms "initial operator profile" and "initial insured profile" (collectively, "insured profile limitation"). A10840-41. With respect to "actuarial class" and "insured profile," the Board adopted wholesale and without comment Liberty's proposed

constructions. *Id.* According to the Board, the original constructions offered in Liberty's pleadings "seem to be consistent with the specification." A10840. Later, the Board retreated from these constructions with new factual findings, inferences, and claim constructions presented for the first time in the Final Written Decision. A7007-15.

## B.   Final Written Decision

### 1.   The Board's Claim Constructions

Progressive's Response to the Institution Decision proposed claim constructions for "actuarial class" and "insured profile." A10905; A10907. The Board's Final Written Decision rejected both parties' proffered constructions as not providing the broadest reasonable constructions, and adopted revised claim constructions. *Compare* A7008-10; A7012-13 *with* A10840-41.

#### a.   "Actuarial Class"

The constructions proposed and adopted for "actuarial class" were:

| Term | Petition/Institution Decision (Adopting Liberty's Proposed Construction) | Progressive's Response | Final Written Decision |
|------|------|------|------|
| **Actuarial class** (claims 1, 3, 6-15, 18) | A combination/group /groupings related to loss/risk/safety which are determined from classifications/characteristics representative of motor vehicle operational characteristics and driver | A grouping of risks (*i.e.,* insureds) with similar risk characteristics and expected insurance claims loss (or | A grouping related to expected loss, which is determined from motor vehicle characteristics |

| | behavior for which data is gathered.  A7241-42; A10840. | insurance costs). A10905. | or driving characteristics. A7010. |
|---|---|---|---|

The Board agreed with Progressive that within the context of the specification and vehicle insurance, actuarial classes are based on expected loss. A7008; A10902-03.  Nonetheless, the Board rejected Progressive's construction for the stated reason that it believed it rendered claim terms "insignificant, if not wholly superfluous" and improperly "exclude[d] a grouping of vehicles."  A7009. As for Liberty's construction, which it initially adopted, the Board expressed concern that the phrases containing the "/" symbol were confusing.  A7008-09.

In the Final Written Decision, the term "actuarial class" is defined as "a grouping related to expected loss, which is determined from motor vehicle characteristics or driving characteristics."  A7010.  In arriving at this construction, the Board did more than simply replace the "/" symbols in its original construction. The Board also removed the requirement that the groupings be determined from vehicle *operational* characteristics *and* driver behavior.  A7010; *see also* A7241-42; A10840.  Instead, as shown by the following strikethroughs, all that was required was that groupings be determined from vehicle ~~*operational*~~ characteristics ~~*and*~~ *or* driving characteristics.  A7010.

### b.    "Insured Profile"

The constructions proposed and adopted for "insured profile" were:

| Term | Petition/Institution Decision (Adopting Liberty's Proposed Construction) | Progressive's Response | Final Written Decision |
|---|---|---|---|
| "Insured profile" | Initial files or information with respect to the operator or the insuring thereof. A7241; A10840.[7] | Basic insurance information pertaining to the insured from which an initial insurance cost is determined. A10907. | "Insurance information pertaining to the insured and the insured vehicle," which includes, for example, insurance coverage information such as limits and deductibles. A7012-13. |

Although the Board recognized that the term "insured profile" should be interpreted consistently with the specification to include "information about [insurance] coverages including limits and deductibles, ***which are necessary*** for establishing ***the appropriate cost*** of insurance of the . . . insured," it ignored aspects of that passage that establish that the information be essential, instead allowing the term "insured profile" to encompass any information that relates to an insured and the insured's vehicle.  A7013 (brackets in original) (emphasis added) (quoting A7091, 10:36-39).

---

[7] Liberty's Petition proposed a combined construction for "'initial operator profile' / 'initial insured profile'" (A7241), which the Board initially adopted in its institution decision.  A10840.  The Board's Final Written Decision, however, provided a construction for "insured profile" that was separate from "initial operator profile."  *See* A7011-13.

2.    **The Board's Erroneous Obviousness Holdings**

a.    **Claims Requiring An "Insured Profile" (Claims 4-5 And 16-17)**

The Board did not make explicit findings why it combined Bouchard, Pettersen, and the Florida Guide to hold independent claims 4 and 5 obvious.[8] Rather, its motivation to combine is a single sentence adopting Liberty's conclusory statement put forth in the Petition.  A7025 (citing A7254).

With respect to Pettersen, the Board rejected Progressive's argument that there was no need for an "insured profile" in Pettersen, since Pettersen focuses on rental car insurance and provides a single insurance premium for all insureds regardless of any distinguishing characteristics among them.  A7025-26; *see also* A10930.  Without providing further reasoning demonstrating why an insured profile would be generated, the Board cited to Pettersen's disclosure that the information may also be of interest in "leasing and ownership of cars" as another basis.  A7026.

The Board also rejected Progressive's argument that Pettersen does not determine a final cost of insurance from a "base cost" because Pettersen focuses

---

[8] Although the Board relied on the Florida Guide in its combination for independent claims 4 and 5, it did not cite or refer to any specific portion of the reference in its obviousness analysis.  *See* A7022-29.  The Board further recognized that the Florida Guide was cumulative of the background of the '970 patent.  A7016.

only on *prospective* cost bonuses.  A7026-27.  Without citation to authority, or any other basis reasonably related to how insurance works, the Board asserted that Pettersen's use of the word "bonus": (1) suggests the existence of an initial premium for a monitored period; (2) does not suggest determining a prospective premium for a renewal period, as argued by Progressive; and (3) applies its "bonus" retroactively to the initial premium for the monitored period.  *See* A7028-29.

    **b.**  **Claims Requiring A Vehicle "Log" (Claims 1 and 3)**

  The Board held that the "log" limitation of claims 1, 3, 11, and 14[9] was disclosed by Bouchard's use of an "event recording apparatus" as a "black box," (A7031-32) notwithstanding the fact that the "black box" was not identified as a log in Liberty's Petition or the parties' briefs.  *See* A7258-59.  Progressive was given no opportunity to address the Board's new findings and reasoning based on Bouchard's event recording apparatus because the argument was not presented in Liberty's Petition or the Board's Institution Decision.  *See* A7258; A10848-51.

---

[9] The Board held that claims 11 and 14 require the "log" limitation.  A7030. However, neither of these claims or their intervening or base claims recites this limitation.  A7093, 13:1-5, 14:3-8.

### c.  Claims Requiring An "Actuarial Class" (Claims 1, 3, 6-15, And 18)

In applying a new claim interpretation, the Board determined that Herrod "discloses [1] classifying drivers into *groups,* [2] *each of which is associated with a different level of accident risk,* [3] *based on actual monitored data*, such as 'levels of acceleration,' that represent driver behavior and vehicle operating characteristics."  A7033 (citing A7145-47) (emphasis in original).

With regard to the requirement that the claimed "actuarial classes" involve a grouping based on "expected loss data," the Board relied on the supposition in Herrod's speculative description that the device might be "*useful to insurance companies*."  A7040 (emphasis in original).  The Board also turned to the Actuarial Standard of Practice ("ASOP") and the conventional, non-usage-based insurance techniques discussed in the background section of the '970 patent for the proposition that "generating actuarial classes of insurance . . . was well known in the art."  A7039-42 (citing A7087, 1:17-2:37; A11178-79).  Based on the foregoing, the Board leaped to the conclusion that "one with ordinary skill in the art would have known to analyze the monitored vehicle data collected by Herrod's device to determine any associated expected loss costs with such data."  A7043.

## SUMMARY OF THE ARGUMENT

The Board's holding that all of the claims of the '970 patent are invalid as obvious should be reversed or alternatively, vacated and remanded for a new proceeding.  The CBMPR underlying this appeal was the fourth CBMPR ever filed under the newly implemented AIA procedures, and is related to companion appeal No. 2014-1466, which was the second filed CBMPR.  As often occurs with the implementation of new procedures, errors are bound to occur – and this case is not the exception.

From the outset, the Board failed to appreciate the intricacies of the insurance process, and specifically how Progressive's new technology of monitoring driving data is used to develop new "actuarial classes of insurance" to derive a total or final cost of insurance from an initial base cost for the driver. Among other things, the Board misunderstood that an "actuarial class of insurance" is based on the likelihood and severity of an insured's claim, and not the equivalent of the risk of an accident occurring.  Armed with this misunderstanding, and guided by Liberty's circular logic and conclusory statements, the Board erred when it found claims 1, 3, 6-15, and 18 obvious based on prior art that does not disclose generating actuarial classes of insurance. Likewise, the Board's misunderstanding of Progressive's technology led it to find claims 1 and 3, reciting the "log" limitation, obvious, where the prior art does not

disclose the claimed limitation. As a result the Board's finding of obviousness as to these claims must be reversed.

The Board committed further error, when contrary to this Court's precedent, it relied on factually unsupported statements and forbidden hindsight to find claims 4-5 and 16-17, reciting the "insured profile" limitation, obvious. Ironically, the Board quoted the same self-serving sentence Liberty provided as a purported reason to combine references that was used in the companion case, although different art is used in each of the respective cases. This alone evidences the impermissible hindsight that was used.

Finally, in piecing together the prior art to arrive at the inventions of the '970 patent, the Board improperly relied on new grounds and evidence offered by Liberty at the close of briefing. Should the Court find that the Board legally erred in relying on new grounds or abused its discretion in relying on inadmissible evidence that was necessary for Liberty to make out its prima facie case against the '970 patent, the Court should reverse, or alternatively, vacate and remand for a new proceeding.

# ARGUMENT

## I. STANDARD OF REVIEW

While Board's factual findings are reviewed for substantial evidence, "whether a claimed invention would have been obvious under 35 U.S.C. § 103(a) is a question of law reviewed de novo." *Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1353 (Fed. Cir. 2013).

Whether the Board relied on a new ground of rejection is a legal question that this Court reviews *de novo*. *In re Biedermann*, 733 F.3d 329, 335 (Fed. Cir. 2013). The Court reviews the denial of a motion to exclude evidence for an abuse of discretion. *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 66 (Fed. Cir. 2012).

## II. THE BOARD ERRED IN ITS OBVIOUSNESS DETERMINATION FOR CLAIMS 1, 3, 6-15, AND 18, ALL OF WHICH REQUIRE AN "ACTUARIAL CLASS OF INSURANCE"

Under the Board's construction of "actuarial class," its obviousness conclusion for claims 1, 3, 6-15, and 18 should be reversed because the prior art does not disclose "actuarial classes" meeting the two requirements of the Board's claim construction. First, under the Board's construction, an "actuarial class" requires a "grouping related to expected loss."[10]  A7010; A10941, ¶¶ 19-20;

---

[10] The relationship between an "actuarial class" and "expected loss" is well-established. Even Liberty's expert, O'Neil, testified that it is known to those of

A10902-06; *see also* A11062, 91:7-11.  Second, the Board's construction of "actuarial class" requires that the grouping be "determined from motor vehicle characteristics or driving characteristics."  A7010.  Although the Board neglected to include any language requiring that the actuarial class pertains to insurance in its construction, the claims also require actuarial classes be "of insurance," indicating that the classes are component parts of an insurance process.  A7095-96, 1:30-35, 2:42-47, 3:4-9 (claims 1, 6, and 18).

None of the prior art before the Board – Bouchard, Pettersen, Herrod, and Florida Guide – discloses an actuarial class meeting the first requirement of the Board's construction: a "grouping related to expected loss" in which the grouping is "of insurance."  Because none of the prior art discloses the claimed "actuarial class" of claims 1, 6, and 18 (and their dependent claims), the Board's obviousness conclusion must be overturned.  *See, e.g.*, *In re Glatt Air Techniques, Inc*., 630 F.3d 1026, 1030-31 (Fed. Cir. 2011) (overturning the Board's obviousness finding where the innovative concept of the claims – involving using an air wall for

---

ordinary skill in the art that "actuarial classes" are based on predicted expected losses and further attested that actuarial classes group similar risk characteristics with differentiated loss costs.  A10972; A11062:7-11; A11064:22-A11065:23.  Liberty's glossary even defines "loss" as "amount sought in a claim."  I*nsurance Glossary*, Liberty Mutual Ins., *available at* http://www.libertymutual.com/insurance-glossary.

"shielding" – was not disclosed by the prior art description of "modulating gas flow" to clear particle blockage).

### A. The Prior Art Does Not Disclose The Claimed "Actuarial Class"

#### 1. Herrod Does Not Disclose The Required "Expected Loss" For An "Actuarial Class" In An Insurance Context

The Board's construction of "actuarial class" requires a grouping related to expected loss, which is not disclosed by Herrod's mention of "different levels of accident risk." A7010; *see also* A7032-35; A7039-43. Both parties' experts agreed that an "expected loss" in the insurance context is the probability of an expected claim under an insurance contract due to a covered loss or accident multiplied by the expected claim severity under that insurance contract. *See* A11215, ¶ 11; A10941, ¶ 18. In other words, an expected loss has two components: (1) a frequency component; and (2) a severity component. A10941, ¶ 18. Notably, the frequency component speaks to more than just the probability of an accident; this component also depends on the probability that the insured will then file a claim.[11] *Id.* Thus, Herrod's mention of "different level of

---

[11] Under an insurance policy, an insured party submits claims to an insurer for damage caused by the insured or otherwise covered under the policy. *See* A10941, ¶ 18. Thus, an insurer has two sources of uncertainty for its policies: (1) whether a claim will be filed, and (2) if so, the amount of the claim. *See id.* The possibility of an accident does not determine whether the insured will submit a claim, and therefore cannot disclose expected loss. *See id.*

accident risk" and "behavioural groups" simply does not disclose an "expected loss." *See* A7146.

Herrod also fails to disclose the second component of an "expected loss" in the insurance context – expected claim *severity* (i.e., the likely cost of the insurance claim), and thus does not disclose an "actuarial class" as required by the claims.  In fact, as discussed below, the Board's improper attempt to address Herrod's deficiencies through generalizations from conclusory declaration testimony regarding the knowledge of a PHOSITA, the '970 patent's background, and the ASOP, confirms that Herrod does not disclose claim severity, and therefore, does not disclose generating actuarial classes of insurance having both components.  *See* A7040-43; Argument Section II.B, *infra*, at 30.

A PHOSITA also would not have understood that Herrod's "accident risk" and "behavioural groups" should be used to generate actuarial classes "of insurance." *See* A10949-50, ¶ 41.  The Board erred in finding otherwise based on Herrod's statement that Herrod's data "might be used by driving training officers, fleet vehicle operators or insurance companies who wish to monitor the standard of driving of certain vehicles."  A7036; A7147.  However, this statement, like the rest of Herrod, concerns assessing driving competence – not generating insurance premiums using actuarial classes of insurance generated from actual monitored driving data.  *See* A7146-47.

### 2. Bouchard And Pettersen Do Not Disclose An "Actuarial Class of Insurance"

Neither Bouchard nor Pettersen discloses the claimed "actuarial class." Liberty effectively conceded that Bouchard does not disclose "actuarial classes" of insurance when it failed to cite in its Petition any portion of Bouchard as disclosing an "actuarial class." A7256; A7275-76; A7298. Further, in deciding to institute a CBMPR, the Board rejected the argument that the combination of Bouchard and Pettersen discloses all elements of independent claims 1, 6, and 18. A10854; *see also* A7007.

Likewise, Pettersen omits any disclosure of the expected claims loss required for an "actuarial class." Even Liberty's original self-serving expert declaration – the only one discussing Pettersen – is silent on this point. A10609-10, ¶¶ 23-24 (citing A7135-36). This declaration discussed Pettersen's "bonus arrangement," and then in conclusory fashion stated that a PHOSITA would have understood that this "bonus arrangement" discloses an actuarial class. A10609-10, ¶¶ 23-24. Additionally, O'Neil's testimony refers to an "actuarial class" under Liberty's proposed construction, which was not adopted by the Board in its Final Written Decision. *See* A10607-08, ¶ 21.

Further, Pettersen's "bonus" is based solely on "policy holders having a 'careful' driving pattern," without consideration of a driver's likelihood of filing a claim if the driver were to get in an accident, or the severity of that potential claim.

A7135.  Thus, Pettersen's "bonus" bears no relation to the two components of an "expected loss" in the insurance context – the frequency and severity of a claim – and does not disclose the claimed "actuarial class."  *See* Argument Section II.A.1, *supra*, at 27.

### B.    The Purported Knowledge Of A Person Of Ordinary Skill Does Not Fill The Prior Art's Gap On "Expected Loss"

Given the lack of any prior art disclosure of a "grouping related to expected loss" as required under the Board's construction of "actuarial class" in claims 1, 3, 6-15, and 18, the Board attempted to draw upon the purported knowledge of a PHOSITA.  A7039-43.  Specifically, the Board reasoned that the PHOSITA would have "known to analyze" the data collected by Herrod's driver training device based on their knowledge of insurance.  A7043.  However, none of the evidence relied upon by the Board – Ms. O'Neil's declaration testimony, the background section of the '970 patent, and ASOP – discloses an "actuarial class" that is formed of "a grouping related to expected loss."  *See* A7040-43.

The Board incorrectly relied on the circular logic presented in O'Neil's belated supplemental declaration submitted with Liberty's Reply to find that Herrod's deficiency on "expected loss" is filled by the knowledge of a PHOSITA.  *See* A7039-43; Argument Section V.B, *infra*, at 47.  The Board merely parroted O'Neil's finding that a PHOSITA "would have known to analyze the monitored

vehicle data collected by Herrod's device to determine any associated expected loss costs . . . ." A7043; *see also* A11223, ¶ 27.

However, O'Neil's reasoning begins with what she attempted to prove. O'Neil's prefaces her analysis with: "A P[H]OSITA would know that, in order to create such behavioural groups relevant to insurance ***rating*** . . . ." A7040 (quoting A11223, ¶ 25) (emphasis added). But that is not what Herrod discloses. Herrod discloses a device used to promote driving safety; it has nothing to do with insurance ratings.

Thus, O'Neil mistakenly assumed that a PHOSITA would understand that Herrod concerns insurance ***rating***. From there, she concluded that a PHOSITA would understand that Herrod's purported disclosure of insurance rating transforms Herrod's behavioral groups into actuarial classes. *Id.* However, Herrod's vague references to driver safety data possibly being "use[ful] to vehicle owners and insurers" does not speak to insurance rating, and thus says nothing about actuarial classes. *See* A7146; A10949-51, ¶¶ 41-43. Such circular logic is a fallacy because O'Neil's premise is just as much in need of proof as is her conclusion.

The Board further erred in relying on the '970 patent's background discussion of "Conventional methods for determining the cost of motor vehicle insurance," which explicitly distinguishes prior art "actuarial classes" from those required by the claims. *See* A7042 (quoting A7087, 1:17-52). The passage cited

31

by the Board describes how ***prior art*** systems create actuarial classes based on

"relevant historical data." *See* A7087, 1:17-52.  The '970 patent subsequently

distinguishes these prior art actuarial classes by explaining that the claimed "new

actuarial classes" are "based on data derived from motor vehicle operational

characteristics and driver behavior," and that such "classes ***heretofore have been***

***unknown in the insurance industry***."  A7089, 5:35-40 (emphasis added).  The

specification further notes that these new "actuarial class[es have] . . . a vastly

reduced rating error over conventional insurance cost systems."  A7088, 3:49-50.

Yet, the Board consistently and erroneously equated the background's description

of conventional actuarial classes with these new classes to find the claimed

"actuarial classes" obvious in light of Herrod.  A7038; A7042-43.

      The Board's reliance on isolated passages from the ASOP that supposedly

show the knowledge of a PHOSITA is equally misplaced.  A7042-43.  The gap

between ASOP's generalizations and the "expected loss" required by the claimed

"actuarial classes" is particularly clear when the teachings of ASOP are applied to

Herrod.  The Board noted that Herrod discloses "behavioural groups" based on

collection of acceleration information and accident statistics.  A7039-40.  The

ASOP provisions quoted by the Board mention use of "professional judgment,"

"statistical tools," and "mathematical analysis" (A7042-43), but fail to disclose

how an actuary would use the information provided by Herrod to predict either of

the agreed-upon requirements for determining "expected loss": (1) the probability

of an expected claim; or (2) the expected severity.[12]  *See* A11215, ¶ 11; A10941,

¶ 18.  Nothing in ASOP articulates how a PHOSITA would determine "expected

loss" costs from the type of information provided by Herrod (e.g., accumulated

acceleration data and surveys), especially when Herrod explains that "accidents are

*such rare events*."  *See* A7146 (emphasis added).  For example, an insurer could

provide a discount based on the insured agreeing to be monitored without any

expected loss calculation.

Further, the Board does not explain why the passages of ASOP on which it

relies render the claimed "actuarial classes of insurance" obvious.  *See* A7042-43.

The Board's conclusory statement that a PHOSITA "would have known to . . . ."

(A7043) is not evidence.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007)

("[R]ejections on obviousness grounds cannot be sustained by mere conclusory

statements; instead, there must be some articulated reasoning with some rational

underpinning to support the legal conclusion of obviousness.") (quoting *In re

Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)).  The Board's generalizations about

---

[12] A PHOSITA would not understand how to associate the naked "acceleration
data" collected by Herrod to "expected loss" without an understanding of the
driving conditions.  *See* A10951-52, ¶¶ 43-45.  For example, frequent
acceleration may not be a predictor of "expected loss" for a driver in an urban
setting whose commute involves numerous traffic lights.  *See id.*; A10925-26.

"professional judgment," "statistical tools," and "mathematical analysis" based on ASOP cannot trump the specific teachings of the '970 patent that the use of an actuarial class of insurance derived from actual driving data was "unknown in the insurance industry." *Id.*; A7089, 5:34-47.

## III. THE BOARD'S FINDING OF OBVIOUSNESS OF CLAIMS 1 AND 3 RESTS ON IMPROPERLY READING OUT THE "LOG" LIMITATION

The Board's finding of obviousness for claims 1 and 3 must be reversed because none of the references relied on by the Board disclose recording a "log" as recited in the claims. *See CFMT, Inc. v. Yieldup Intern. Corp.*, 349 F.3d 1333, 1342 (Fed. Cir. 2003) ("[O]bviousness requires a suggestion of all limitations in a claim.") (citing *In re Royka*, 490 F.2d 981, 985 (CCPA 1974)). Claim 1 of the '970 patent requires the recording of three types of data: "[1] a time and [2] location of vehicle operation and [3] a corresponding log of vehicle speed for the time and location." A7095, 1:44-46. With respect to the third type of recorded data, the recorded log must provide a ***relationship*** between a vehicle speed and each recorded combination of time and location. *Id.*; *see also* A8244-45, ¶¶ 14-16. The "corresponding log of vehicle speed for the time and location" is explicitly recited in the claim, and thus is an element that must be accounted for in the prior art in order to justify an obviousness rejection. *See CFMT*, 349 F.3d at 1342.

34

Separately recording the speed, time, and location of a vehicle, does not equate with recording "a corresponding log" as recited in the claims.

The Board's Final Written Decision implicitly acknowledges that the passage relating to Bouchard's Fig. 18 on which Liberty relied in its Petition for the "log" limitation, does not disclose a "corresponding log of vehicle speed for the time and location" as required by claims 1 and 3. *See* A7031-32. Specifically, the Board consistently cites to Bouchard's geographic positioning information, but fails to make any finding with respect to recording a ***relationship*** between the data elements as a vehicle "log." *Id*. This is not surprising, because Liberty's Petition simply parsed the claim language to individual components by suggesting that Bouchard's Fig. 18 discloses: (1) "monitoring time," (2) "monitoring vehicle location," and (3) "monitoring speed." A7258-59.

First, it is telling that Liberty used the word "monitor" – which is simply an observation – and does not require a recording.[13] There is no evidence to suggest recording a relationship between these data elements. When it came to addressing

---

[13] Rather than monitoring location, Bouchard explains that its device operates by inferring driving environment (either: (1) stopped, (2) in an urban environment, (3) in a suburban environment, or (4) on a highway) based on the vehicle speed at STEP 1801. A7130, 30:7-18. Figure 19 shows Bouchard's driving environment information determines which tests are used to assess the driver's performance. A7115 (illustrating that when stopped only the throttle and blinks tests are applied).

the "corresponding log" language, Liberty's Petition stated: "Bouchard discloses logging *these* data elements of Fig. 18 . . . ." A7259 (emphasis added). Again, Liberty's treatment of Fig. 18 is telling. By using the word "these" to modify "data elements," even Liberty effectively admitted that the *monitored* data elements – i.e., the time, vehicle location, and speed – are stored separately by Bouchard. *Id.* Bouchard simply does not disclose a corresponding *log* of the data elements' *relationships* with one another, and Liberty provides no reason to conclude otherwise.

With an eye towards invalidating all of Progressive's claims, the Board reached beyond Liberty's Petition and cited to new portions of Bouchard directed to a "'black box' to reconstruct an accident more reliably . . . ." A7031; 37 C.F.R. § 42.304(b)(4)-(5) (requiring that a CBMPR petition must be accompanied by all the evidence upon which the petitioner relies in challenging patentability); A7256; A10848-51; A7021-22. The Board's reliance on Bouchard's "black box" is as flawed as it is improper under the CBMPR trial rules, because the "black box" does not purport to record a "corresponding log of vehicle speed for the time and location." A7117, 4:6-41. At most, Bouchard's "black box" discloses separately recording different types of vehicle data. Further, the Board's reliance on Bouchard's "black box" for the first time in its Final Written Decision was contrary to the USPTO's promulgated CBMPR trial rules requiring a petition to

36

present its obviousness case at the outset.  *See* Argument Section V.A.1, *infra*, at

43.

    The Board's incorrect grouping of claims 1, 3, 11, and 14 further evidences

the Board's failure to recognize that the "log" limitation of claims 1 and 3 is a

requirement distinct from simply measuring speed and location.  *See* A7032.  The

Board reasoned that Bouchard discloses "'a time and location of vehicle operation

and a corresponding ***log*** of vehicle speed for the time and location,' as recited in

claims 1, 3, ***11, and 14***."  A7032 (emphasis added).  However, claims 11 and 14

require only the separate recording of "location and time" as data elements.  They

depend from claim 6 which, unlike claim 1, does not require a "log" recording the

corresponding "speed for the time and location."  The language of dependent

claims 11 and 14 does not add a "log."  *Compare* A7093, 13:3-5 (claim 11), 14:5-8

(claim 14) *with* A7094, 1:45-46 (claim 1).  By finding that the "log" limitation

disclosed by prior art met only the separate data element requirements of claims 11

and 14, the Board improperly read the "log" limitation out of claims 1 and 3.  *See,

e.g.*, *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1370 (Fed. Cir.

2003) (finding error where the court's construction and application of prior art

"improperly read out" a requirement of the claims).

    Because none of the prior art identified in Liberty's Petition discloses

recording a "log" that provides a relationship between a vehicle speed and each

recorded combination of time and location, the Board's finding of obviousness must be reversed. *See Motorola, Inc. v. InterDigital Tech. Corp.*, 121 F.3d 1461, 1473 (Fed. Cir. 1997). The facts in *Motorola* are analogous. *See id.* at 1472-73. In *Motorola*, the Federal Circuit reversed a jury verdict of obviousness because no combination of prior art references described the four functions required by the claimed "means to determine synchronization." *Id.* at 1473. Similarly, none of the references at issue in this CBMPR disclose a "log" that performs the claimed function of recording a corresponding time and location.

## IV.    THE BOARD ERRED IN FINDING CLAIMS 4-5 AND 16-17 OBVIOUS WITHOUT ARTICULATING A REASON TO COMBINE

The Board's obviousness determination with respect to independent claims 4 and 5 and the dependent claims 16 and 17 should be overturned because the Board failed to articulate "an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *See KSR*, 550 U.S. at 418. The Supreme Court has advised that "this analysis should be made explicit." *Id.*; *see also id.* ("[T]here must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness") (quoting *Kahn*, 441 F. 3d at 988). Here, the Board simply adopted wholesale, and without analysis, Liberty's asserted motivation to combine Bouchard, Pettersen, and Florida Guide to arrive at an invention containing the "insured profile" of claims 4-5 and 16-17. *Compare*

A7025 *with* A7254.  The entirety of the Board's rationale for this combination is reproduced below:

> [A person of ordinary skill in the art] would have found it obvious to implement Bouchard's system of monitoring vehicle data in view of Pettersen's teachings of using monitored driving characteristics to determine insured risk and premiums with Florida Guide's teachings that insurers are required, in issuing policies, to generate an insured profile comprising coverage information, including limits and deductibles, for determining a base cost of vehicle insurance, ***because insurance companies are required, in issuing policies, to do so***.

A7025 (brackets in original) (emphasis added).

Once the Board's opening paraphrasing of the "insured profile" limitations themselves is set aside, it is apparent that the Board's alleged reason to combine consists of the following eleven word clause: "because insurance companies are required, in issuing policies, to do so."  A7025.  This single sentence, distilled down to the final clause, amounts to nothing more than an unsubstantiated, conclusory statement to the effect that it would be common sense to combine the three references that form the basis of the Board's obviousness determination.  *See Platronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1354 (Fed. Cir. 2013) (holding reliance on "common sense," absent support, was insufficient to provide a reason to combine).  As this Court has explained, "core factual findings in a determination of patentability" cannot rest on the Board's "assessment of what would be . . . common sense."  *In re Zurko*, 258 F.3d 1379, 1386 (Fed. Cir. 2001).  To hold otherwise would defeat the appellate review process for substantial evidence.  *Id.*

39

The Board provided no evidentiary support – not even a single citation to any of the references – for why a PHOSITA *at the time of invention* would have deemed it obvious to select the various portions of these three different references and then combine them in the manner required by the '970 patent.  A7024-26. Nowhere did the Board explain how a PHOSITA would conclude that the combination of elements in these three references, published three years (Bouchard), six years (Pettersen), and eight years (the Florida Guide) before Progressive filed its patent application, would have been obvious; yet, despite insurance companies continuing to issue insurance policies during the span of these years, *no one created it before Progressive*.  *See Alco Standard Corp. v. Tenn. Valley Auth.*, 808 F.2d 1490, 1498 (Fed. Cir. 1986) (finding industry's failure to develop and commercialize a viable solution to be strong evidence of nonobviousness); *see also* A10749-54 (recognizing the commercial success of Progressive's Snapshot program and that other carriers "are following suit"); A10755-57 (same).  The only explanation is impermissible hindsight.

The Board's failure to articulate a reason to combine various purported components of Bouchard, Pettersen, and the Florida Guide is indicative of the Board's improper hindsight reconstruction of the invention of claims 4-5 and 16-17.  Indeed, this Court has cautioned that a reason to combine "is especially important to guard against the dangers of hindsight bias."  *See Platronics, Inc. v.*

40

*Aliph, Inc.*, 724 F.3d 1343, 1354 (Fed. Cir. 2013). Here, hindsight reconstruction

is the only explanation for the Board drawing from three different references with

no "articulated reasoning" to explain the combination. *See InTouch Techs., Inc. v.*

*VGo Commc'ns, Inc.*, 751 F.3d 1327, 1347-48 (Fed. Cir. 2014) ("We must also

keep in mind that which may be made clear and thus 'obvious' to a court, with the

invention fully diagrammed and aided, . . . may have been a breakthrough of

substantial dimension when first unveiled.") (internal citation omitted). It is

impermissible to use hindsight and the patent at issue as guidance to render a claim

obvious. *See id.* at 1348.

## V.    THE BOARD IMPROPERLY RELIED ON NEW GROUNDS AND EVIDENCE IN ITS OBVIOUSNESS DETERMINATION

### A.    At A Minimum, Progressive Is Entitled To A Remand To Respond To The New Rejection Grounds

The Board's cancellation of claims 1, 3, 6-15 and 18 must be vacated to

permit Progressive an opportunity to respond to new grounds for rejection raised

for the first time in the Board's Final Written Decision. *See Rambus Inc. v. Rea*,

731 F.3d 1248, 1255-56 (Fed. Cir. 2013) (applying law regarding new grounds for

rejection to inter partes reexamination). Pursuant to the provisions of the

Administrative Procedure Act ("APA") (5 U.S.C. §§ 551-559) and this Court's

precedent, the introduction of new facts to support the Board's rejections is

improper and warrants remand.

The Supreme Court has made it clear that the Patent and Trademark Office is subject to the APA. *Dickinson v. Zurko*, 527 U.S. 150, 154 (1999); *see also Rambus*, 731 F.3d at 1255-56 (applying APA to inter partes reexamination) Under the APA, the parties are entitled to be "fully and fairly treated" before the USPTO. *See In re Leithem*, 661 F.3d 1316, 1319 (Fed. Cir. 2011); *In re Stepan*, 660 F.3d 1341, 1343-44 (Fed. Cir. 2011). Accordingly, the USPTO is required to provide notice of "the matters of fact and law asserted" prior to an agency hearing. 5 U.S.C. § 554(b)(3). Failure to adhere to these notice procedures requires vacating the Board's decision. *See Rambus* 731 F.3d at 1256.

For more than 100 years, applicants have been afforded the right to respond to new rejections raised for the first time by a reviewing board. *Ex Parte Burrowes*, 110 O.G. 599 (Comm'r Pat. 1904). As this Court has explained, the determination as to whether a decision by the Board presents a new ground of rejection is whether the party "had fair opportunity to react to the thrust of the rejection." *In re Biedermann*, 733 F.3d 329, 337 (Fed. Cir. 2013). "Mere reliance by the Board on the same type of rejection or the same prior art . . . is insufficient to avoid a new ground of rejection where it propounds new facts and rationales to advance a rejection" not previously raised. *See In re Stepan Co.*, 660 F.3d at 1345.

As explained below, with respect to at least the "log" limitation of claims 1 and 3 and the "actuarial class" limitations of claims 1, 3, 6-15, and 18, the Board's

Final Written Decision relies on new facts and rationales for which Progressive never had an opportunity to respond. Remand is required to permit Progressive that opportunity.

**1.    The Board's Finding That Bouchard's "Black Box" Meets The "Log" Limitation Of Claims 1 And 3 Is An Improper New Ground For Rejection**

The Board's finding that Bouchard's "black box" discloses the "log" limitation presented an improper new ground for rejection with respect to claims 1 and 3. A7031-32 (citing A7117, 4:39-41). In its Petition, Liberty relied on Bouchard's Fig. 18 as allegedly disclosing "recording . . . a time and location of vehicle operation and a corresponding log of vehicle speed for the time and location" as required by the "log" limitation of claims 1 and 3. A7258-59 (citing A7114; A7131, 31:36-38; A8394; A8400). Without commenting on this limitation, other than a passing reference to the applicable pages in Liberty's Petition, the Board instituted review of these claims. A10847-51. Thus, prior to the Final Written Decision, it was not asserted that Bouchard's mention of a "'black box' to reconstruct an accident more reliably" disclosed the log limitation. A7258-59; A10847-51. However, this is exactly what the Board relied upon, for the first time, in its Final Written Decision as disclosing this claimed "log." A7031-32.

After dismissing Progressive's arguments against Bouchard's Figure 18 "for fail[ing] to consider Bouchard's disclosure, as a whole . . ." (A7031), the Board *sua sponte* turned to previously unidentified portions of Bouchard to find the mention of a "black box" disclosed the "log" limitation.  A7031-32.  Specifically, the Board made new findings: a PHOSITA "would have recognized that the *actual* location of the vehicle is being recorded in order to allow Bouchard's system to reconstruct an accident reliably, because Bouchard specifically states that its [event recording apparatus] is configured to store a variety of information including geographic position information."  A7031 (citing A7118, 5:66-6:1; A7120, 9:21-50; A7121, 11:1-2) (emphasis in original).  As articulated by the Board: "Based on those disclosures of Bouchard, we determine that Liberty has demonstrated that [a PHOSITA] would have recognized Bouchard's system [discloses the "log" limitation] as recited in claims 1 [and] 3 . . . ."  A7032.  Accordingly, Progressive's first notice that obviousness might be found based on Bouchard's "black box" disclosure combined with Pettersen and Herrod came in the Final Written Decision.

The Board's rejection based on the new "black box" rationale in the Final Written Decision deprived Progressive of its right, under the APA, to respond to this rejection.  *See In re Stepan*, 660 F.3d at 1344 (relying on new factual findings not previously asserted amounts to a new ground of rejection).  That the Board

extracted the basis for its new "black box" rationale from the previously asserted Bouchard reference is immaterial. *See id.* at 1345. Progressive never had an opportunity to present evidence to challenge the particular rationale relied on by the Board. For example, Progressive was denied the opportunity to present argument, declaration testimony or exhibits, to explain why the "black box" does not adequately disclose the "log" limitation. Accordingly, the Board's decision should be vacated and remanded to provide Progressive this opportunity.

### 2. The Board Improperly Relied On New Grounds With Respect To "Actuarial Class"

The Board's finding of obviousness with respect to claims 1, 3, 6-15, and 18 should be vacated and remanded due to the Board's reliance on new grounds in finding that Herrod discloses the claimed "actuarial class" limitations. The Board relied upon O'Neil's improper supplemental declaration as to the understanding of Herrod from the perspective of a PHOSITA along with the ASOP document. A7034; A7040-43 (citing A11212-16, ¶¶ 7-13; A11222-30, ¶¶ 25, 27-29, 31, 35-36, 38). Under this rationale, the Board introduced new factual findings to support O'Neil, and presented new inferences not raised in Liberty's Petition or offered from a PHOSITA's perspective. A7040-43. Yet, before the Board's Final Written Decision issued, Progressive had no notice of this basis for an obviousness rejection. By making and relying on previously unraised factual findings and

inferences, the Board relied on a new ground of rejection. *In re Stepan*, 660 F.3d at 1344.

While the Institution Decision acknowledged that Herrod "must be read in light of the knowledge of [a PHOSITA]," the Board made no factual findings with respect to this knowledge. *See* A10849. In fact, Liberty elected not to present any declaration testimony regarding Herrod's teachings at the petition stage. *See* A10604, ¶ 14; A10637, ¶ 13; A7260. Only after Progressive pointed out the already-apparent flaws in Herrod did Liberty present ten pages of "supplemental" testimony explaining, for the first time, how Herrod's four-page disclosure should be read with regard to "actuarial class" in light of the purported knowledge of a PHOSITA, the '970 patent's background section, and ASOP. A11221-30. Although the Board's Final Written Decision characterizes O'Neil's testimony as being "consistent with Herrod . . . and other evidence on the record with respect to the level of ordinary skill in the art" (A7041), the basis of rejection is wholly different from that presented in Liberty's Petition and the institution decision. *Compare* A7039-43 (analyzing expected loss costs) *with* A10848-51 (containing no mention of expected loss costs); A7256 (same).

The change in the Board's position on "actuarial class" is even more striking than the change in the USPTO's position that was held to constitute a new grounds for rejection in *In re Leithem*, 661 F.3d 1316, 1319-20 (Fed. Cir. 2011). In

*Leithem*, the examiner rejected the claim directed to a personal hygiene device based on its finding that the prior art disclosed fluff pulp.  *Id.* at 1320.  The Federal Circuit held that the Board of Patent Appeals and Interferences's finding that the same prior art reference taught pulp "which may be fluffed" – as opposed to already fluffed pulp – presented a new grounds of rejection.  *Id.* at 1320.  Here, the Board's Final Written Decision presents a new finding that Herrod discloses an expected loss, which is based on new supplemental testimony and new references, including ASOP, raised after Progressive's Response.[14]  A7039-43.  Accordingly, just as in *Leithem*, "fairness dictates" that this case be remanded so that Progressive may have an opportunity to respond.  *See* 661 F.3d at 1320.

### B.    The Board Erred By Not Excluding Evidence That Should Have Previously Been Presented In Liberty's Petition

The Board abused its discretion in admitting evidence presented for the first time with Liberty's reply to find the '970 patent claims obvious.  *See, e.g.*, *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 409-10 (1st Cir. 1985) (holding that the district court abused its discretion by admitting reply brief containing new expert affidavit without allowing opposing party to file rebuttal,

---

[14] It is irrelevant that the ASOP document was submitted by Progressive to support the validity of its claims (A11170).  *See In re Stepan*, 660 F.3d at 1345 (prohibiting the Board from rejecting a patentee declaration as ineffective even though it was only addressed by the patentee).

noting the district court had two options, "it could strike the brief or grant plaintiff as the nonmoving party the opportunity to respond to it.").

Liberty offered no declaration testimony to show how Herrod's behavioral classes would be interpreted as an actuarial class by a PHOSITA when it filed its Petition. A10604, ¶ 14 (identifying that O'Neil did not consider Herrod for her declaration). This stands in stark contrast to Liberty's numerous references to O'Neil's opinions as to a PHOSITA's understanding of the other prior art submitted with Liberty's Petition. *See* A7256 ("P[H]OSITA would have recognized that Pettersen . . . ."); A7276 (P[H]OSITA would have recognized that Pettersen (in combination with Bouchard) . . . ."). Nothing prevented Liberty from proffering such testimony when it challenged the patent. Rather, Liberty made a conscious decision not to do so, and instead laid in waiting for Progressive to demonstrate how the claims were patentable over Herrod. Only then, at a time when Progressive could not respond, did Liberty improperly introduce new evidence as to a PHOSITA's understanding of Herrod. A11209, A11221-30. The Board denied Progressive's motion to strike Liberty's improper new supplemental declaration, and, in fact, instead relied heavily on that declaration in its Final Written Decision. A7033-43 (citing A11212-16, ¶¶ 7-13; A11222-30, ¶¶ 25, 27-29, 31, 35-36, 38); A11349-54. This was prejudicial to Progressive, and as a

result, this Court is left with a skewed and incomplete picture of the patentability of the '970 patent.

The Board's reliance on the new PHOSITA evidence presented in O'Neil's untimely supplemental declaration is contrary to the Board's strict rules regarding introduction of evidence. To prove obviousness, Liberty was required to set forth in its Petition all the bases for its position that the claims of the '970 patent were unpatentable, including all the supporting evidence. *See* 37 C.F.R. § 42.304(b)(4)-(5).[15] It did not do so. At the time that Liberty filed its Petition, it believed that there was sufficient support for its obviousness positions without having to rely on a PHOSITA's understanding of Herrod. The disclosure of Herrod has not changed, so Liberty should not now be permitted to argue belatedly that it needs to rely on the knowledge of a PHOSITA to explain the teachings of this reference.

The USPTO's Trial Practice Guide further confirms the impropriety of the Board basing its decision on issues and evidence improperly presented for the first time in Liberty's reply. *See* Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, at 48,767 (Aug. 14, 2012) (hereinafter "PTAB Practice Guide"). The

---

[15] A limited exception is permitted under 37 C.F.R. § 42.223(b), which allows for the introduction of supplemental evidence, if such introduction is "in the interests-of-justice." In order to submit such evidence, a party must seek authorization to file a motion, which must also demonstrate why the information "reasonably could not have been obtained earlier." *Id.*

Practice Guide states that the Board will not even consider "new issue[s] or belatedly present[ed] evidence" in a reply and cites the presentation of "new evidence necessary to make out a *prima facie* case" as one example of improper new reply evidence. *Id.* at 48,767.

Here, not only did the Board consider Liberty's new PHOSITA evidence and argument, but also the Board repeatedly relied on it to find the "actuarial class" limitation of claims 1, 3, 6-15, and 18 disclosed in the prior art. *See* A7040-43 (citing A11212-16, ¶¶ 7-13; A11222-30, ¶¶ 25, 27-29, 31, 35-36, 38). The Board relied on O'Neil's new supplemental testimony regarding Herrod and ASOP to conclude that "one with ordinary skill in the art would have known to analyze the monitored vehicle data collected by Herrod's device to determine any associated expected loss costs with such data, in order to classify drivers into groups relevant to insurance rating" that O'Neil calls actuarial classes. *See* A7041-43 (citing A11215-16, ¶ 12; 11222-25, ¶¶ 25, 27-29). The error in allowing this testimony is particularly harmful here, as it was presented when Progressive no longer had a meaningful opportunity to address these arguments and present opposing evidence and testimony.[16]

---

[16] While Progressive filed observations related to O'Neil's "supplemental" declaration, the observations were not a sur-reply as observations cannot exceed one short paragraph, include arguments, or new evidence. The USPTO's Trial Practice Guide is clear that observations "should be in the form of: "In exhibit __,

Because Liberty's proffered evidence was untimely and should have been presented with its Petition, this Court should reverse the Order allowing ¶¶ 25, 27-29, 31, and 33 of O'Neil's second declaration.  Because the Board (over Progressive's objection) refused to strike ¶¶ 25, 27-29, 31, and 33 of O'Neil's supplemental declaration, and this testimony was a necessary basis for the Board's decision cancelling claims 1, 3, 6-15, and 18, the Board's Final Written Decision should be vacated and the case remanded for further consideration absent this improper new evidence.

---

on page __, lines__, the witness testified __. This testimony is relevant to the __ on page __ of __. The testimony is relevant because __." PTAB Practice Guide at 48,767-68.

## CONCLUSION

For the above reasons, Progressive respectfully requests this Court reverse the Board's holding that claims 1 and 3-18 of the '970 patent are invalid.  At a minimum, the Court should vacate the Board's holding that claims 1 and 3-18 are invalid and remand for further proceedings and consideration before the Board.


October 31, 2014                              Respectfully submitted,

                                             */s/ Gary M. Ropski*
                                             Gary M. Ropski
                                             Cynthia A. Homan
                                             James A. Collins
                                             Laura A. Lydigsen
                                             Nicholas A. Restauri
                                             BRINKS GILSON & LIONE
                                             455 N. Cityfront Plaza Drive
                                             Suite 3600
                                             Chicago, Illinois 60611

                                             *Counsel for Appellant Progressive*
                                             *Casualty Insurance Co.*

ADDENDUM

# TABLE OF CONTENTS
## TO ADDENDUM

Final Written Decision 35 U.S.C. § 328(a) and
37 C.F.R. § 42.73 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A7000-A7053

U.S. Patent No. 6,064,970 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A7079-A7096

Decision Institution of Covered Business Method Patent Review
37 C.F.R. § 42.208 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A10824-A10855

Trials@uspto.gov                                    Paper 60
571-272-7822                              Entered:  January 23, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
————————

LIBERTY MUTUAL INSURANCE CO.
Petitioner

v.

PROGRESSIVE CASUALTY INSURANCE CO.
Patent Owner
————————

Case CBM2012-00004
Patent 6,064,970
————————

Before JAMESON LEE, JONI Y. CHANG, and MICHAEL R. ZECHER,
*Administrative Patent Judges*.

CHANG, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 328(a) and 37 C.F.R. § 42.73*

Case CBM2012-00004
Patent 6,064,970

## I.    INTRODUCTION

Liberty Mutual Insurance Company ("Liberty") filed a petition on September 16, 2012, requesting a covered business method patent review of U.S. Patent No. 6,064,970 ("the '970 patent") pursuant to section 18(a) of the Leahy-Smith America Invents Act ("AIA").[1]  Paper 1 ("Pet."). Progressive Casualty Insurance Company ("Progressive") filed a patent owner preliminary response.  Paper 8 ("Prelim. Resp.").  Taking into account Progressive's preliminary response, the Board determined that the information presented in Liberty's petition demonstrated that it was more likely than not that the challenged claims are unpatentable.  Pursuant to 35 U.S.C. § 324, the Board instituted this trial on January 25, 2013, as to claims 1 and 3-18 of the '970 patent.  Paper 10 ("Dec.").

During the trial, Progressive filed a patent owner response (Paper 25, "PO Resp."), and Liberty filed a reply to the patent owner response (Paper 30, "Reply").  An oral hearing was held on October 21, 2013.[2]

The Board has jurisdiction under 35 U.S.C. § 6(c).  This decision is a final written decision under 35 U.S.C. § 328(a) as to the patentability of claims 1 and 3-18 of the '970 patent.  We hold that claims 1 and 3-18 of the '970 patent are unpatentable under 35 U.S.C. § 103(a).

---

[1] Pub. L. 112-29, 125 Stat. 284, 329 (2011).

[2] The oral arguments for the instant trial and for CBM2012-00002 were merged and conducted at the same time.  A transcript of the oral hearing is included in the record as Paper 58 ("Tr.").

2

Case CBM2012-00004
Patent 6,064,970

## A.  Related Proceedings

Liberty indicates that the '970 patent was asserted against it in *Progressive Casualty Ins. Co. v. Safeco Ins. Co. of Ill.,* Case No. 1:10-cv-01370 (N.D. Ohio).  Pet. 5.  The '970 patent also is subject to a covered business method patent review in CBM2012-00002.  A final written decision in CBM2012-00002 is entered concurrently with this decision.

## B.  The '970 Patent

The '970 patent relates to a method for determining an automobile insurance premium based on data collected from monitored motor vehicle operational characteristics and operator's driving characteristics.  Ex. 1001, Abs.; 3:61-66.  The method assesses vehicle usage by collecting and recording monitored vehicle data, such as miles driven, types of roads driven, speeds driven, rate of acceleration, and rate of braking.  *Id*. at 4:27-29; 6:29-43.  According to the '970 patent, the method determines insurance costs more precisely and fairly, because new actuarial classes generated based on actual usage of the vehicle and driver behavior are better predictors of loss.  *Id*. at 4:27-29; 4:53-56.

Claims 1, 4-6, and 18 are independent.  Claim 3 depends directly from claim 1; claims 7-15 depend ultimately from claim 6; and claims 16 and 17 depend directly from claim 5.  Claim 4, reproduced below, is illustrative of the claimed subject matter of the '970 patent.

3

Case CBM2012-00004
Patent 6,064,970

> 4.  A method of insuring a vehicle operator for a selected period based upon operator driving characteristics during the period, comprising, steps of:
>
> generating an initial operator profile;
>
> generating an insured profile for the vehicle operator prior to any monitoring of any of the vehicle operator's driving characteristics wherein the insured profile comprises coverage information, including limits and deductibles, for determining a base cost of vehicle insurance for the vehicle operator;
>
> monitoring the vehicle operator's driving characteristics during the selected period; and
>
> deciding a total cost of vehicle insurance for the selected period based upon the vehicle operator's driving characteristics monitored in that selected period and the base cost of insurance.[3]

## C.  Covered Business Method Patent

Upon consideration of Liberty's contentions in the petition and Progressive's arguments in the preliminary response, the Board, in the Decision on Institution, determined that the '970 patent is a covered business method patent as defined in section 18(a)(1)(E) of the AIA and 37 C.F.R. § 42.301, because at least one claim of the '970 patent is directed to a covered business method.  Dec. 3-8.  Accordingly, the Board concluded that the '970 patent is eligible for a covered business method patent review.  *Id.*

In its patent owner response, Progressive argues that the Board must conduct a claim-by-claim analysis and determine that every challenged

---

[3] Ex. 1001, Reexam. Cert., 1:50-65 (original emphases and bracketed matters omitted).

4

Case CBM2012-00004
Patent 6,064,970

claim is directed to a covered business method, before it is authorized, under section 18(a)(1)(E) of the AIA, to review all of the challenged claims. PO Resp. 2-3, n.1.  Progressive asserts that the Board exceeded its "statutory authority to institute review of any patent claim which the Board has not determined to be directed to a covered business method."  *Id.*

Progressive's argument is based on an erroneous statutory construction that interprets the word "patent" in the statutory provision on what is subject to review as "claim."  We decline to adopt such an interpretation.

As in any statutory construction analysis, we begin with the language of the statute.  *In re Swanson*, 540 F.3d 1368, 1374-75 (Fed. Cir. 2008); *Duncan v. Walker*, 533 U.S. 167, 172 (2001); *Crandon v. United States*, 494 U.S. 152, 158 (1990).  "In the absence of a clearly expressed legislative intention to the contrary, the language of the statute itself must ordinarily be regarded as conclusive."  *United States v. James*, 478 U.S. 597, 606 (1986) (internal quotation marks and citations omitted).  "It is well settled law that the plain and unambiguous meaning of the words used by Congress prevails in the absence of a clearly expressed legislative intent to the contrary."  *Hoechst AG v. Quigg*, 917 F.2d 522, 526 (Fed. Cir. 1990).

Section 18(d)(1) of the AIA defines the term "covered business method patent" to mean (emphases added):

> [A] *patent* that claims a method or corresponding apparatus for performing data processing or other operations used in the practice, administration, or management of a financial product

5

Case CBM2012-00004
Patent 6,064,970

or service, except that the term does not include *patents* for technological inventions.

If Congress intended to limit the availability of the covered business method patent review on a claim-by-claim basis, as urged by Progressive, it could have used the term "claim" rather than "patent." Notably, when specifying the subject matter for review, Congress could have used the language "a *claim* that is directed to a method or corresponding apparatus" rather than "a *patent* that claims a method or corresponding apparatus." Section 18(d)(1) of the AIA sets forth a single threshold based on just one claim—the satisfaction of which qualifies an entire patent as eligible for review—rather than a test that must be applied on a claim-by-claim basis to justify review of each claim.[4] Therefore, a *patent* is eligible for a covered business method patent review if the subject matter of at least one claim is directed to a covered business method. Nothing in the legislative history, or other parts of the AIA, requires us to deviate from the plain meaning of the definition set forth in section 18(d)(1) of the AIA, as proposed by Progressive. Moreover, Progressive has not identified any statutory provision or legislative history that requires "each" claim for which trial is instituted to meet the test for a covered business method patent.

Further, Progressive provides no meaningful explanation as to why the Board's analysis—e.g., "[d]etermining a cost of vehicle insurance is a

---

[4] *See also* Transitional Program for Covered Business Method Patents – Definitions of Covered Business Method Patent and Technological Invention; Final Rule, 77 Fed. Reg. 48734, 48736 (Aug. 14, 2012).

6

Case CBM2012-00004
Patent 6,064,970

financial problem rather than a technical problem" (Dec. 8)—was incorrect. PO Resp. 2-3, n. 1.

For the foregoing reasons, we disagree with Progressive that the Board exceeded its statutory authority to institute a covered business method patent review as to claims 1 and 3, 5-18 of the '970 patent.

### D. Prior Art Relied Upon

Liberty relies upon the following prior art references:

| | | | |
|---|---|---|---|
| Camhi | US 5,430,432 | July 4, 1995 | (Ex. 1010) |
| Bouchard | US 5,465,079 | Nov. 7, 1995 | (Ex. 1004) |
| Pettersen | WO 90/02388 | Mar. 8, 1990 | (Ex. 1005) |
| Herrod | GB 2 286 369 A | Aug. 16, 1995 | (Ex. 1007) |

Paul Dorweiler, *Notes on Exposure and Premium Bases in* XVI, Part II, PROCEEDINGS OF THE CASUALTY ACTUARIAL SOCIETY 319-343 (1930) ("Dorweiler") (Ex. 1009).

FLA. DEPT. OF INS., 1988 Automobile Insurance Shoppers' Guide (1988) ("Florida Guide") (Ex. 1008).

N.Y. STATE INS. DEPT., 1995 Consumers Guide on Automobile Insurance (Downstate) (1995) ("New York Guide") (Ex. 1006).

7

Case CBM2012-00004
Patent 6,064,970

*E. Grounds of Unpatentability*

The Board instituted the instant covered business method patent
review based on the following grounds of unpatentability:

| Claims | Basis | References |
|---|---|---|
| 1, 3, 6-8, 10, 11, 13, 14, and 18 | § 103 | Bouchard, Pettersen, and Herrod |
| 4, 5, 16, and 17 | § 103 | Bouchard, Pettersen, and Florida Guide |
| 9 | § 103 | Bouchard, Pettersen, Herrod, and Camhi |
| 12 and 15 | § 103 | Bouchard, Pettersen, Herrod, and Dorweiler |

## II.  ANALYSIS

*A. Claim Construction*

In a covered business method patent review, claim terms are given
their broadest reasonable construction in light of the specification of the
patent in which they appear.  37 C.F.R. § 42.300(b).  Under the broadest
reasonable construction standard, claim terms are given their ordinary and
customary meaning as would be understood by one of ordinary skill in the
art in the context of the entire disclosure.  *In re Translogic Tech. Inc.*, 504
F.3d 1249, 1257 (Fed. Cir. 2007).  In that regard, we must be careful not to
read limitations from a particular embodiment appearing in the written
description into the claim if the claim language is broader than the
embodiment.  *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993).

8

Case CBM2012-00004
Patent 6,064,970

   *1.  "actuarial class" (claims 1, 3, 6-15, and 18)*

Claim 1 recites "generating [actuarial] classes of insurance, which group operators or vehicles having a similar risk characteristic."  Liberty proposes that the claim term "actuarial class" should be construed as "a combination/group/groupings related to loss/risk/safety which are determined from classifications/characteristics representative of motor vehicle operational characteristics and driver behavior for which data is gathered."  Pet. 20-21 (citing Ex. 1003, 937-38).  Progressive counters that the claim term should be construed as "a grouping of risks (*i.e.*, insureds) with similar risk characteristics and expected insurance claims loss (or insurance costs)."  PO Resp. 12; *see also id*. at 9-13.  Progressive argues that its proposed construction is consistent with the specification and the understanding of one of ordinary skill in the art.  *Id*. at 9-10 (citing Ex. 1001, 4:52-54 ("new and more precise actuarial classes are considered to be better predictors of loss because they are based on actual use of the vehicle and the behaviors demonstrated by the driver.")).

Although we agree with Progressive that, in light of the specification and in the context of vehicle insurance, actuarial classes are generated based on expected loss, we are not persuaded that the construction proposed by either Liberty or Progressive is the broadest reasonable interpretation of the claim term "actuarial class."  The phrases that contain the "/" symbol in Liberty's proposed construction are subject to multiple interpretations, which cause confusion.  For instance, replacing "/" symbol with the word "or" would render the construction too broad, and replacing "/" symbol with

9

Case CBM2012-00004
Patent 6,064,970

the word "and" would render the construction too narrow. Further, as acknowledged by Liberty during the oral hearing, "a combination/ group/groupings" may simply be read as "grouping." Tr. 79:9-80:6.

On the other hand, Progressive's proposed construction would render the claim limitation "having a similar risk characteristic" recited in claim 1 insignificant, if not wholly superfluous. Progressive's proposed construction also would redefine the term "risks" as "insureds" to exclude a grouping of vehicles. Such an interpretation would be inconsistent with the claim language "generating [actuarial] classes of insurance, which group operators or vehicles," and inconsistent with the specification of the '970 patent. *See, e.g.*, Ex. 1001, 1:28-35 (the "current system of insurance creates groupings of vehicles and drivers (actuarial classes) based on the following types of classifications. Vehicle: Age, manufacturer, model; and value."); *id.* at 4:30-52 ("Examples of possible actuarial classes developed from vehicle provided data.")

Progressive, through its arguments regarding the asserted grounds of unpatentability based in part on Herrod, attempts to import limitations into the construction of the claim term "actuarial class"—requiring *homogeneity* as pertaining to acceleration data from different *locations*, and the risk characteristics of all drivers resident in the *household*. PO Resp. 25-33. We decline to accept those additional requirements as part of the broadest reasonable interpretation, because it would import limitations into the claims, and it would be inconsistent with the specification of the '970 patent. For instance, some of the actuarial classes provided in the specification are

10

Case CBM2012-00004
Patent 6,064,970

based on data that are not associated with any location or household—e.g., "driving time in minutes by each driver of the insured vehicle," "number of minutes driving at high/low risk times," and "number of sudden acceleration situations." Ex. 1001, 4:30-52. It is well established that if a feature is not necessary to give meaning to what the inventor means by a claim term, it would be "extraneous" and should not be read into the claim. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998); *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co*., 849 F.2d 1430, 1433 (Fed. Cir. 1988).

Moreover, we decline to import those limitations into the claims in absence of a special definition set forth in the specification. An inventor may rebut the presumption that a claim term be given its ordinary meaning by providing a definition of the term in the specification with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). Here, the parties have not alleged that the inventor of the '970 patent acted as his own lexicographer and provided a special definition in the specification for the claim term "actuarial class" that is different from its recognized meaning to one with ordinary skill.

In light of the claims and specification of the '970 patent, we construe the claim term "actuarial class" broadly, but reasonably, as "a grouping related to expected loss, which is determined from motor vehicle characteristics or driving characteristics."

11

Case CBM2012-00004
Patent 6,064,970

*2. "initial operator profile" (claim 4)*

Liberty proposes to construe the claim term "initial operator profile" as "initial files or information with respect to the operator or the insuring thereof." Pet. 20 (citing Ex. 1003, 756). Progressive counters that Liberty's proposed construction is overly broad and fails to give meaning to the word "profile." PO Resp. 13. According to Progressive, the claim term should be construed as "an initial collection of actual driving data associated with a driver that distinguishes that driver from other drivers and is related to insurance." *Id*.

We note that the specification of the '970 patent does not assign or suggest a particular definition for the term "initial operator profile." In fact, that claim term, in its entirety, does not appear in the specification other than in the claims. Progressive cites, instead, to a discussion of "operator profiles" in the specification (*id*):

> It is yet another object of the present invention to generate actuarial classes and *operator profiles* relative thereto based upon actual driving characteristics of the vehicle and driver, as represented by the monitored and recorded data elements for providing a more knowledgeable, enhanced insurance rating precision.

Ex. 1001, 5:28-33 (emphasis added).

The plain and ordinary meaning of the term "profile" is "a set of characteristics or qualities that identify a type or category of person or thing."[5] Nothing in the specification or the plain and ordinary meaning of

---

[5] RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY 1053 (9th ed. 1999).

Case CBM2012-00004
Patent 6,064,970

the term "profile" precludes two drivers having the same initial operator profile. Therefore, we decline to import the limitation "that distinguishes that driver from other drivers" into the claims, as suggested by Progressive. *See Renishaw*, 158 F.3d at 1249.

In the light of the specification, we construe the claim term "initial operator profile" broadly, but reasonably, as "an initial collection of information associated with an operator that is related to motor vehicle characteristics or driving characteristics."

   3.  *"insured profile" (claim 4)*

Claim 4 recites "wherein the *insured profile* comprises coverage information, including limits and deductibles, *for determining a base cost of vehicle insurance for the vehicle operator*." Claim 5 recites "determining an *initial insured profile* for the operator of the vehicle prior to any monitoring of any data elements representative of an operating state of the vehicle or an action of the operator of the vehicle."

Liberty proposes to construe the claim term "initial insured profile" the same as "initial operator profile" to mean "initial files or information with respect to the operator or the insuring thereof." Pet. 20 (citing Ex. 1003, 756). Although both terms are similar, we nevertheless decline to give two different claim terms the same construction. *See CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use [of] different terms in the claims connotes different meanings.").

13

Case CBM2012-00004
Patent 6,064,970

Progressive argues that the claim term "insured profile" should be construed as "basic insurance information pertaining to the insured *from which an initial insurance cost is determined*."  PO Resp. 14 (emphasis added).  Progressive's proposed construction, however, would render the claim limitation "for determining a base cost of vehicle insurance" recited in claim 4, and the word "initial" in the claim term "*initial* insured profile" recited in claim 5, insignificant, if not wholly superfluous.

Consistent with the language of claim 4, the specification of the '970 patent provides:  "This insured profile includes the information about [insurance] coverages including limits and deductibles, which are necessary for establishing the appropriate cost of insurance of the subject insured." Ex. 1001, 10:36-39.

In the light of the claims and specification, we construe the claim term "insured profile" broadly, but reasonably, as "insurance information pertaining to the insured and the insured vehicle," which includes, for example, insurance coverage information such as limits and deductibles.

4. *"cost of insurance" and "base cost of insurance" (claims 1, 4, and 5)*

Liberty contends that the claim term "cost of insurance" should be construed as "a/one or more or all cost(s) associated with insurance of the vehicle, including, but not limited to, a cost to the insured and/or insurer/underwriter associated with the insurance."  Pet. 21 (citing Ex. 1003, 758-61).  On the other hand, Progressive argues that, in the context of the claim, the word "cost" refers to the *insured's* cost (i.e., the premium), and

14

Case CBM2012-00004
Patent 6,064,970

not the *insurer's* cost.  PO Resp. 14-15.  We agree with Progressive, as such a construction would be consistent with the specification and claims of the '970 patent.

The specification of the '970 patent provides that "the following information would produce a unique *vehicle insurance cost*. . . .  A change to any of this information would result in a different *premium* being charged, if the change resulted in a different actuarial class for that variable."  Ex. 1001, 1:56-2:16 (emphases added).  Claim 5 recites "identifying a surcharge or discount to be applied to the base cost [of vehicle insurance]," and "producing a final cost of vehicle insurance for the selected period from the base cost and the surcharge or discount."  In the context of the specification and claims, "cost of insurance" is the premium paid by the policyholder for the insurance coverage.  The plain and ordinary meaning of the term "premium" is the amount paid in installment by a policyholder for coverage under a contract.[6]

Therefore, in the light of the specification and claims, we construe the claim term "cost of insurance" as "the amount paid or to be paid by the policyholder for insurance coverage of a selected time period under the policy contract."  Similarly, we construe the claim term "base cost of insurance" as "the *initial* amount paid or to be paid by the policyholder for insurance coverage under the policy contract, during a time period, before any surcharge or bonus is applied."

---

[6] RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY 1041 (9th ed. 1999).

15

Case CBM2012-00004
Patent 6,064,970

   *5. "safety standard" (claims 5, 10, 11, 13, 14, and 16-18)*

   Liberty proposes that the claim term "safety standard" be construed as "value/criteria associated with the promotion of safety/prevention of risk/loss/injury." Pet. 21 (citing Ex. 1003, 761). Progressive does not dispute Liberty's proposed construction. The specification of the '970 patent does not provide a special definition.

   The ordinary meaning of the claim term "safety standard" includes a measure or criterion of exemption from injury, danger, or loss."[7] In the context of the vehicle insurance, Liberty's proposed interpretation is broad, consistent with that ordinary meaning, and consistent with the specification as it would be understood by one of ordinary skill in the art. *See, e.g.*, Ex. 1001, 8:44-46 ("Select[ed] ones of the plurality of data elements are recorded when the ones are determined to have an identified relationship to the safety standards.").

   We, therefore, adopt Liberty's proffered construction as the broadest reasonable construction consistent with the specification. But we further clarify that the "/" symbol should be replaced with the word "or"—"value or criteria associated with the promotion of safety or prevention of risk, loss, or injury."

_____

[7] RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY 1157 (9th ed. 1999).

16

Case CBM2012-00004
Patent 6,064,970

### B. The Level of Ordinary Skill in the Art

On the record before us, the evidence shows that the level of ordinary skill in the art is high.[8]  We also note that a hypothetical person of ordinary skill in the art possesses ordinary skill both in the determination of insurance premiums and in telematics.  PO Resp. 21-23.  Notably, conventional insurance schemes that use *actuarial classes* to determine vehicle insurance costs were well known in the art at the time of the invention.  *See, e.g.*, Prelim. Resp. 13-14; 33-34; PO Resp. 23 (stating one of ordinary skill in the art "would have had knowledge of multi-variant analysis of risk classifications . . . [and] actuarial standards applicable to risk classification systems.").

We agree with Progressive that the Florida Guide and New York Guide, cited by Liberty, reflect conventional or basic knowledge of one with ordinary skill in the art, and include the conventional insurance determination methods disclosed in the background section of the '970 patent.  Prelim. Resp. 13-14 (stating the Florida and New York Guides "discuss the same subject matter (*i.e.*, the existence of traditional actuarial

---

[8] For instance, Liberty submits that a person of ordinary skill in the art as to insurance pricing would have at least a Bachelor of Science ("B.S.") in Mathematics, or equivalent, with at least five years of experience in the insurance industry setting premiums for auto insurance, and as an associate in the Casualty Actuarial Society.  Ex. 1011 ¶ 17.  Liberty also provides that a person of ordinary skill in the art as to telematics data would have at least a B.S. degree in electrical engineering, computer engineering, computer science, or the equivalent thereof, and at least one to two years of experience with vehicle telematics systems.  Ex. 1014 ¶ 17.

17

classes) that . . . is disclosed in the background section of the '970 patent");
*id.* at 34 (stating the cited portions of the Florida Guide are "essentially
identical to the prior art knowledge disclosed in columns 1 and 2 of the '970
patent."). We conclude that the background section of the '970 patent
(Ex. 1001, 1:17-2:37) reflects the level of ordinary skill in the art.
Therefore, one with ordinary skill in the art would have had a thorough
understanding of using the principle of *actuarial classes* to determine
vehicle insurance costs.

The '970 patent also indicates that the electronic motor vehicle control
and operating systems were known in the art at the time of invention, and
those systems could be modified readily to obtain the desired types of
information relevant to determine the cost of insurance. Ex. 1001, 3:25-28.
Indeed, Liberty's expert, Mr. Scott Andrew, testifies that "several companies
had developed vehicle telematics systems that measured vehicle data, such
as speed, acceleration, time of day, etc.," and these "systems commonly
included in-vehicle data monitoring devices that would monitor the data,
store it, and/or transmit it to a remote location outside of the vehicle."
Ex. 1014 ¶ 20. As noted in the '970 patent, vehicle tracking systems—those
that used communication links with satellite navigation systems for
providing information describing a vehicle's location based upon navigation
signals—were also well known in the art. Ex. 1001, 3:28-32. The '970
patent further provides that it was known in the art to detect and record
seatbelt usage to assist in determination of the vehicle insurance costs.
Ex. 1001, 2:66-3:2 (citing U.S. Patent No. 4,667,336, Abs. ("a system for

18

Case CBM2012-00004
Patent 6,064,970

detecting and recording each time a seat belt is used [and depending] on the
level of seat belt usage the driver earns discounts on car insurance
premiums.")).  Therefore, one with ordinary skill in the art would have
possessed the knowledge of determining insurance premiums using
monitored vehicle data.

In determining the knowledge level of one with ordinary skill in the
art, we note that various factors may be considered, including "type of
problems encountered in the art; prior art solutions to those problems;
rapidity with which innovations are made; sophistication of the technology;
and educational level of active workers in the field." *In re GPAC, Inc.*, 57
F.3d 1573, 1579 (Fed. Cir. 1995) (citing *Custom Accessories, Inc. v. Jeffrey-
Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986)).  We also recognize
that the knowledge of one with ordinary skill in the art would have included
the basic principles, standards, and practices of insurance premium
determination—e.g., Risk Classification Statement of Principles of the
American Academy of Actuaries (Ex. 2012), Actuarial Standard of Practice
No. 12, Concerning Risk Classification, issued by the Actuarial Standards
Board (Ex. 2020), Interpretative Opinion 3:  Professional Communications
of Actuaries and Interpretative Opinion 4:  Actuarial Principles and Practices
(Ex. 1023).  Ex. 2011 ¶ 16; Ex. 2020 ¶ 5.

### C.  Principles of Law

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the
differences between the claimed subject matter and the prior art are such that

19

Case CBM2012-00004
Patent 6,064,970

the subject matter, as a whole, would have been obvious at the time the
invention was made to a person having ordinary skill in the art to which said
subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406
(2007). The question of obviousness is resolved on the basis of underlying
factual determinations including: (1) the scope and content of the prior art;
(2) any differences between the claimed subject matter and the prior art;
(3) the level of skill in the art; and (4) where in evidence, so-called
secondary considerations. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18
(1966).

We analyze the instituted grounds of unpatentability in accordance
with the above-stated principles. We also recognize that prior art references
must be "considered together with the knowledge of one of ordinary skill in
the pertinent art." *Paulsen*, 30 F.3d at 1480. Moreover, "it is proper to take
into account not only specific teachings of the reference but also the
inferences which one skilled in the art would reasonably be expected to draw
therefrom." *In re Preda*, 401 F.2d 825, 826 (CCPA 1968). That is because
an obviousness analysis "need not seek out precise teachings directed to the
specific subject matter of the challenged claim, for a court can take account
of the inferences and creative steps that a person of ordinary skill in the art
would employ." *KSR*, 550 U.S. at 418; *see also Translogic*, 504 F.3d at
1259.

20

Case CBM2012-00004
Patent 6,064,970

### D. Claims 4, 5, 16, and 17

Liberty asserts that claims 4, 5, 16, and 17 are unpatentable under
35 U.S.C. § 103(a) over the combination of Bouchard, Pettersen, and Florida
Guide.  Pet. 31-33, 41-50, 71-72.  In support of that asserted ground of
unpatentability, Liberty provides explanations as to how each claim
limitation is met by the combination of the cited prior art references (Pet. 41-
50, 71-72) and rationales for combining the references (Pet. 31-33).  Liberty
also submits declarations of Ms. Mary L. O'Neil (Ex. 1011) and
Mr. Andrews (Ex. 1014) to support its positions.

Upon review of Liberty's petition and supporting evidence, as well as
Progressive's response and supporting evidence, we determine that Liberty
has demonstrated, by a preponderance of the evidence, that claims 4, 5, 16,
and 17 are unpatentable over the combination of Bouchard, Pettersen, and
Florida Guide.

### 1. Florida Guide

The Florida Guide is an automobile insurance shoppers' guide that is
designed to help insurance policyholders control the cost associated with
automobile insurance.  Ex. 1008, 2.[9]  According to the Florida Guide, all
drivers in the state of Florida must carry a minimum amount of property
damage liability coverage in addition to the required personal injury
protection coverage.  *Id.* at 3.  The cost of auto insurance for the

---

[9] All references to the page numbers in Florida Guide refer to the original
page numbers in the bottom, right corner.

Case CBM2012-00004
Patent 6,064,970

policyholder may vary, based on factors such as the type of coverage the policyholder selects, the liability limits and deductibles, and the resident location of the policyholder's car. *Id.* at 11, 13. For example, if the policyholder selects a high liability limit and a low deductible, the auto insurance premium is likely to be higher. *Id.* at 11. Different premiums are charged in different areas, because of variation in frequency of accidents, medical expenses, and repair cost. *Id.* at 13.

   *2. Bouchard*

   Bouchard discloses a system for evaluating a driver's performance under actual, real-time conditions and using such evaluations to determine the driver's ability to operate a vehicle safely. Ex. 1004, Abs. Specifically, Bouchard's system monitors the driver's performance characteristics, such as average driving speed, braking and acceleration habits, and typical distance from the vehicle immediately in front. *Id*. at 28:47-52. The driver's performance is monitored and compared constantly to the driver's past performance and the normal driving standards. *Id*. at Abs.

   Bouchard's system has an event recording apparatus ("ERA") that records selectable vehicle performance, operational status, and/or environment information. Ex. 1004, 5:53-57. Bouchard's ERA is configured to store a wide variety of vehicle information gathered by sensors dispersed throughout a vehicle. *Id*. at 5:66-6:1. The recorded information is used to determine a baseline performance standard based on the driver's past performance against which a driver's present performance can be measured.

22

Case CBM2012-00004
Patent 6,064,970

*Id*. at 5:60-64.  Each driver has a personalized ERA, which maintains:
(1) information that identifies the driver; and (2) a record of the driver's
driving history and performance.  *Id*. at 6:4-8.  A system processing unit
generates a profile of the driver based upon the information that is stored in
the ERA.  *Id*. at 6:11-15.

### 3.  *Pettersen*

Pettersen discloses an electronic monitoring and reporting system for
recording the driving pattern of a motor vehicle.  Ex. 1005 at 1-7.[10]
Pettersen's system monitors the speed of the vehicle, the distance driven,
and the acceleration of the vehicle, to generate data describing the driving
pattern of the motor vehicle.  *Id*. at 1-2.  According to Pettersen, it would be
advantageous to insurance companies to use such an electronic monitoring
system for recording the driving pattern of the policyholder and to set a
bonus arrangement that gives a higher bonus to those policyholders having a
"careful" driving pattern (*e.g.*, low speeds and low accelerations).  *Id*.

### 4.  *Discussion*

Based on our review of Liberty's petition and supporting evidence, we
determine that Liberty has provided sufficient evidence to show that the
combination of Bouchard, Pettersen, and Florida Guide renders obvious each
claim limitation of claims 4, 5, 16, and 17.

---

[10] The page numbers used herein to reference Pettersen (Ex. 1005) refer to
the original page numbers of the reference.

23

Case CBM2012-00004
Patent 6,064,970

a. <u>Generating initial operator profile</u>

Claim 4 recites "generating an initial operator profile."  In its petition, Liberty asserts that the combination of Bouchard, Pettersen, and Florida Guide discloses that claim limitation.  Pet. 42-44 (citing Ex. 1004, 5:59-63 ("[T]he information that is recorded is also used *to determine a baseline performance standard* based on the driver's past performance against which a driver's present performance can be measured.")).

Progressive argues that the combination of the cited references fails to disclose generating an initial operator profile.  PO Resp. 37-38.  In particular, Progressive argues that "Bouchard only involves creating baseline data about a driver to compare against that same driver's later driving performance," but it "does not involve creating a profile that distinguishes a driver from other drivers."  *Id*.

In its reply, Liberty responds that Progressive applies an improper construction of the claim term "an initial operator profile."  Reply 5.  According to Liberty, even under Progressive's improper construction, Bouchard, in combination with Pettersen and Florida Guide, discloses generating an initial operator profile.  Reply 5-6 (citing Ex. 1004, 5:59-63; Abs.; 5:13-29; 5:66-6:8; Ex. 1014 ¶¶ 26, 27).

We agree with Liberty that Progressive's argument is based on an overly narrow claim construction—"an initial collection of actual driving data associated with a driver that distinguishes that driver from other drivers and is related to insurance"—which, as discussed above, we decline to adopt as it would import improperly an extraneous limitation into the claim.

24

Case CBM2012-00004
Patent 6,064,970

In light of the specification, we construe the claim term "initial operator profile" broadly, but reasonably, as "an initial collection of information associated with an operator that is related to motor vehicle characteristics or driving characteristics."

In any event, under either construction, we determine that Liberty has demonstrated that the combination of cited prior art references discloses "generating an initial operator profile," as required by claim 4. Bouchard's driver-specific profile distinguishes each driver using the driver's own stored past performance, as well as standard values, to evaluate the driver's ability to safely operate a vehicle. Ex. 1004, 5:59-63; Abs.; 5:13-29; 5:66-6:8. Specifically, Bouchard describes that "the information that is recorded [by ERA for accident analysis and driver fitness evaluation] is also used to determine a *baseline performance standard* based on *the driver's past performance* against which a driver's present performance can be measured." Ex. 1004, 5:59-63 (emphasis added). Bouchard also describes that "each driver maintains a removable ERA that is *personalized to that particular driver*," and each "ERA has information that identifies the driver, and a record of that driver's driving history and performance." *Id*. at 6:5-8.

Therefore, we determine that the combination of Bouchard, Pettersen, and Florida Guide suggests "generating an initial operator profile," as recited by claim 4.

b. Generating insured profile

Claim 4 recites "generating an *insured profile* for the vehicle operator prior to any monitoring of any of the vehicle operator's driving

25

Case CBM2012-00004
Patent 6,064,970

characteristics wherein the *insured profile* comprises coverage information, including limits and deductibles, for determining a base cost of vehicle insurance for the vehicle operator." Claims 5, 16, and 17 each require a similar limitation for determining an *initial insured profile*.

In its petition, Liberty asserts that Florida Guide, in combination with Bouchard and Pettersen, discloses generating or determining an "insured profile," as required by claims 4, 5, 16, and 17. Pet. 43. Liberty notes that Florida Guide teaches that "the cost to a driver for auto insurance will depend on an initial collection (profile) of information about the insured driver, including the driver's selected coverage limits and deductibles, together with other profile information about the driver." Pet. 43-44 (citing Ex. 1008, 3, 6, 11, 12). Liberty also provides rationales to combine the cited references, including the following:

> [A person of ordinary skill in the art] would have found it obvious to implement Bouchard's system of monitoring vehicle data in view of Pettersen's teachings of using monitored driving characteristics to determine insured risk and premiums with Florida Guide's teachings that insurers are required, in issuing policies, to generate an insured profile comprising coverage information, including limits and deductibles, for determining a base cost of vehicle insurance, because insurance companies are required, in issuing policies, to do so.

Pet. 33.

Progressive argues that the combination of cited prior art references does not render generating "an insured profile" obvious. PO Resp. 37. Specifically, Progressive asserts that "there is no indication in Pettersen that [an insured profile] would have been needed, since Pettersen may have been

26

Case CBM2012-00004
Patent 6,064,970

using a single premium for all insureds (as in common rental car insurance)." *Id*.

Progressive's argument narrowly focuses on Pettersen's discussion of car rental insurance, and fails to consider Pettersen's disclosure, as a whole, from the perspective of one of ordinary skill in the art.  Although Pettersen does disclose an embodiment pertaining to insuring rental cars, Pettersen also discloses leasing and ownership of cars. Ex. 1005, 1.  Notably, Pettersen expressly describes "[r]ecording of the driving pattern of a motor vehicle may be of interest for car owners as well as car insurance companies." Ex. 1005, 1.  A prior art reference must be considered for everything it teaches by way of technology and is not limited to the particular invention it is describing and attempting to protect.  *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907 (Fed. Cir. 1985).

Furthermore, upon reviewing the parties' arguments and supporting evidence, we hold that Liberty's rationale for modifying Bouchard's system in light of Pettersen and Florida Guide constitutes an articulated reason with a rational underpinning to justify the legal conclusion of obviousness. Pet. 33, 43-44, 46-47, 50.

For the foregoing reasons, we determine that the combination of cited prior art references suggests generating an insured profile, as required by claims 4, 5, 16, and 17.

   c.  Determining a total cost of insurance for the selected period

Liberty relies upon Pettersen, in combination with Bouchard and Florida Guide, to teach determining a total cost of insurance for the *selected*

27

Case CBM2012-00004
Patent 6,064,970

*period* based on the monitored driving characteristics, as required in claims 4, 5, 16, and 17.  Pet. 43; *see also* Pet. 36-37 (which addresses a similar limitation recited in claims 1 and 3).  Specifically, Liberty submits that a person of ordinary skill in the art would have understood that, by disclosing "a more fair bonus arrangement," Pettersen discloses rewarding a driver retrospectively for past behavior.  *Id.*  In support of Liberty's position, Ms. O'Neil testifies:

> [A] person of ordinary skill in the art would have understood Pettersen's disclosure of a "more fair bonus arrangement" to describe rewarding a policyholder *for past driving performance*. As part of this arrangement, it would have been understood that the policyholder's insurance policy premium varies *retrospectively based on the policyholder's driving statistics* (from the vehicle telematics data).

Ex. 1011 ¶ 24 (emphases added).

Progressive argues that Pettersen does not disclose "monitoring driving characteristics during a selected period, and deciding a total cost of insurance for *that selected period* based on the monitored driving characteristics."  PO Resp. 36 (emphasis added).  In particular, Progressive alleges that this limitation is not met by Pettersen, and that only by relying upon impermissible hindsight can Liberty conclude that Pettersen's bonus necessarily would be applied retrospectively.  *Id.*  Progressive further contends that Pettersen's bonus could be applied to a *renewal period* following the monitoring period.  *Id.* at 33-34.

We are not persuaded by Progressive's arguments.  Essentially, the issue is whether Pettersen's "bonus" is:  (1) a discount that is applied

28

Case CBM2012-00004
Patent 6,064,970

retrospectively to the premium for the *monitored* period, as urged by
Liberty; or (2) a discount that is applied prospectively to the premium for the
*renewal* period following the monitored period, as argued by Progressive.
We note that, in the situation where the insurance policy is not renewed by
the policyholder or insurance company, there would be *no renewal period*.
Naturally, Pettersen's "bonus" could not have applied prospectively to a
renewal period that may not exist, as suggested by Progressive.

In addition, Pettersen describes that the "car insurance companies may
fit the motor vehicles of their [policyholders] with the apparatus and read the
same at equal intervals," and that on "the basis of these readings, the
company may set a more fair bonus arrangement, i.e. that [policyholders]
having a 'careful' driving pattern – low speeds and low accelerations – may
be allotted a higher bonus." Ex. 1005, 1. Pettersen refers to determining a
"bonus." A "bonus," itself, suggests the existence of a base amount with
respect to which the "bonus" would be applied. The only premium in
existence in the monitored period is the premium for the monitored period.
The premium for the renewal period has not been determined yet.
Therefore, we find that the "bonus" amount is applied retroactively to the
premium in effect during the monitored period.

Based on Pettersen's explicit disclosure, and as supported by
Ms. O'Neal's testimony (Ex. 1011 ¶ 24), one with ordinary skill would have
recognized that Pettersen teaches monitoring the vehicle operator's driving
characteristics *during a selected period*, and Pettersen's bonus is determined
based on the monitored driving behavior during *that selected period*. It is

29

Case CBM2012-00004
Patent 6,064,970

clear that the bonus is a reward for the "careful" driving pattern that occurred during the actual *monitored* period.

Therefore, we determine that Pettersen, in combination with Bouchard and Florida Guide, suggests a total cost of insurance for a selected period based on the monitored driving characteristics, as required by claims 4, 5, 16, and 17. For the foregoing reasons, we conclude that Liberty has demonstrated, by a preponderance of evidence, that claims 4, 5, 16, and 17 are unpatentable over the combination of Bouchard, Pettersen, and Florida Guide.

### E. Claims 1, 3, 6-15, and 18

Liberty alleges that claims 1, 3, 6-8, 10, 11, 13, 14, and 18 are unpatentable under 35 U.S.C. § 103(a) over the combination of Bouchard, Pettersen, and Herrod. Pet. 31-41, 50-71, and 73-79. Liberty also cites Camhi to satisfy the additional limitation in dependent claim 9 (Pet. 62-63), and cites Dorweiler to satisfy the additional limitations in dependent claims 12 and 15 (Pet. 65-67, 69-70). In support of those asserted grounds of unpatentability, Liberty provides detailed explanations as to how each claim limitation is met by the combination of the cited prior art references and rationales for combining the references. Liberty also relies upon the declarations of Ms. O'Neil (Ex. 1011) and Mr. Andrews (Ex. 1014) to support its positions.

Upon review of Liberty's petition and supporting evidence, as well as Progressive's response and supporting evidence, we determine that Liberty

30

Case CBM2012-00004
Patent 6,064,970

has demonstrated, by a preponderance of the evidence, that claims 1, 3, 6-15, and 18 are unpatentable over the cited prior art references.

### 1. *Corresponding log of vehicle speed and location*

Claims 1, 3, 11, and 14 each require "a time and location of vehicle operation and a corresponding log of vehicle speed for the time and location." In its petition, Liberty asserts that Bouchard, in combination with Pettersen and Herrod, discloses monitoring time, location, and speed of vehicle operation, and logging these data elements. Pet. 37-38 (citing Ex. 1004, fig. 18; 30:19-22 ("certain time factors are classified . . . time factors include time of day"); Ex. 1004, fig. 18; 30:8-11; 11:1-2; 9:39-47 ("Additional information can be obtained by providing other sensors, such as . . . geographic positioning information."); Ex. 1004, fig. 18; 30:29-35 ("Certain profiles are then generated (STEP 1803). These profiles include characterizations of the history of the throttle, speed . . . , and/or turn signal use"); Ex. 1004, fig. 18; 31:36-38 ("In STEP 1807, the recent history of the driver is updated.")).

Progressive argues that the combination of cited prior art references does not disclose or suggest "a time and *location* of vehicle operation and a corresponding log of vehicle speed for the time and *location*," as required by claims 1, 3, 11, and 14. PO Resp. 23-25, 35. In particular, Progressive argues that the "environment classification" step illustrated in Figure 18 of Bouchard is not a location determination step, as that "step merely infers

31

Case CBM2012-00004
Patent 6,064,970

'environment' from driving speed," but does not record the *actual location*. *Id*. at 24.

We are not persuaded by Progressive's argument that the combination of cited prior art references does not disclose recording the actual location of the vehicle. Progressive's argument narrowly focuses on Bouchard's "environment classification" step shown in Figure 18, and fails to consider Bouchard's disclosure, as a whole, from the perspective of one with ordinary skill in the art. *See Paulsen*, 30 F.3d at 1480.

Bouchard uses an ERA that records selectable vehicle performance, operational status, and environment information, to determine the vehicle operational conditions. Ex. 1004, 5:53-57; 10:51-53. Bouchard's ERA is configured to store a wide variety of vehicle operational information—including vehicle speed and *geographic positioning information*—gathered by sensors dispersed throughout a vehicle. *Id*. at 5:66-6:1; 9:21-50; 11:1-2. According to Bouchard, by recording this data, its device for motor vehicles can function as an event recording "black box" to reconstruct an accident more reliably and less expensively, using real historical data. *Id*. at 4:39-41; 9:21-50; 11:22-25. One of ordinary skill in the art would have recognized that the *actual* location of the vehicle is being recorded in order to allow Bouchard's system to reconstruct an accident reliably, because Bouchard specifically states that its ERA is configured to store a variety of information, including geographic position information (Ex. 1004, 5:66-6:1; 9:21-50; 11:1-2).

32

Case CBM2012-00004
Patent 6,064,970

Based on those disclosures of Bouchard, we determine that Liberty has demonstrated that one of ordinary skill in the art would have recognized that Bouchard's system records "a time and location of vehicle operation and a corresponding log of vehicle speed for the time and location," as recited in claims 1, 3, 11, and 14.

## 2. *Generating actuarial classes*

Claims 1, 3, 6-15, and 18 each require generating or using actuarial classes. As we articulated above in the claim construction section, we construe the claim term "actuarial class" as "a grouping related to expected loss, which is determined from motor vehicle characteristics or driving characteristics."

Liberty asserts that Herrod, in combination with Bouchard and Pettersen, discloses:

> generating classes associated with different levels of risk, which group operators or vehicles having a similar risk characteristic, from actual monitored driving characteristics (*e.g.*, acceleration applied by a driver) during a selected time period as represented by recorded data elements representative of an operating state of the vehicles or an action of the operators.

Pet. 39, 56, 78 (citing Ex. 1007, Abs., 1-2).

Herrod discloses a computer-based monitoring and reporting device that is used in a vehicle to measure driver acceleration patterns and report

33

Case CBM2012-00004
Patent 6,064,970

associated accident risks.  Ex. 1007, 1-2.[11]  In that regard, Herrod describes

that its device can be used for measuring safety-related features of driving,

and the monitored data can be useful to insurance companies.  *Id.*  Herrod

further discloses classifying drivers into *groups, each of which is associated*

*with a different level of accident risk, based on actual monitored data*, such

as "levels of acceleration," that represent driver behavior and vehicle

operating characteristics.  Ex. 1007, Abs., 1-2.

    a.  <u>Generating groups of risk based on actual monitored driving data</u>

       Progressive argues that one of ordinary skill in the art would not have

understood the "behavioral groups" of Herrod to be actuarial classes.

PO Resp. 25-33.  In particular, Progressive argues, and Mr. Miller testifies,

that Herrod's accident statistics obtained from a national survey of drivers

using the device "would be unreliable for purposes of establishing an

actuarial class," and a person of ordinary skill in the art would not "have

created an actuarial class based on survey data."  *Id.* at 29; Ex. 2011 ¶ 45.

Progressive alleges that Herrod's behavioral groups would not suggest

actuarial classes to one of ordinary skill in the art, because "Herrod suggests

looking at accident statistics (no loss data) in creating its behavioral groups."

*Id.* at 31.

       Liberty disagrees and argues that Herrod discloses using actual

driving data.  Reply 13-14 (citing Ex. 1007, 1-2 ("Measurements made on

--------------------------------------------------

[11] The page numbers used herein to refer Herrod (Ex. 1007) are the original
page numbers of the reference on the top, center of each page.

34

Case CBM2012-00004
Patent 6,064,970

many drivers over a long period are used to establish these levels of accident risk."); Ex. 1022 ¶¶ 25, 38).  Liberty specifically establishes that Herrod discloses:

> [A computer] read[s] the recorded acceleration patterns and the time history of driver group and advice codes.  This information is added to a database, which is used to update the algorithms used for analyzing the acceleration patterns and the accident statistics.

*Id.* (citing Ex. 1007, 1-2).  Liberty maintains that Herrod discloses creating actuarial classes using actual monitored acceleration data.  Reply 2-3, 8-9 (citing Ex. 1007, Abs, 1-2; Ex. 1022 ¶¶ 31, 35-36).  We agree with Liberty.

We are not persuaded by Progressive's arguments and supporting evidence, as they incorrectly characterize Herrod as disclosing mere usage of *survey data*, and fail to discuss Herrod's disclosure, as a whole.  A prior art reference must be considered for everything it teaches by way of technology and is not limited to the particular invention it is describing and attempting to protect.  *EWP Corp.*, 755 F.2d at 907.

Notably, Progressive's arguments and Mr. Miller's testimony narrowly focus on Herrod's disclosure of obtaining additional accident statistics from a national survey of drivers using the device, and ignore Herrod's disclosure of generating groups of accident risk based on *actual monitored driving data*.  In particular, Herrod discloses:

> This invention concerns an electronic device for *measuring and recording the levels of acceleration* applied by the drivers of road vehicles. These accelerations include forward acceleration, backward acceleration (braking) and left and right accelerations (cornering). The device contains a computer, which processes

35

Case CBM2012-00004
Patent 6,064,970

> accumulated *acceleration data* to determine to which of several
> behavioural groups the driver belongs. *Each group is
> associated with a significantly different level of accident risk.
> Measurements made on many drivers over a long period are
> used to establish these levels of accident risk.*

Ex. 1007, 1 (emphases added).

Therefore, we are unpersuaded by Progressive's arguments (PO Resp.
25-33), and Mr. Miller's testimony (Ex. 2010 ¶ 45), that are based on an
incomplete reading of Herrod: (1) that it merely discloses the usage of
*accident statistics* obtained from a national survey, and (2) that it does not
disclose generating groups of accident risk based on *actual monitored
acceleration data.*

b. Pertaining to insurance

Progressive alleges that a person of ordinary skill in the art "would not
have considered Herrod to be of interest or value to the insurance field or to
the determination of insurance premium." PO Resp. 31-32 (citing Ex. 2011
¶ 41). Progressive also argues that Herrod's device is used for driver
training and performance assessment, and to detect "reckless drivers."
PO Resp. 27. As support, Mr. Miller testifies that one of ordinary skill in
the art, at best, might have understood that Herrod's disclosure concerning a
demonstration of competence "meant that the data could have been used by
an insurer to determine a driver's eligibility to be offered insurance
coverage." Ex. 2011 ¶ 41. Mr. Miller concludes that a person of ordinary
skill in the art would have recognized that Herrod's data was not suitable for

36

Case CBM2012-00004
Patent 6,064,970

that purpose as the data is incomplete and unreliable for the purposes of determining insurance premiums. *Id*.

Progressive's argument and Mr. Miller's testimony narrowly focus on only certain aspects of Herrod—"safe drivers [would be able] to demonstrate their competence to insurance companies"—but fail to discuss Herrod's disclosure, as a whole, in a meaningful way from the perspective of one with ordinary skill in the art. *Id*. For instance, Progressive and Mr. Miller do not explain adequately why Herrod's groups of accident risks generated based on monitored driving data, and the database of the recorded acceleration data would not be of interest or value to insurance companies. To the contrary, Herrod expressly states that the monitored driving data could be useful to insurers and the "database might also be used by *. . . insurance companies, who wish to monitor the standard of driving of certain vehicles*." Ex. 1007, Abs., 1-2 (emphasis added). As noted in the background section of the '970 patent, one with ordinary skill in the art would have possessed the knowledge of determining insurance premiums based on monitored vehicle data. *See, e.g.*, Ex. 1001, 2:66-3:2 (citing U.S. Patent No. 4,667,336, Abs. (disclosing "a system for detecting and recording each time a seat belt is used[, and depending] on the level of seat belt usage[,] the driver earns discounts on car insurance premiums")).

Therefore, we determine that Mr. Miller's testimony focusing on, and discussing only a selected portion of, Herrod's disclosure is not meaningful and does not account for other relevant portions of Herrod's disclosure. As such, it is entitled to little weight. *See Velander v. Garner*, 348 F.3d

37

Case CBM2012-00004
Patent 6,064,970

1359, 1371 (Fed. Cir. 2003) ("In giving more weight to prior publications than to subsequent conclusory statements by experts, the Board acted well within [its] discretion.").

For the foregoing reasons, we agree with Liberty that a person of ordinary skill in the art would have considered Herrod to be of interest or value to the insurance field.

c. Homogeneity and household data

Progressive submits that one of ordinary skill in the art would have understood that Herrod's driver-specific data would not be suitable for establishing an actuarial class.  PO Resp. 32.  According to Progressive, one of ordinary skill in the art would have recognized that, to determine auto insurance premiums accurately, an insurer needs to understand the risk characteristics of all drivers resident in the household.  *Id*. at 31-32 (citing Ex. 1007, 3; Ex. 2011 ¶ 42).  Progressive also maintains that Herrod fails the homogeneity requirement, because Herrod groups drivers who have acceleration data collected from different driving location settings (e.g., urban and rural settings), creating different degrees of insurance risk. *Id*. (citing Ex. 2011 ¶ 44).  In support of Progressive's position, Mr. Miller testifies that Herrod does not disclose that all of the drivers in the household would be monitored and that Herrod's data are incomplete and would fail the actuarial standard for homogeneity.  Ex. 2011 ¶¶ 42-44.

Liberty responds that applying those homogeneity and household data requirements to *each risk characteristic* is contrary to the usage of the claim term "actuarial class" in the '970 patent.  Reply 14-15 (citing Ex. 1022

38

Case CBM2012-00004
Patent 6,064,970

¶¶ 25-29, 31, 33, 35-36, 38).  Liberty notes that some of the actuarial classes disclosed in the '970 patent are based on data that are not associated with any location or household—"driving time in minutes by each driver of the insured vehicle," "number of minutes driving at high/low risk times," and "number of sudden acceleration situations."  *Id.*; Ex. 1001, 4:30-52.

We agree with Liberty.  Indeed, as we have explained in our claim construction analysis above, we decline to add the alleged homogeneity and household data requirements to the broadest reasonable interpretation of the claim term "actuarial class."  Progressive's arguments are not commensurate with the scope of the claims.  *See In re Self*, 671 F.2d 1344, 1348 (CCPA 1982) ("It is well established that limitations not appearing in the claims cannot be relied upon for patentability.").

Further, Liberty's expert, Ms. O'Neil, testifies that there is "no requirement that a *single risk characteristic* completely measures all insurance risk," because "conventional insurance rating depends on the evaluation and actuarial grouping utilizing many separate risk characteristics, including age, location, mileage, etc."  Ex. 1022 ¶ 35 (citing Ex. 1001, 1:28-2:20) (emphasis added).  Ms. O'Neil explains that classifications based on driving experience—drivers with less than three years of driving experience and those with greater than three years driving experience—do not depend on driving location. Ex. 1022 ¶ 36.  Ms. O'Neil also explains that "Herrod's measured risk characteristics do not have to measure *all* risk distinctions in order to form the basis of valid actuarial classes."  *Id*.  As to the household issue, Ms. O'Neil testifies that "Herrod

39

Case CBM2012-00004
Patent 6,064,970

discusses providing a programmable monitoring card to any driver of any
equipped vehicle[;] any driver with a suitable card or disk can be monitored
whilst driving any equipped vehicle." Ex. 1022 ¶ 33 (citing Ex. 1007, 2
(internal quotations omitted)).

On this record, we credit the testimony of Ms. O'Neil over that of
Mr. Miller. *See Yorkey v. Diab*, 601 F.3d 1279, 1284 (Fed. Cir. 2010)
(holding that Board has discretion to give more weight to one item of
evidence over another "unless no reasonable trier of fact could have done
so"). We find Ms. O'Neil's explanations to be more consistent with the
level of one with ordinary skill in the art as disclosed in the background
section of the '970 patent, as well as with Herrod. In contrast, Mr. Miller
does not explain adequately why homogeneity and household data are
required. We observe that not every actuarial class known at the time of
invention depends on driving location or household data, such as those
disclosed in the background of the '970 patent (Ex. 1001, 1:28-52).

For the foregoing reasons, we agree with Liberty that Herrod's data
would be suitable for establishing an actuarial class.

d. Expected loss data

Progressive argues that "in order to be an actuarial class, a group of
risks should predict insurance losses or costs," and that Herrod's behavioral
groups would not be predictive of insurance claims losses (or premiums).
PO Resp. 9-10 (citing Ex. 2011 ¶¶ 16-17), 27-31 (citing Ex. 2011 ¶ 41).
Progressive submits that Herrod's behavioral groups would not have
differentiated *expected loss costs*. *Id*. at 28. Progressive also alleges that

40

Case CBM2012-00004
Patent 6,064,970

Herrod's *accident statistics* "may help to indicate how safe a driver is, but they are not part of the expected loss determination." *Id*. at 30-31 (citing Ex. 2011 ¶ 45).

However, Progressive's argument does not account for certain teachings of Herrod, including its device can be used for measuring safety-related features of driving, and *the monitored data can be useful to insurance companies*. Ex. 1007, 1-2. Further, as explained by Liberty, "risk characteristics need not be *direct or complete* predictors of future losses to form the basis of an actuarial class," as confirmed by Actuarial Standards of Practice No. 12 (Ex. 2020, ASOP No. 12 ¶ 5.2) and the examples provided by the '970 patent (Ex. 1001, 1:27-2:47). Reply 12-13 (emphasis added) (citing Ex. 1022 ¶¶ 7-13, 25, 27-29). Liberty submits that a driver's age or marital status, or a vehicle's value or age, does not predict losses or costs *directly*, nor do these risk characteristics result in actual insurance claims. *Id*. (citing Ex. 1022 ¶¶ 11-12, Ex. 1001, 1:27-2:47, Ex. 2020, ASOP No. 12 ¶ 5.2, Ex. 2012, 15). In support of Liberty's position, Ms. O'Neil testifies:

> Herrod teaches monitoring and gathering acceleration data and accident statistics to group drivers in "behavioural groups" reflecting different levels of accident risk. A [person of ordinary skill in the art] would know that, in order to create such behavioural groups relevant to insurance rating—which a [person of ordinary skill in the art] would interpret as actuarial classes—would involve analyzing the data collected in Herrod to determine any associated expected loss costs with such data.

Ex. 1022 ¶ 25.

41

Case CBM2012-00004
Patent 6,064,970

Ms. O'Neil explains that "[i]t is *the job of an actuary* to determine how risk characteristics, such as number of accidents or sudden braking events, correlate to predicted future insurance losses so that an insurer can charge an individual the proper premium," and "[t]his can be done—as explained, for example, in Standard of Practice No. 12—using 'actual experience' (actual frequency and severity claims data) *or 'any reliable source*, including statistical or other mathematical analysis of available data.'"  Ex. 1022 ¶ 12 (citing Ex. 2020, ASOP No. 12, pp. 3-4).  Ms. O'Neil also testifies that a person of ordinary skill in the art would have the knowledge to calculate expected loss costs associated with monitored driving data.  Ex. 1022 ¶¶ 27-29.

We credit Ms. O'Neil's testimony (Ex. 1022 ¶¶ 12, 25, 27-29), because her explanations are consistent with Herrod, the disclosure of the '970 patent, and other evidence on record with respect to the level of ordinary skill in the art.  In a proper obviousness analysis, we note that Herrod's disclosure must be "considered together with the knowledge of one of ordinary skill in the pertinent art."  *Paulsen*, 30 F.3d at 1480.  Such analysis must include reading the prior art in context, taking into account "demands known to the design community," "the background knowledge possessed by a person having ordinary skill in the art," and "the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR*, 550 U.S. at 418.

42

Case CBM2012-00004
Patent 6,064,970

As noted above, generating actuarial classes of insurance, which group operators or vehicles having a similar risk characteristic, was well known in the art. The background section of the '970 patent describes:

> *Conventional methods for determining costs of motor vehicle insurance* involve gathering relevant historical data from a personal interview with the applicant for the insurance and by referencing the applicant's public motor vehicle driving record that is maintained by a governmental agency, such as a Bureau of Motor Vehicles. *Such data results in a classification of the applicant to a broad actuarial class for which insurance rates are assigned based upon the empirical experience of the insurer.* Many factors are relevant to such classification in a particular actuarial class, such as age, sex, marital status, location of residence and driving record.
>
> *The current system of insurance creates groupings of vehicles and drivers (actuarial classes) based on the following types of classifications.*
> Vehicle: Age; manufacturer, model; and value.
> Driver: Age; sex; marital status; driving record (based on government reports), violations (citations); at fault accidents; and place of residence.
> Coverage: Types of losses covered, liability, uninsured motorist, comprehensive, and collision; liability limits; and deductibles.

Ex. 1001, 1:17-52 (emphases added).

Actuarial Standard of Practice No. 12 expressly states that "[r]isk classification has been a fundamental part of actuarial practice since the beginning of the profession." Ex. 2020 ¶ 5, ASOP No. 12 § 3. Risk classification is defined as the "process of grouping risks with similar risk characteristics so that differences in costs may be recognized." Ex. 2020, ASOP No. 12 ¶ 2.8. The design of risk classification systems requires "the

43

Case CBM2012-00004
Patent 6,064,970

actuary to exercise professional judgment as well as to use statistical tools."
Ex. 2020, ASOP No. 12 § 5. For example, the "actuary can rely on actual or
reasonably anticipated experience," and relevant "information from any
reliable source, including statistical or other mathematical analysis of
available data, may be used." *Id*. § 5.1. Furthermore, in the absence of
actual experience, "an actuary may rely on clear actuarial evidence that
differences in costs are related to a particular risk characteristic." *Id*.
Therefore, one with ordinary skill in the art would have known to analyze
the monitored vehicle data collected by Herrod's device to determine any
associated expected loss costs with such data, in order to classifying drivers
into groups relevant to insurance rating.

For the foregoing reasons, we determine that, in light of Herrod's
disclosure, it would have been obvious to one with ordinary skill in the art to
generate actuarial classes of insurance by grouping operators having a
similar risk characteristic using actual monitored driving data.

### 3. Selected period

Claims 1 and 3 require determining a cost of insurance for the vehicle
during the *monitored time period*. As discussed above with respect to
claims 4, 5, 16, and 17, Liberty relies upon Pettersen, in combination with
Bouchard, to meet this claim limitation. Pet. 36-37, 43. We already have
addressed Progressive's argument that Pettersen does not apply the bonus
retrospectively to the monitored period, and for those same reasons, we
determine that this argument is unavailing.

44

Case CBM2012-00004
Patent 6,064,970

### 4. *Safety standard*

Claims 10, 13, and 18 each require using safety standard values as the preset values. Liberty notes that the monitored conditions in Bouchard are used to determine whether the driver's performance conforms to normal driving standards and the driver's past performance, and Bouchard's warning unit emits sounds when the hazard level exceeds a threshold level. Pet. 63-64, 67-68, 75-76 (citing Ex. 1004, 5:20-25; 24:33-37).

Progressive counters that Bouchard only discloses "using a driver's own driving patterns as a baseline for evaluating driving performance" and not "safety or other actuarial standard values." PO Resp. 35-36. We do not agree with Progressive. Progressive's argument narrowly focuses on Bouchard's disclosure of individual driver's past performance, and fails to consider Bouchard's disclosure, as a whole, from the perspective of one with ordinary skill in the art. A prior art reference must be considered for everything it teaches by way of technology and is not limited to the particular invention it is describing and attempting to protect. *EWP Corp.*, 755 F.2d at 907. For instance, Progressive's argument ignores Bouchard's determination of whether the driver's performance conforms to normal driving standards, as well as Bouchard's disclosure of a warning system (Ex. 1004, Abs.; 5:20-25; 24:33-37).

Progressive further argues that Bouchard's warning system does not involve the generation of an output data value that is used to compute an insurance rating, as required by claims 10, 13, and 18. PO Resp. 35-36. Progressive's argument is unpersuasive. Nonobviousness cannot be

45

Case CBM2012-00004
Patent 6,064,970

established by attacking references individually when, as here, the ground of unpatentability is based upon the teachings of a combination of prior art references. *In re Keller*, 642 F.2d 413, 426 (CCPA 1981). Instead, the test for obviousness is whether the combination of references, taken as a whole, would have suggested the patentees' invention to a person having ordinary skill in the art. *In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986).

Liberty relies upon Pettersen, in combination with Bouchard, to disclose "generating an adjusted insurance cost as the output data value." Pet. 64, 68 (citing Ex. 1005, 1 ("On the basis of these [driving pattern] readings, the [car insurance] company may e.g., set a more fair bonus arrangement, i.e. that [policyholders] having a 'careful' driving pattern – low speeds and low accelerations – may be allotted a higher bonus."); Ex. 1011 ¶ 19). Liberty further provides a rationale for combining the references—a person with ordinary skill in the art would "have recognized that Bouchard's sophisticated driver safety monitoring and analysis techniques could advantageously be implemented using Pettersen's teachings of determining insurance costs using a similar system." Pet. 31. Upon reviewing the parties' arguments and supporting evidence, we hold that Liberty's rationale for modifying Bouchard with the teachings of Pettersen constitutes an articulated reason with a rational underpinning to justify the legal conclusion of obviousness. *See KSR*, 550 U.S. at 416 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.").

46

Case CBM2012-00004
Patent 6,064,970

Accordingly, we determine that the combination of Bouchard, Pettersen, and Herrod renders the subject matter recited in claims 1, 10, and 18 obvious to a person with ordinary skill in the art.

### 5. Conclusion

For the foregoing reasons, we conclude that Liberty has demonstrated, by a preponderance of the evidence, that claims 1, 3, 6-15, and 18 are unpatentable over the combination of the cited prior art references.

### F. Progressive's Motion to Exclude

Progressive seeks to exclude certain evidence submitted in support of Liberty's reply. Paper 46 ("Mot."). Liberty opposes Progressive's motion to exclude. Paper 51 ("Opp."). As the movant, Progressive has the burden of proof to establish that it is entitled to the requested relief. *See* 37 C.F.R. § 42.20(c). For the reasons stated below, Progressive's motion is *denied*.

A motion to exclude must explain why the evidence is not admissible (e.g., relevance or hearsay), but may not be used to challenge the sufficiency of the evidence to prove a particular fact. Office Patent Trial Practice Guide, 77 Fed. Reg. 48765, 48767 (Aug. 14, 2012). A motion to exclude evidence also must:

(a) Identify where in the record the objection originally was made;
(b) Identify where in the record the evidence sought to be excluded was relied upon by an opponent;
(c) Address objections to exhibits in numerical order; and
(d) Explain each objection.

*Id*. However, Progressive's motion to exclude does not identify where in the

47

Case CBM2012-00004
Patent 6,064,970

record the objection originally was made, and does not address objections to exhibits in numerical order.

While a motion to exclude may raise issues related to admissibility of evidence, it is not an opportunity to file a sur-reply, and also is not a mechanism to argue that a reply contains new arguments or relies on evidence necessary to make out a prima facie case. Here, Progressive's motion to exclude contains such improper arguments, and is in the nature of a sur-reply. Mot. 1-9. Moreover, as discussed below, Progressive's arguments also are without merit.

### 1. Rebuttal evidence concerning Herrod

Progressive seeks to exclude Ms. O'Neil's testimony concerning Herrod'disclosure. Mot. 4 (citing Ex. 1022 ¶¶ 25, 27-29, 31, 33). According to Progressive, Ms. O'Neil's testimony includes new arguments and constitutes new evidence that should have been submitted with Liberty's petition. *Id*. at 4-7. In particular, Progressive argues that Ms. O'Neil's testimony cites to new portions of Herrod, and Ms. O'Neil's testimony as to the understanding of Herrod from the perspective of a person of ordinary skill in the art, constitutes evidence that should have been submitted with Liberty's petition. *Id*. at 5-7.

Liberty opposes and argues that the Board instituted the instant trial based on Liberty's arguments and evidence submitted with its petition, and therefore, its rebuttal evidence should not be excluded as "new evidence" that should have been submitted with the petition to make out a prima facie

48

Case CBM2012-00004
Patent 6,064,970

case.  Opp. 3-4 (citing Decision on Institution, Paper 10 at 2).  Liberty also maintains that its rebuttal evidence was submitted properly to respond to the issues raised in Progressive's response, as it continues to urge unpatentability on the same grounds instituted by the Board.  *Id*. at 5-6.

Having considered the parties' arguments and supporting evidence, we are not persuaded by Progressive's arguments.  Rather, we agree with Liberty that Ms. O'Neil's testimony (Ex. 1022 ¶¶ 25, 27-29, 31, 33) properly responded to issues raised by Progressive in the patent owner response (PO Resp. 25-33, Ex. 2011 ¶¶ 41-45).

Notably, each section of Ms. O'Neil's testimony (e.g., Ex. 1022 ¶¶ 24, 30, 32) first directs our attention to the testimony of Progressive's expert, Mr. Miller (e.g., Ex. 2011 ¶¶ 41, 42), and then presents her rebuttal testimony as to Mr. Miller's assertions (Ex. 1022 ¶¶ 25-29, 31, 33).  For instance, to rebut Progressive's argument and Mr. Miller's corresponding testimony that a person of ordinary skill in the art "would have had no reason to think that the disclosure of Herrod had any relevance to . . . the determination of auto insurance premiums" (PO Resp. 27, Ex. 2011 ¶ 41), Ms. O'Neil testifies that such a contention is based on an unreasonably narrow reading of Herrod's disclosure.  Ex. 1022 ¶ 25.  Ms. O'Neil explains that Herrod's disclosure, on its face, explicitly and repeatedly describes using its system for insurance purposes.  *Id*. (citing Ex. 1007, 1, 2).

For the reasons stated above, Progressive has not demonstrated that Ms. O'Neil's testimony exceeds the proper scope of reply evidence.

49

Case CBM2012-00004
Patent 6,064,970

   *2. Reliability of the evidence*

   Progressive seeks to exclude Ms. O'Neil's testimony concerning the
testimony of Progressive expert, Mr. Miller, as unreliable, pursuant to
Federal Rule of Evidence 702.[12]  Mot. 8-9 (citing Ex. 1022 ¶¶ 8, 13, 27, 32,
38).  Progressive argues that Ms. O'Neil's declaration "mischaracterizes"
Mr. Miller's declaration and Progressive's arguments as requiring *actual*
claims loss data to generate actuarial classes.  *Id*. at 8.  In support of its
arguments, Progressive notes that Mr. Miller's declaration does not use the
phrase "*actual* claims data," and that the Statement of Principles (Ex. 2012)
cited by Mr. Miller (Ex. 2011 ¶ 16) makes it clear that actuarial
classification may be based on data other than *actual* claims loss data
(Ex. 2012, p. 4).

   We are not persuaded by Progressive's arguments.  Rather, we
determine that Ms. O'Neil's testimony (Ex. 1022 ¶¶ 8, 13, 27, 32, 38) is
reasonable rebuttal evidence in the light of Progressive's arguments
submitted in its patent owner response and Mr. Miller's declaration.  We
observe that Progressive's patent owner response and Mr. Miller's
declaration are ambiguous as to whether the claim term "actuarial classes"
requires use of <u>both</u> *actual* claims loss data <u>and</u> *expected* claims loss data.
For instance, Progressive states:

   When determining or evaluating actuarial classes, *claims loss
   data is used*, not accident statistics. (Ex. 2011, Miller Decl. at

_____

[12] The Federal Rules of Evidence generally apply to a review.  37 C.F.R.
§ 42.62(a).

50

Case CBM2012-00004
Patent 6,064,970

¶ 45; *see also* Ex. 2013, O'Neil depo. at 91:7-11 ("An actuarial class, as I mentioned it here, is grouping – sharing similar risk characteristics and presumably with differentiated expected loss costs.").) While *claims loss data indicates both the frequency and severity of losses*, accident data would reveal only the frequency of accidents. Moreover, an insured may have accidents that do not result in claims. Accident statistics may help to indicate how safe a driver is, but they are not part of the expected loss determination. (Ex. 2011, Miller Decl. at ¶ 45.) Yet Herrod suggests looking at accident statistics (not *loss* data) in creating its behavioral groups, further confirming that its behavioral groups would not suggest actuarial classes to a POSITA.

PO Resp. 30-31 (emphases added).

Mr. Miller testifies that:

By the same token, differences in expected costs between classes do not preclude the *actual claim* experience of risks in one class from being the same as the *actual claim* experience of risks in another class. This overlap phenomenon is both an anticipated and, indeed, statistically inevitable ramification of any sound risk classification system.

Ex. 2011 ¶ 44 (emphases added).

Rather, Herrod discloses the use of "accident statistics . . . obtained from a national survey of drivers using the device" for this purpose. (Ex. 1007 at 000002.) *In determining actuarial classes and auto insurance premiums, it is claims data that are used*, not accident statistics. It is my opinion that data "obtained from a national survey of drivers using the device" would be unreliable for purposes of establishing an actuarial class, such that no POSITA would have created an actuarial class that depended on survey data.

Ex. 2011 ¶ 45 (emphasis added).

51

Case CBM2012-00004
Patent 6,064,970

We decline to exclude the testimony of Liberty's expert, Ms. O'Neil, because the ambiguity was created first by Progressive's arguments and expert testimony.  It was reasonable for Ms. O'Neil to rebut Progressive's argument and Mr. Miller's testimony by providing opinions regarding use of both *actual* claims loss data and *expected* claims loss data in the context of actuarial classes.  Moreover, the Board is capable of taking into account the baselessness of a witness's testimony, if any, when weighing all of the testimony of the witness.

For the foregoing reasons, we are not persuaded by Progressive's argument that Ms. O'Neil's testimony (Ex. 1022 ¶¶ 8, 13, 27, 32, 38) should be excluded.

## III.  CONCLUSION

Liberty has met its burden of proof, by a preponderance of the evidence, in showing that claims 1 and 3-18 of the '970 patent are unpatentable based on the following grounds:

A.  Claims 1, 3, 6-8, 10, 11, 13, 14, and 18 are unpatentable under 35U.S.C. § 103(a) over Bouchard, Pettersen, and Herrod;

B.  Claims 4, 5, 16, and 17 are unpatentable under 35 U.S.C. § 103(a) over Bouchard, Pettersen, and Florida Guide;

C.  Claim 9 is unpatentable under 35 U.S.C. § 103(a) over Bouchard, Pettersen, Herrod, and Camhi; and

D.  Claims 12 and 15 are unpatentable under 35 U.S.C. § 103(a) over Bouchard, Pettersen, Herrod, and Dorweiler.

Case CBM2012-00004
Patent 6,064,970

## IV.  ORDER

In consideration of the foregoing, it is

ORDERED that claims 1 and 3-18 of the '970 patent are
CANCELLED; and

FURTHER ORDERED that Progressive's Motion to Exclude
Evidence is *denied*.

53

Case CBM2012-00004
Patent 6,064,970

PETITIONER:

J. Steven Baughman
James R. Myers
Nicole M. Jantzi
ROPES & GRAY LLP
steven.baughman@ropesgray.com
james.myers@ropesgray.com
nicole.jantzi@ropesgray.com

PATENT OWNER:

Calvin P. Griffith
James L. Wamsley, III
John V. Biernacki
JONES DAY
cpgriffith@jonesday.com
jlwamsleyiii@jonesday.com

54



US006064970A

# United States Patent [19]

## McMillan et al.

[11] **Patent Number:** 6,064,970

[45] **Date of Patent:** *May 16, 2000

[54] **MOTOR VEHICLE MONITORING SYSTEM FOR DETERMINING A COST OF INSURANCE**

[75] Inventors: **Robert John McMillan**, Tampa, Fla.; **Alexander Dean Craig**, Moreland Hills, Ohio; **John Patrick Heinen**, Tampa, Fla.

[73] Assignee: **Progressive Casualty Insurance Company**, Mayfield Village, Ohio

[ * ] Notice: This patent is subject to a terminal disclaimer.

[21] Appl. No.: **09/135,034**

[22] Filed: **Aug. 17, 1998**

### Related U.S. Application Data

[63] Continuation of application No. 08/592,958, Jan. 29, 1996, Pat. No. 5,797,134.

[51] **Int. Cl.[7]** .................................................. **G06F 17/60**

[52] **U.S. Cl.** ......................... **705/4**; 340/439; 340/870.01; 360/5; 702/1; 705/400

[58] **Field of Search** ............................. 340/439, 870.01; 360/5; 701/1.7; 702/1; 705/4, 400

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,504,337 | 3/1970 | Ekman | 340/439 |
| 4,067,061 | 1/1978 | Juhasz | 360/5 |
| 4,234,926 | 11/1980 | Wallace et al. | 702/188 |
| 4,258,421 | 3/1981 | Juhasz et al. | 701/35 |
| 4,533,962 | 8/1985 | Decker et al. | 360/5 |
| 4,608,638 | 8/1986 | Tsikos | 364/424 |
| 4,638,295 | 1/1987 | Middlebrook et al. | 340/465 |
| 4,667,336 | 5/1987 | Best | 377/15 |
| 4,745,564 | 5/1988 | Tennes et al. | 702/141 |
| 4,763,745 | 8/1988 | Eto et al. | 180/143 |
| 4,807,179 | 2/1989 | Clere et al. | 360/5 X |
| 4,829,434 | 5/1989 | Karmel et al. | 72/866 X |
| 4,843,463 | 6/1989 | Michetti | 358/108 |
| 4,843,578 | 6/1989 | Wade | 364/565 |
| 4,853,720 | 8/1989 | Onari et al. | 364/431.07 |

(List continued on next page.)

#### FOREIGN PATENT DOCUMENTS

9002388 8/1989 WIPO .

#### OTHER PUBLICATIONS

"The Safest Cars of 91", Baig, Edward U.S. News & World Report v109, n22, p.71;Dec. 3, 1990.

"Vendor's Spice Up Services", Robert Deierlein, Beverage-World, v109, n1467, p.82; Jun. 1990.

Rosenberg, Martin; Alexander, Stephen A. ; Rate Classification Reform in New Jersey. Best's Review (Prop/Casualty) vo. 92. No. 12, pp. 30–32, Apr. 1992.

Kaneko, Tetsuya; Jovanis, Paul P. Multiday driving patterns and motor carrier accident risk. A disaggregate analysis. Accident Analysis and Prevention, vol. 24, No. 5, pp. 437–456, Jan. 1, 1992.

*Primary Examiner*—Edward R. Cosimano
*Attorney, Agent, or Firm*—Fay, Sharpe, Fagan Minnich & McKee, LLP

[57] **ABSTRACT**

A method and system of determining a cost of automobile insurance based upon monitoring, recording and communicating data representative of operator and vehicle driving characteristics. The cost is adjustable retrospectively and can be prospectively set by relating the driving characteristics to predetermined safety standards. The method comprises steps of monitoring a plurality of raw data elements representative of an operating state of the vehicle or an action of the operator. Selected ones of the raw data elements are recorded when the ones are determined to have an identified relationship to safety standards. The selected ones are consolidated for processing against an insurer profile and for identifying a surcharge or discount to be applied to a base cost of automobile insurance. A final cost is produced from the base costs and the surcharges or discounts.

**15 Claims, 6 Drawing Sheets**



**Liberty Mutual Exhibit 1001**

**6,064,970**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,939,652 | 7/1990 | Steiner | 364/424.04 |
| 4,987,541 | 1/1991 | Levente et al. | 364/424.04 |
| 4,992,943 | 2/1991 | McCracken | 364/424.04 |
| 5,055,851 | 10/1991 | Sheffer | 342/457 |
| 5,111,289 | 5/1992 | Lucas et al. | 358/108 |
| 5,189,621 | 2/1993 | Onari et al. | 364/431.04 |
| 5,223,844 | 6/1993 | Mansell et al. | 342/357 |
| 5,319,374 | 6/1994 | Desai et al. | 342/387 |
| 5,365,451 | 11/1994 | Wang et al. | 364/449 |
| 5,430,432 | 7/1995 | Camhi et al. | 340/438 |
| 5,499,182 | 3/1996 | Ousborne | 701/35 |
| 5,500,806 | 3/1996 | Bellin et al. | 364/528.33 |
| 5,548,273 | 8/1996 | Nicol et al. | 340/439 |
| 5,550,551 | 8/1996 | Alesiu | 342/457 |
| 5,638,273 | 6/1997 | Coiner et al. | 364/424.04 |
| 5,694,322 | 12/1997 | Westerlage et al. | 705/417 |
| 5,797,134 | 8/1998 | McMillan et al. | 705/400 |

**A7080**



FIG. 1



FIG. 2

BEGIN

VEHICLE SENSOR RECORD FILE — 204

ACQUIRE VEHICLE RECORD FILE — 202

TRIGGER EVENT RESPONSE FILE — 206

ACQUIRE TRIGGER EVENT RESPONSE FILE — 208

CONSOLIDATE FILES ACQUIRED — 210

PROCESS FILE AGAINST INSURED PROFILE — 212

PROCESS FILE AGAINST SURCHARGE ALGORITHM FILE — 214

PRODUCE PERIODIC BILLS TO BE MAILED TO INSURED — 216

ACCOUNT STATEMENTS



FIG. 3



FIG.4



FIG. 5

| INFORMATION DATABASE | INTERFACE | SAMPLE RATE |
|---|---|---|
| - MAPS<br>- SPEED LIMITS<br>- TRAFFIC SIGNS<br>- HIGHWAY CONDITIONS<br>- (FUTURE TBD) | -COMPUTER STORAGE | - ON DEMAND |
| VEHICLE SOURCES | INTERFACE | SAMPLE RATE |
| - ENGINE DATA<br>- BODY DATA<br>- ELECTRICAL DATA | - SAE J1978 CONNECTOR | - 10 - 15HZ |
| OTHER SOURCES | INTERFACE | SAMPLE RATE |
| - IVHS DATA<br>- GPS DATA<br>- SECURITY SYSTEM<br>- ADDITIONAL SYSTEM(S) | - VARIOUS I/O PORTS<br>(eg, RS-232 / 422, ETC.) | - VARIES |

FIG. 6

MOTOR VEHICLE INSURANCE PROCESS
VEHICLE DATA ACQUISITION PROCESS FLOW

6,064,970

1

## MOTOR VEHICLE MONITORING SYSTEM FOR DETERMINING A COST OF INSURANCE

This application is a continuation application of U.S. Ser. No. 08/592,958, filed Jan. 29, 1996, now U.S. Pat. No. 5,797,134.

## BACKGROUND OF THE INVENTION

The present invention relates to data acquisition and processing systems, and particularly to a system for monitoring motor vehicle operational characteristics and driver behavior to obtain increased amounts of data relating to the safety of use for purposes of providing a more accurate determination of a cost of insurance for the vehicle.

Conventional methods for determining costs of motor vehicle insurance involve gathering relevant historical data from a personal interview with the applicant for the insurance and by referencing the applicant's public motor vehicle driving record that is maintained by a governmental agency, such as a Bureau of Motor Vehicles. Such data results in a classification of the applicant to a broad actuarial class for which insurance rates are assigned based upon the empirical experience of the insurer. Many factors are relevant to such classification in a particular actuarial class, such as age, sex, marital status, location of residence and driving record.

The current system of insurance creates groupings of vehicles and drivers (actuarial classes) based on the following types of classifications.

Vehicle:

Age;

manufacturer, model; and

value.

Driver:

Age;

sex;

marital status;

driving record (based on government reports), violations (citations);

at fault accidents; and

place of residence.

Coverage:

Types of losses covered,

liability,

uninsured motorist,

comprehensive, and

collision;

liability limits; and

deductibles.

The classifications, such as age, are further broken into actuarial classes, such as 21 to 24, to develop a unique vehicle insurance cost based on the specific combination of actuarial classes for a particular risk. For example, the following information would produce a unique vehicle insurance cost.

Vehicle:

Age 1993 (three years old)

manufacturer, model Ford, Explorer XLT

value $ 18,000.

Driver:

Age 38 years old

sex male

marital status single

2

driving record (based on government reports)

violations 1 point (speeding)

at fault accidents 3 points (one at fault accident)

place of residence 33619 (zip code)

Coverage:

Types of losses covered

liability yes

uninsured motorist no

comprehensive yes

collision yes

liability limits $100,000./$300,000./$50,000.

deductibles $500./$500.

A change to any of this information would result in a different premium being charged, if the change resulted in a different actuarial class for that variable. For instance, a change in the drivers' age from 38 to 39 may not result in a different actuarial class, because 38 and 39 year old people may be in the same actuarial class. However, a change in driver age from 38 to 45 may result in a different premium because of the change in actuarial class.

Current insurance rating systems also provide discounts and surcharges for some types of use of the vehicle, equipment on the vehicle and type of driver. Common surcharges and discounts include:

Surcharges:

Business use.

Discounts:

Safety equipment on the vehicle

airbags, and

antilock brakes;

theft control devices

passive systems (e.g. "The Club"), and

alarm system; and

driver type

good student, and

safe driver (accident free).

A principal problem with such conventional insurance determination systems is that much of the data gathered from the applicant in the interview is not verifiable, and even existing public records contain only minimal information, much of which has little relevance towards an assessment of the likelihood of a claim subsequently occurring. In other words, current rating systems are primarily based on past realized losses. None of the data obtained through conventional systems necessarily reliably predicts the manner or safety of future operation of the vehicle. Accordingly, the limited amount of accumulated relevant data and its minimal evidential value towards computation of a fair cost of insurance has generated a long-felt need for an improved system for more reliably and accurately accumulating data having a highly relevant evidential value towards predicting the actual manner of a vehicle's future operation.

Many types of vehicle operating data recording systems have heretofore been suggested for purposes of maintaining an accurate record of certain elements of vehicle operation. Some are suggested for identifying the cause for an accident, others are for more accurately assessing the efficiency of operation. Such systems disclose a variety of conventional techniques for recording vehicle operation data elements in a variety of data recording systems. In addition, it has also been suggested to provide a radio communication link for such information via systems such as a cellular telephone to provide immediate communication of certain types of data elements or to allow a more immediate response in cases such as theft, accident, break-down or emergency. It has even been suggested to detect and record seatbelt usage to

6,064,970

3

assist in determination of the vehicle insurance costs (U.S. Pat. No. 4,667,336).

The various forms and types of vehicle operating data acquisition and recordal systems that have heretofore been suggested and employed have met with varying degrees of success for their express limited purposes. All possess substantial defects such that they have only limited economical and practical value for a system intended to provide an enhanced acquisition, recordal and communication system of data which would be both comprehensive and reliable in predicting an accurate and adequate cost of insurance for the vehicle. Since the type of operating information acquired and recorded in prior art systems was generally never intended to be used for determining the cost of vehicle insurance, the data elements that were monitored and recorded therein were not directly related to predetermined safety standards or the determining of an actuarial class for the vehicle operator. For example, recording data characteristics relevant to the vehicle's operating efficiency may be completely unrelated to the safety of operation of the vehicle. Further, there is the problem of recording and subsequently compiling the relevant data for an accurate determination of an actuarial profile and an appropriate insurance cost therefor.

Current motor vehicle control and operating systems comprise electronic systems readily adaptable for modification to obtain the desired types of information relevant to determination of the cost of insurance. Vehicle tracking systems have been suggested which use communication links with satellite navigation systems for providing information describing a vehicle's location based upon navigation signals. When such positioning information is combined with roadmaps in an expert system, vehicle location is ascertainable. Mere vehicle location, though, will not provide data particularly relevant to safety of operation unless the data is combined with other relevant data in an expert system which is capable of assessing whether the roads being driven are high-risk or low-risk with regard to vehicle safety.

The present invention contemplates a new and improved motor vehicle monitoring, recording and communication system, which primarily overcomes the problem of determining cost of vehicle insurance based upon data which does not take into consideration how a specific vehicle is operated. The subject invention will base insurance charges with regard to current material data representative of actual driving characteristics of the vehicle and driver operation to provide a classification rating of the operator and the vehicle in an actuarial class which has a vastly reduced rating error over conventional insurance cost systems. Additionally, the present invention allows for frequent (monthly) adjustment to the cost of coverage because of the changes in operator behavior and driving patterns. This can result in automobile insurance charges that are readily controllable by individual operators. The system is adaptable to current electronic operating systems, tracking systems and communication systems for the improved extraction of selected insurance related data.

BRIEF SUMMARY OF THE INVENTION

In accordance with the present invention, there is disclosed a method of determining a cost of automobile insurance based upon monitoring, recording and communicating data representative of operator and vehicle driving characteristics, whereby the cost is adjustable by relating the driving characteristics to predetermined safety standards. The method is comprised of steps of monitoring a plurality

4

of raw data elements representative of an operating state of a vehicle or an action of the operator. Selected ones of the plurality of raw data elements are recorded when they are determined to have an identified relationship to the safety standards. The recorded elements are consolidated for processing against an insured profile and for identifying, a surcharge or discount to be applied to a base cost of automobile insurance. The total cost of insurance obtained from combining the base cost and surcharges or discounts is produced as a final cost to the operator.

In accordance with another aspect of the present invention, the recording comprises identifying a trigger event associated with the raw data elements which has an identified relationship to the safety standards so that trigger information representative of the event is recorded.

In accordance with a more limited aspect of the present invention, the method comprises a step of immediately communicating to a central control station via an uplink, information representative of the trigger event and recording response information generated by the control station.

In accordance with yet another aspect of the present invention, the method comprises steps of generating calculated data elements and derived data elements from the raw data elements, and accumulating the calculated and derived data elements in a recording device.

The present invention will use information acquired from the vehicle to more accurately assess vehicle usage and thereby derive insurance costs more precisely and fairly. Examples of possible actuarial classes developed from vehicle provided data include:

Driver:

Total driving time in minutes by each driver of the insured vehicle;

number of minutes driving in high/low risk locations (high/low accident areas);

number of minutes of driving at high/low risk times (rush hour or Sunday afternoon);

safe driving behavior,
  using seat belts,
  use of turn signals,
  observance of speed limits, and
  observance of traffic control devices;

number of sudden braking situations; and

number of sudden acceleration situations.

Vehicle:

Location vehicle is parked at night (in garage, in driveway, on street); and

location vehicle is parked at work (high theft locations, etc.).

These new and more precise actuarial classes are considered to be better predictors of loss because they are based on actual use of the vehicle and the behaviors demonstrated by the driver. This will allow the consumers unprecedented control over the ultimate cost of their vehicle insurance.

In accordance with the present invention, additional discounts and surcharges based on data provided by the insured vehicle will be available. Examples of surcharges and discounts based on vehicle provided data include:

Surcharges:

Excessive hard braking situations occurring in high risk locations; and

intermittent use of a safety device, such as seat belts.

Discounts:

Regular selection of low/high risk routes of travel;

6,064,970

5

regular travel at low/high risk times;

significant changes in driving behavior that results in a lower risk;

vacation discount when the vehicle is not used;

regular use of safety devices; and

unfailing observance of speed limits.

There is some overlap between the use of actuarial classes and discounts and surcharges. Until data has been gathered and analyzed it is not possible to determine which vehicle provided data will be used to determine actuarial classes and which will be used for surcharges or discounts.

One benefit obtained by use of the present invention is a system that will provide precise and timely information about the current operation of an insured motor vehicle that will enable an accurate determination of operating characteristics, including such features as miles driven, time of use and speed of the vehicle. This information can be used to establish actual usage based insurance charges, eliminating rating errors that are prevalent in traditional systems and will result in vehicle insurance charges that can be directly controlled by individual operators.

It is another benefit of the subject invention that conventional motor vehicle electronics are easily supplemented by system components comprising a data recording, a navigation system and a communications device to extract selected insurance relevant data from the motor vehicle.

It is yet another object of the present invention to generate actuarial classes and operator profiles relative thereto based upon actual driving characteristics of the vehicle and driver, as represented by the monitored and recorded data elements for providing a more knowledgeable, enhanced insurance rating precision.

The subject new insurance rating system retrospectively adjusts and prospectively sets premiums based on data derived from motor vehicle operational characteristics and driver behavior through the generation of new actuarial classes determined from such characteristics and behavior, which classes heretofore have been unknown in the insurance industry. The invention comprises an integrated system to extract via multiple sensors, screen, aggregate and apply for insurance rating purposes, data generated by the actual operation of the specific vehicle and the insured user/driver.

Other benefits and advantages of the subject new vehicle insurance cost determination process will become apparent to those skilled in the art upon a reading and understanding of the specification.

## BRIEF DESCRIPTION OF THE DRAWINGS

The invention may take physical form in certain parts and steps and arrangements of parts and steps, the preferred embodiments of which will be described in detail in this specification and illustrated in the accompanying drawings which form a part hereof and wherein:

FIG. 1 is a flowchart generally describing a data gathering process from a vehicle;

FIG. 2 is a flowchart detailing the gathering and consolidating of appropriate information for determining a cost of insurance and the resulting insurance billing process;

FIG. 3 is a suggestive perspective drawing of a vehicle including certain data element monitoring, recording and communicating devices;

FIG. 4 is a block diagram of a vehicle on-board computer and recording system implementing the subject invention for selective communication with a central control center and a global positioning navigation system;

6

FIG. 5 is a flowchart generally illustrating a method for acquiring and recording vehicle insurance related data; and

FIG. 6 is a tabular illustration of various sources of insurance-related data, a necessary interface for acquiring the data and an exemplary sample rate therefor.

## DETAILED DESCRIPTION OF THE INVENTION

Referring now to the drawings, wherein the showings are for purposes of illustrating the preferred embodiments of the invention only and not for purposes of limiting same, the FIGURES show an apparatus and method for monitoring, recording and communicating insurance related data for determination of an accurate cost of insurance based upon evidence relevant to the actual operation and in particular the relative safety of that operation. Although described with specific reference to automobiles, this invention is also applicable to other operator controlled motor vehicles normally requiring insurance. Generally, a vehicle user is charged for insurance based upon statistical averages related to the safety of operation based upon the insurer's experience with other users who drive similar vehicles in a similar geographic area. The invention allows for the measure of the actual data while the motor vehicle is being driven. Such data measurement will allow the vehicle user to directly control his/her insurance costs by operating the vehicle in a manner which he/she will know will evidence superior safety of operation and a minimal risk of generation of an insurance claim. Examples of data which can be monitored and recorded include:

1. Actual miles driven;

2. Types of roads driven on (high risk vs. low risk); and,

3. Safe operation of the vehicle by the vehicle user through:
   A. speeds driven,
   B. safety equipment used, such as seat belt and turn signals,
   C. time of day driven (high congestion vs. low congestion),
   D. rate of acceleration,
   E. rate of braking,
   F. observation of traffic signs.

With reference to FIG. 3, an exemplary motor vehicle is shown in which the necessary apparatus for implementing the subject invention is included. An on-board computer 300 monitors and records various sensors and operator actions to acquire the desired data for determining a fair cost of insurance. Although not shown therein, a plurality of operating sensors are associated with the motor vehicle to monitor a wide variety of raw data elements. Such data elements are communicated to the computer through a connections cable which is operatively connected to the vehicle data bus 304 through an SAE-J1978 connector, or OBD-II connector or other vehicle sensors 306. A driver input device 308 is also operatively connected to the computer 300 through connector 307 and cable 302. The computer is powered through the car battery 310 or a conventional generator system (not shown). Tracking of the vehicle for location identification can be implemented by the computer 300 through navigation signals obtained from a GPS (global positioning system) antenna or other locating system 312. The communications link to a central control station is accomplished through the cellular telephone, radio, satellite or other wireless communication system 314.

FIG. 4 provides the block diagram of the in-vehicle computer system. The computer 300 is comprised of four

6,064,970

**7**

principal components, an on-board data storage device **402**, an input/output subsystem **404** for communicating to a variety of external devices, a central processing unit and memory device **406** and a real time operating kernel **408** for controlling the various processing steps of the computer **300**. The computer **300** essentially communicates with three on-board vehicle devices for acquisition of information representative of various actual vehicle operating characteristics. A driver input console **410** allows the driver to input data representative of a need for assistance or for satisfaction of various threshold factors which need to be satisfied before the vehicle can be operated. The physical operation of the vehicle is monitored through various sensors **412** in operative connection with the vehicle data bus, while additional sensors **414** not normally connected to the data bus can be in direct communication with the computer **300** as will hereinafter be more fully explained.

The vehicle is linked to an operation control center **416** by a communications link **418**, preferably comprising a conventional cellular telephone interconnection. A navigation sub-system **420** receives radio navigation signals from a GPS **422**.

The type of elements monitored and recorded by the subject invention comprise raw data elements, calculated data elements and derived data elements. These can be broken down as follows:

Raw Data Elements:
Power train sensors
  RPM,
  transmission setting (Park, Drive, Gear, Neutral),
  throttle position,
  engine coolant temperature,
  intake air temperature,
  barometric pressure;
Electrical sensors
  brake light on,
  turn signal indicator,
  headlamps on,
  hazard lights on,
  back-up lights on,
  parking lights on,
  wipers on,
  doors locked,
  key in ignition,
  key in door lock,
  horn applied;
Body sensors
  airbag deployment,
  ABS application,
  level of fuel in tank,
  brakes applied,
  radio station tuned in,
  seat belt on,
  door open,
  tail gate open,
  odometer reading,
  cruise control engaged,
  anti-theft disable;
Other sensors
  vehicle speed,
  vehicle location,
  date,
  time,
  vehicle direction,
  IVHS data sources.
Calculated Data Elements:
rapid deceleration;

**8**

rapid acceleration;
vehicle in skid;
wheels in spin;
closing speed on vehicle in front;
closing speed of vehicle in rear;
closing speed of vehicle to side (right or left);
space to side of vehicle occupied;
space to rear of vehicle occupied;
space to front of vehicle occupied;
lateral acceleration;
sudden rotation of vehicle;
sudden loss of tire pressure;
driver identification (through voice recognition or code or fingerprint recognition);
distance travelled; and
environmental hazard conditions (e.g. icing, etc.).
Derived Data Elements:
vehicle speed in excess of speed limit;
observation of traffic signals and signs;
road conditions;
traffic conditions; and
vehicle position.
This list includes many, but not all, potential data elements.

With particular reference to FIG. **1**, a flowchart generally illustrating the data gathering process of the subject invention is illustrated. Such a process can be implemented with conventional computer programming in the real time operating kernel **408** of the computer **300**. The process is identified with initially a begin step **100** (key in ignition?) and a check of whether the vehicle is operating at step **102**. If the vehicle is not operating a reverification occurs every two (2) minutes as shown at step **104**. It should be noted that the computer is continually powered by at least the vehicle battery **310** (FIG. **3**), but it can be appreciated that during operation the generator (not shown) will supply the energy. If the vehicle is operating, then there is a step of recording sensor information **106**. The recording comprises monitoring a plurality of raw data elements, calculated data elements and derived data elements as identified above. Each of these is representative of an operating state of the vehicle or an action of the operator. Select ones of the plurality of data elements are recorded when the ones are determined to have an identified relationship to the safety standards. For example, vehicle speed in excess of a predetermined speed limit will need to be recorded but speeds below the limit need only be monitored and stored on a periodic basis. The recording may be made in combination with date, time and location. Other examples of data needed to be recorded are excessive rates of acceleration or frequent hard braking.

The recording process would be practically implemented by monitoring and storing the data in a buffer for a selected period of time, e.g., thirty seconds. Periodically, such as every two minutes, the status of all monitored sensors for the data elements is written to a file which is stored in the vehicle data storage **402**. The raw, calculated and derived data elements listed above comprise some of the data elements to be so stored.

Certain of the recorded sensor information may comprise a trigger event of which inquiry is identified at step **108**. "Trigger events" are defined as a combination of sensor data requiring additional action or which may result in a surcharge or discount during the insurance billing process. Certain trigger events may require immediate upload **110** to a central control **112** which will then be required to take

6,064,970

9 | 10

appropriate action **114**. For example, a trigger event would be rapid deceleration in combination with airbag deployment indicating a collision, in which case the system could notify the central control of the vehicle location. Alternatively, if the operator were to trigger on an emergency light, similarly the system could notify the central control of the vehicle location indicating that an emergency is occurring. Alternatively, if the trigger information is not so serious as to require immediate upload (i.e., the inquiry is "NO") then, the trigger information is recorded, as at step **116**. For upload information, whatever response is taken by the central control is also recorded at step **118**. The trigger information recording step **116** and the recording sensor information step **106** may impart recording of information in the on-board data storage device **402** or memory **406**. The event response information recording at step **118** will usually occur in the central control station. Such acquisition information could be the dispatch of an emergency vehicle, or the telephoning of police or an EMS unit. The "NO" response to the trigger event inquiry **108** indicates that the system remains in a wait loop with the recording sensor information step **106**.

Trigger events are divided into two groups: those requiring immediate action and those not requiring immediate action, but necessary for proper billing of insurance. Those required for proper billing of insurance will be recorded in the same file with all the other recorded vehicle sensor information. Those trigger events requiring action will be uploaded **110, 112** to a central control center which can take action **114** depending on the trigger event. Some trigger events will require dispatch of emergency services, such as police or EMS, and others will require the dispatch of claims representatives from the insurance company.

The following comprises an exemplary of some, but not all, trigger events:

Need for Assistance:

These events would require immediate notification of the central control center.

1. Accident Occurrence. An accident could be determined through the use of a single sensor, such as the deployment of an airbag. It could also be determined through the combination of sensors, such as a sudden deceleration of the vehicle without the application of the brakes.
2. Roadside assistance needed. This could be through the pressing of a "panic button" in the vehicle or through the reading of a sensor, such as the level of fuel in the tank. Another example would be loss of tire pressure, signifying a flat tire.
3. Lock-out assistance needed. The reading of a combination of sensors would indicate that the doors are locked but the keys are in the ignition and the driver has exited the vehicle.
4. Driving restrictions. The insured can identify circumstances in which he/she wants to be notified of driving within restricted areas, and warned when he/she is entering a dangerous area. This could be applied to youthful drivers where the parent wants to restrict time or place of driving, and have a record thereof.

Unsafe Operation of the Vehicle

These events would be recorded in the in-vehicle recording device for future upload. Constant trigger events would result in notification of the driver of the exceptions.

1. Excessive speed. The reading of the vehicle speed sensors would indicate the vehicle is exceeding the speed limit. Time would also be measured to determine if the behavior is prolonged.

2. Presence of alcohol. Using an air content analyzer or breath analyzer, the level of alcohol and its use by the driver could be determined.
3. Non-use of seatbelt. Percent of sample of this sensor could result in additional discount for high use or surcharge for low or no use.
4. Non-use of turn signals. Low use could result in surcharge.
5. ABS application without an accident. High use could indicate unsafe driving and be subject to a surcharge.

With particular reference to FIG. **2**, a general flowchart describing the steps of the gathering of appropriate information for billing insurance on a periodic basis is illustrated.

At the initiation of the vehicle insurance billing process, the central billing system of the insurer will acquire **202** the vehicle sensor record file from the sensor record file **204** from each vehicle to be billed. This process of data acquisition will involve a periodic uploading of the vehicle file **204**. This file will be uploaded to the central system when the storage device **402** in the vehicle approaches capacity, on command, or when the billing process starts. All the information from the combination of files stored in the vehicle will be used to determine the bill for the insurance on the vehicle for the prior insurance period. Data acquisition is also made from the trigger event response file **206** in the acquisition step **208**. This data is stored in the central control center, and includes information for response activities listed above which require additional billing for services rendered to the insured.

At step **210**, the vehicle sensor record file and the trigger event response file are consolidated. Such files will include all the activity for which the insured is to be billed for the prior period. At step **212**, all the information comprising the insured profile, which is already maintained and stored in other insurance files, is applied to the consolidated activity files for the immediately prior period. This insured profile includes the information about coverages including limits and deductibles, which are necessary for establishing the appropriate cost of insurance for the subject insured. At step **214**, the acquired consolidated file information from step **210** and the overall insured profile acquired at step **212** are combined and processed against a surcharge or discount algorithm step, which include the specific factors for the various usage patterns and trigger events. The surcharges and discounts are continuously adjusted based on the loss results associated with driving behaviors demonstrated. Finally at step **216**, the appropriate billing is produced showing the charges for insurance and other services for the prior period. The billing can be sent electronically or in printed form to the insured for payment.

With particular reference to FIG. **5**, a general diagram of the process for acquiring and recording vehicle insurance related data is illustrated. At step **502**, the raw data elements are collected from the vehicle sensors that provide the raw data elements identified above. Calculated data elements are generated in step **504** and derived data elements are generated at step **508**. As noted, it is necessary to collect certain database information elements at step **506** prior to generating the derived data elements. A sample of all the data elements is stored in the vehicle at step **510**. The sample rate or the recording of the information is controlled based upon the particular insurance billing recording needs predetermined by an algorithm developed by the insurance company. The algorithm will change depending on the particular type of insurance related requirements for the information. At step **512**, if a certain incident, for example collision, occurs then a snapshot is generated of all the relevant data elements

6,064,970

11

at the time of the incident, **514**. If no such incident occurs (i.e., the condition inquiry is "NO"), the system remains in the data collection loop.

With reference to FIG. **6**, various examples of sources of insurance related data, the interface required to acquire the data and an example of the sample rate are illustrated for a preferred embodiment of the subject invention. Accordingly, it can be seen that for a certain information database comprised of maps, speed limits, traffic signs, and highway conditions is stored in the data storage device of the computer and can be obtained on demand therefrom. Acquiring data from vehicle sources such as engine data, body data and electrical data is obtained through a conventional SAEJ 1978 connector with an exemplary sample rate of 10–15 Hz. The other sources of relevant data, such as IVHs, GPS, security system or any additional systems are obtained through various I/O ports and the sample rate can be varied in accordance with the desired goals of the insurer.

One of the useful consequences of the subject invention is that other products could be marketed to a particular vehicle operator based on information provided from the subject invention from the operator's motor vehicle. Since the invention includes processes for gathering, extracting and analyzing information provided by the vehicle, a more informed judgment can be made about a determination of when and which products could be marketed to that motor vehicle operator. For example, by knowing that a vehicle operator travels on vacation in that vehicle to a certain resort location may give rise to a marketing of a package of products particular to the type of travel or the location. Another example would relate to the knowledge that the vehicle operator attends particular types of sporting events which may give rise to certain types of products catered to fans of that sporting event.

The invention has been described with reference to preferred embodiments. Obviously, modifications and alterations will occur to others upon a reading and understanding of the specification. It is our intention to include all such modifications and alterations insofar as they come within the scope of the appended claims or the equivalents thereof.

What is claimed is:

**1**. A method of generating a database comprising data elements representative of operator or vehicle driving characteristics, the method comprising:

monitoring a plurality of the data elements representative of an operating state of a vehicle or an action of the operator during a selected time period; and,

recording selected ones of the plurality of data elements into the database when said ones are determined to be appropriate for recording relative to determining a cost of insurance for the vehicle during the selected time period, said ones including, a time and location of vehicle operation and a corresponding log of vehicle speed for the time and location.

**2**. A database comprising data elements representative of operator or vehicle driving characteristics for a selected time period including a time and location of vehicle operation and a corresponding log of vehicle speed for the time and location, the database then being used to determine an insurance charge for the vehicle operation for said selected time period.

**3**. The database as defined in claim **2** wherein the data elements comprise raw data elements, derived data elements and calculated data elements.

**4**. A method of insuring a vehicle operator for a selected period based upon operating driving characteristics during the period, comprising, steps of:

12

generating an initial operator profile;

monitoring operator driving characteristics during the selected period; and

deciding a cost of vehicle insurance for the period based upon the operating characteristics monitored in that period.

**5**. A method of determining a cost of vehicle insurance for a selected period based upon monitoring, recording and communicating data representative of operator and vehicle driving characteristics during said period, whereby the cost is adjustable by relating the driving characteristics to predetermined safety standards, the method comprising:

determining an initial insured profile and a base cost of vehicle insurance based on said insured profile;

monitoring a plurality of data elements representative of an operating state of a vehicle or an action of the operator during the selected period;

recording selected ones of the plurality of data elements when said ones are determined to have a preselected relationship to the safety standards;

consolidating said selected ones for identifying a surcharge or discount to be applied to the base cost; and,

producing a final cost of vehicle insurance for the selected period from the base cost and the surcharge or discount.

**6**. A method of monitoring a human controlled power source driven vehicle, the method comprising:

extracting one or more data elements from at least one sensor wherein the one or more elements are of at least one operating state of the vehicle and the at least one human's actions during a data collection period;

analyzing, grouping, and storing the one or more data elements as group data values in a first memory related to a predetermined group of elements; and,

correlating the group data values to preset values in a second memory and generating an output data value based on the correlation wherein the output data value is used to compute an insurance rating for the vehicle FOR the data collection period.

**7**. The method according to claim **6**, further including the steps of:

determining if the one or more data elements indicate one or more predetermined triggering events, where if the determination is positive, correlating the one or more data elements to one or more types of triggering events stored in a third memory; and,

storing and transmitting a signal corresponding to the determined triggering event to a receiving system.

**8**. The method according to claim **6**, further including steps of:

determining if the one or more data elements indicate one or more predetermined triggering events, where if the determination is positive, correlating the one or more data elements to one or more types of triggering events stored in a third memory; and,

storing or transmitting a signal corresponding to the determined triggering event to a receiving system.

**9**. The method as defined in claim **6** wherein the output data value is additionally used for computing an insurance rating for the vehicle for a future data collection period.

**10**. The method according to claim **6**, further comprising the steps of:

using safety or other actuarial standard values as the preset values; and,

generating an adjusted insurance cost as the output data value.

6,064,970

**13**

**11**. The method according to claim **10**, further comprising the steps of:

using location and time as the one or more data elements which are compared to the safety or other actuarial standard values to generate the adjusted insurance cost.

**12**. The method according to claim **11** wherein:

the adjusted insurance cost can be for a prospective or retrospective basis.

**13**. The method according to claim **6**, further comprising the steps of:

using safety or other actuarial standard values as the preset values; and,

**14**

generating an adjusted underwriting cost as the output data value.

**14**. The method according to claim **13**, further comprising the steps of:

using location and time as the one or more data elements which are compared to the safety or other actuarial standard values to generate the adjusted underwriting cost.

**15**. The method according to claim **14** wherein:

the adjusted underwriting cost can be for a prospective or retrospective basis.

\*    \*    \*    \*    \*



US006064970C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (8789th)

# United States Patent

McMillan et al.

(10) **Number:** **US 6,064,970 C1**

(45) **Certificate Issued:** *Jan. 10, 2012

(54) **MOTOR VEHICLE MONITORING SYSTEM FOR DETERMINING A COST OF INSURANCE**

(75) Inventors: **Robert John McMillan**, Tampa, FL (US); **Alexander Dean Craig**, Moreland Hills, OH (US); **John Patrick Heinen**, Tampa, FL (US)

(73) Assignee: **Progressive Casualty Insurance Company**, Mayfield Village, OH (US)

Reexamination Request:
No. 90/011,252, Sep. 22, 2010

Reexamination Certificate for:

| | |
|---|---|
| Patent No.: | **6,064,970** |
| Issued: | **May 16, 2000** |
| Appl. No.: | **09/135,034** |
| Filed: | **Aug. 17, 1998** |

( * ) Notice: This patent is subject to a terminal disclaimer.

**Related U.S. Application Data**

(63) Continuation of application No. 08/592,958, filed on Jan. 29, 1996, now Pat. No. 5,797,134.

(51) **Int. Cl.**
*G06Q 40/00* (2006.01)

(52) **U.S. Cl.** ...................... **705/4**; 340/439; 340/870.01; 360/5; 702/1; 705/400

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/011,252, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner*—Karin Reichle

(57) **ABSTRACT**

A method and system of determining a cost of automobile insurance based upon monitoring, recording and communicating data representative of operator and vehicle driving characteristics. The cost is adjustable retrospectively and can be prospectively set by relating the driving characteristics to predetermined safety standards. The method comprises steps of monitoring a plurality of raw data elements representative of an operating state of the vehicle or an action of the operator. Selected ones of the raw data elements are recorded when the ones are determined to have an identified relationship to safety standards. The selected ones are consolidated for processing against an insurer profile and for identifying a surcharge or discount to be applied to a base cost of automobile insurance. A final cost is produced from the base costs and the surcharges or discounts.



US 6,064,970 C1

# 1

## EX PARTE
## REEXAMINATION CERTIFICATE
## ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the
patent, but has been deleted and is no longer a part of the
patent; matter printed in italics indicates additions made
to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

Claim **2** is cancelled.

Claims **1**, and **3-6** are determined to be patentable as
amended.

Claims **7-15**, dependent on an amended claim, are deter-
mined to be patentable.

New claims **16-18** are added and determined to be patent-
able.

1. A method of generating a database comprising data
elements representative of operator or vehicle driving char-
acteristics, the method comprising:

*generating acturial classes of insurance, which group
operators or vehicles having a similar risk
characteristic, from actual monitored driving charac-
teristics during a selected time period as represented by
recorded data elements representative of an operating
state of the vehicles or an action of the operators; and*

monitoring a plurality of the data elements representative
of an operating state of a vehicle or an action of [the] *an*
operator during a *latter* selected time period; and,

recording selected ones of the plurality of data elements
into the database when said ones are determined to be
appropriate for recording relative to determining a cost
of insurance for the vehicle during the *latter* selected
time period, said ones including, a time and location of
vehicle operation and a corresponding log of vehicle
speed for the time and location.

3. The [database] *method* as defined in claim [2] *1* wherein
the data elements comprise raw data elements, derived data
elements and calculated data elements.

4. A method of insuring a vehicle operator for a selected
period based upon operator driving characteristics during the
period, comprising, steps of:

generating an initial operator profile;

*generating an insured profile for the vehicle operator
prior to any monitoring of any of the vehicle operator's
driving characteristics wherein the insured profile com-
prises coverage information, including limits and
deductibles, for determining a base cost of vehicle
insurance for the vehicle operator;*

monitoring [operator] *the vehicle operator's* driving char-
acteristics during the selected period; and deciding a
*total* cost of vehicle insurance for the *selected* period
based upon the [operating] *vehicle operator's driving*
characteristics monitored in that *selected* period *and the
base cost of insurance.*

5. A method of determining a cost of vehicle insurance for
a selected period based upon monitoring, recording and

# 2

communicating data representative of operator and vehicle
driving characteristics during said period, whereby the cost
is adjustable by relating the driving characteristics to prede-
termined safety standards *that are related to a safe operation
of a vehicle,* the method comprising:

determining an initial insured profile *for the operator of
the vehicle prior to any monitoring of any data ele-
ments representative of an operating state of the vehicle
or an action of the operator of the vehicle* and deter-
mining a base cost of *the* vehicle insurance based on
said *initial* insured profile *wherein the initial insured
profile comprises coverage information, including lim-
its and deductibles;*

monitoring a plurality of *the* data elements representative
of [an] *the* operating state of [a] *the* vehicle or [an] *the*
action of the operator *of the vehicle* during the selected
period;

recording selected ones of the plurality of data elements
when said ones are determined to have a preselected
relationship to the safety standards;

consolidating said selected ones for identifying a sur-
charge or discount to be applied to the base cost; and,

producing a final cost of vehicle insurance for the selected
period from the base cost and the surcharge or discount.

6. A method of monitoring a human *operator* controlled
power source driven vehicle, the method comprising:

extracting one or more data elements *by a computer pro-
grammed to monitor sensor data* from at least one sen-
sor wherein the one or more elements are *actual driving
characteristics* of at least one operating state of the and
[the] at least one [human's] *human operator's* actions
during a data collection period;

analyzing, grouping, and storing the one or more data
elements as group data values in a first memory related
to a predetermined group of elements; and,

correlating the group data values to preset values in a
second memory and generating an output data value
based on the correlation wherein the output data value
is used to compute an insurance rating for the vehicle
[FOR the data collection period] *for the data collection
period that is based on an actuarial class of insurance
which groups other human operator controlled power
source driven vehicles having a similar operator or
vehicle risk characteristic and which also represents
the actual driving characteristics of the vehicle moni-
tored and recorded from the at least one sensor.*

*16. The method of claim 5, wherein the surcharge or dis-
count comprises a discount, and wherein producing the final
cost of vehicle insurance comprises applying the discount to
the base cost of vehicle insurance.*

*17. The method of claim 5, wherein the surcharge or dis-
count comprises a surcharge, and wherein producing the
final cost of vehicle insurance comprises applying the sur-
charge to the base cost of vehicle insurance.*

*18. A method of monitoring a human operator controlled
power source driven vehicle, the method comprising:*

*extracting one or more data elements by an on-board
computer from at least one sensor wherein the one or
more elements are actual driving characteristics of at
least one operating state of the vehicle and at least one
human operator's actions during a data collection
period;*

*analyzing, grouping, and storing the one or more data
elements as group data values in a first memory related
to a predetermined group of elements;*

US 6,064,970 C1

**3**

correlating the group data values to preset values related to safety standards in a second memory and generating an output data value based on the correlation; and

computing an insurance rating based upon the output data value for the vehicle for the data collection period, in which the insurance rating is also based on an actuarial class of insurance wherein said actuarial class of insurance groups other human operator controlled power source driven vehicles having a similar operator

**4**

or vehicle risk characteristic as well as represents the actual driving characteristics of the vehicle monitored and recorded from the at least one sensor, and setting prospective insurance premiums based on the actuarial class of insurance.

\* \* \* \* \*

Trials@uspto.gov                                                         Paper 10
571-272-7822                                            Entered:  January 25, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

**LIBERTY** MUTUAL INSURANCE CO.
Petitioner,

v.

**PROGRESSIVE** CASUALTY INSURANCE CO.
Patent Owner.

_____

Case CBM2012-00004 (JL)
Patent 6,064,970

_____

Before JAMESON LEE, JONI Y. CHANG, and MICHAEL R. ZECHER,
*Administrative Patent Judges*.

CHANG, *Administrative Patent Judge*

**DECISION**
**Institution of Covered Business Method Review**
***37 C.F.R. § 42.208***

Case CBM2012-00004
Patent 6,064,970

# I. BACKGROUND

On September 16, 2012, Liberty Mutual Insurance Company

("Liberty") filed a petition requesting a review under the transitional

program for covered business method patents of U.S. Patent 6,064,970 ("the

'970 patent"). The patent owner, Progressive Casualty Insurance Company

("Progressive"), filed a preliminary response on December 21, 2012. (Paper

No. 8.) We have jurisdiction under 35 U.S.C. § 324. *See* section 18(a) of

the Leahy-Smith America Invents Act, Pub. L. 112-29, 125 Stat. 284, 329

(2011) ("AIA").

The standard for instituting a covered business method review is set

forth in 35 U.S.C. § 324(a), which provides as follows:

> THRESHOLD --The Director may not authorize a post-grant
> review to be instituted unless the Director determines that the
> information presented in the petition filed under section 321, if
> such information is not rebutted, would demonstrate that it is
> more likely than not that at least 1 of the claims challenged in
> the petition is unpatentable.

Liberty challenges the patentability of claims 1 and 3-18 of the

'970 patent. Taking into account Progressive's preliminary response, we

determine that the information presented in the petition demonstrates that it

is more likely than not that the challenged claims are unpatentable. Pursuant

to 35 U.S.C. § 324 and section 18(a) of the AIA, we hereby authorize a

covered business method review to be instituted as to claims 1 and 3-18 of

the '970 patent.

2

A10825

Case CBM2012-00004
Patent 6,064,970

### A.  Liberty's standing

Liberty certifies that the '970 patent was asserted against it in Case No. 1:10-cv-01370, *Progressive Cas. Ins. Co. v. Safeco Ins. Co. of Ill. et al.,* pending in the U.S. District Court for the Northern District of Ohio.  (Pet. 5.) Progressive does not dispute that certification.

### B.  Covered Business Method Patent

Under section 18(a)(1)(E) of the AIA, the Board may institute a transitional proceeding only for a patent that is a covered business method patent.  Section 18(d)(1) of the AIA defines the term "covered business method patent" to mean:

> a patent that claims a method or corresponding apparatus for performing data processing or other operations used in the practice, administration, or management of a financial product or service, except that the term does not include patents for technological inventions.

The legislative history explains that the definition of covered business method patent was drafted to encompass patents "claiming activities that are financial or complementary to financial activity."  157 Cong. Rec. S5432 (daily ed. Sept. 8, 2011) (statement of Sen. Schumer).

Section 18(d)(2) of the AIA provides that "the Director shall issue regulations for determining whether a patent is for a technological invention."  The legislative history points out that the regulation for this determination should only exclude "those patents whose novelty turns on a technological innovation over the prior art and are concerned with a

3

Case CBM2012-00004
Patent 6,064,970

technical problem which is solved with a technical solution and which requires the claims to state the technical features which the inventor desires to protect." 157 CONG. REC. S1364 (daily ed. Mar. 8, 2011) (statement of Sen. Schumer).

Pursuant to that statutory mandate, the Office promulgated 37 C.F.R. § 42.301(b) to define the term "technological invention" for the purposes of the Transitional Program for Covered Business Method Patents. Therefore, for determining whether a patent is for a technological invention in the context of the Transitional Program for Covered Business Method Patents, 37 C.F.R. § 42.301(b) identifies the following for consideration:

> whether the claimed subject matter as a whole recites a technological feature that is novel and unobvious over the prior art; and solves a technical problem using a technical solution.

In the petition, Liberty asserts that the '970 patent is a covered business method patent because the '970 claimed invention is related to the administration and management of an insurance policy to adjust insurance premiums based on monitored vehicle data. (Pet. 3.) Liberty further contends that the claimed invention of the '970 patent is not a "technological invention" as defined in 37 C.F.R. § 42.301(b). (Pet. 4.) According to Liberty, the prosecution history of the prior reexamination shows that there was no "technological feature" that was novel and unobvious, and the subject matter as a whole does not solve a "technical problem." (Pet. 4-5.)

Progressive counters that the claimed invention of the '970 patent is a "technological invention" and, therefore, the '970 patent is ineligible for

4

Case CBM2012-00004
Patent 6,064,970

covered business method review.  (PR 45.)  More specifically, Progressive
argues that the claimed invention is similar to the credit card reader example
provided in the Office Patent Trial Practice Guide,[1] which the Office
indicates would not be eligible for a covered business method review.
(PR 43-45.)  Progressive also asserts that the claimed invention is more
technical than a credit card reader since it includes physical sensors for
sensing actual vehicle operation data.  (*Id*.)  Progressive further argues that
the claimed subject matter as a whole recites a technological feature that is
novel and unobvious over the prior art citing to the reasons for patentability
provided by the Examiner in the prior *ex parte* reexamination (NIIRC at
pages 9-22).  (PR 46-53.)  Additionally, Progressive contends that the
claimed subject matter as a whole solves a technical problem using a
technical solution because sensor data representing actual monitored driving
characteristics of an operating state of vehicles or actions of operators is
used to determining an insurance rating, solving the problem of the
unavailability of such data.  (PR 54-58.)

We are not persuaded by Progressive's arguments.  Rather, we
determine that Liberty has demonstrated that the '970 patent is a covered
business method patent and the claimed invention is not a "technological
invention" within the meaning of 37 C.F.R. § 42.301(b).

The determination of whether a patent is eligible for covered business
method review is based on what the patent claims.  In other words, a patent

---

[1] *Office Patent Trial Practice Guide*, 77 *Fed. Reg.* 48756, 48764
(Aug. 14, 2012).

Case CBM2012-00004
Patent 6,064,970

having one claim directed to a covered business method is eligible for review even if the patent includes additional claims.[2]

Here, the '970 patent discloses an invention that is related to a method of determining a cost of automobile insurance based upon monitoring, recording and communicating data representative of operator and vehicle driving characteristics. (Abs.) Claim 4, reproduced below, is illustrative of the claimed subject matter:

> A method of insuring a vehicle operator for a selected period based upon operator driving characteristics during the period, comprising, steps of:
>
> generating an initial operator profile;
>
> generating an insured profile for the vehicle operator prior to any monitoring of any of the vehicle operator's driving characteristics wherein the insured profile comprises coverage information, including limits and deductibles, for determining a base cost of vehicle insurance for the vehicle operator;
>
> monitoring the vehicle operator's driving characteristics during the selected period; and
>
> deciding a total cost of vehicle insurance for the selected period based upon the vehicle operator's driving characteristics monitored in that selected period and the base cost of insurance.[3]

---

[2] *Transitional Program for Covered Business Method Patents – Definitions of Covered Business Method Patent and Technological Invention; Final Rule*, 77 *Fed. Reg.* 48734, 48736 (Aug. 14, 2012) (Response to Comment 8).
[3] Reexam. Cert. at col. 1:50-65 (original emphases and bracketed matters omitted).

6

Case CBM2012-00004
Patent 6,064,970

For the issue of whether the claimed invention is a technological invention under 37 C.F.R. § 42.301(b), we focus our analysis on claim 4. We first note that Progressive's contentions are not commensurate with the scope of claim 4. Notably, the sensors for monitoring the vehicle operator's driving characteristics are described in the '970 specification, but are not recited in claim 4. In fact, claim 4 does not recite any technological element (*e.g.*, a computer or electrical sensors), but rather recites only method steps that can be completed by a person. For example, a passenger sitting in the vehicle when the vehicle operator is driving can monitor the vehicle operator's driving characteristics during the selected time period (*e.g.*, the passenger can observe whether the vehicle operator is driving over the speed limit or fails to stop at a red traffic light). Progressive fails to point out any specific novel and non-obvious technological element recited in claim 4. Therefore, Progressive's arguments related to the credit card reader example in the Office Patent Trial Practice Guide are misplaced.

As to Progressive's contentions regarding the Examiner's reasons for patentability for claim 4 in the prior *ex parte* reexamination, Progressive merely relies upon the Examiner's statements that the prior art cited in the reexamination does not disclose the insured-profile claim limitation (generating an insured profile prior to any monitoring of any of the vehicle operator's driving characteristics). (PR 49-50.) However, that claim limitation does not require a technological feature. Indeed, a person can generate an insured profile by writing down on a paper the value of the

7

Case CBM2012-00004
Patent 6,064,970

vehicle, insurance coverage limits, and deductibles, before a passenger monitors the vehicle operator's driving characteristics.

We are also not convinced by Progressive's argument that the claimed subject matter as a whole solves a technical problem using a technical solution. The '970 specification expressly states that the motor vehicle control and operating systems that were known in the art at the time of the invention could readily be modified to obtain the desired types of information relevant to determination of the cost of insurance. (Col. 3:25-28.) Determining a cost of vehicle insurance is a financial problem rather than a technical problem.

For the foregoing reasons, the subject matter of claim 4 is not a "technological invention" under 37 C.F.R. § 42.301(b). Accordingly, the '970 patent is eligible for a covered business method review.

## C. Prior Art Relied Upon

Liberty relies upon the following prior art references:

| Camhi | US patent 5,430,432 | July 4, 1995 | (Ex. 1010) |
| Bouchard | US patent 5,465,079 | Nov. 7, 1995 | (Ex. 1004) |
| Pettersen | WO 90/02388 | Mar. 8, 1990 | (Ex. 1005) |
| Herrod | GB-2 286 369 | Aug. 16, 1995 | (Ex. 1007) |

"Notes on Exposure and Premium Bases" by Paul Dorweiler, published on May 9, 1930 ("Dorweiler") (Ex. 1009)

1988 Automobile Insurance Shoppers' Guide, published in 1988 ("Florida Guide") (Ex. 1008)

8

Case CBM2012-00004
Patent 6,064,970

1995 Consumers Guide on Automobile Insurance (Downstate), published in 1995 ("New York Guide") (Ex. 1006)

### D. Grounds of Challenge

Claims 1, 4, 5, 6, and 18 are independent claims. Liberty seeks cancelation of claims 1 and 3-18 based on the following grounds:

A. Claims 1 and 3 are unpatentable under 35 U.S.C. § 103(a) over:

   (1) Bouchard and Pettersen;

   (2) Bouchard, Pettersen, and New York Guide; or

   (3) Bouchard, Pettersen, and Herrod.

B. Claims 4, 5, 16, and 17 are unpatentable under 35 U.S.C. § 103(a) over:

   (1) Bouchard and Pettersen;

   (2) Bouchard, Pettersen, and Florida Guide; or

   (3) Bouchard, Pettersen, and New York Guide.

C. Claims 6-8, 10-11, 13, and 14 are unpatentable under 35 U.S.C. § 103(a) over:

   (1) Bouchard and Pettersen;

   (2) Bouchard, Pettersen, and New York Guide; or

   (3) Bouchard, Pettersen, and Herrod.

D. Claim 9 is unpatentable under 35 U.S.C. § 103(a) over:

   (1) Bouchard, Pettersen, and Dorweiler;

   (2) Bouchard, Pettersen, New York Guide, and Dorweiler; or

   (3) Bouchard, Pettersen, Herrod, and Dorweiler.

9

Case CBM2012-00004
Patent 6,064,970

    (4) Bouchard, Pettersen, and Camhi;

    (5) Bouchard, Pettersen, New York Guide, and Camhi; or

    (6) Bouchard, Pettersen, Herrod, and Camhi.

E. Claims 12 and 15 unpatentable under 35 U.S.C. § 103(a) over:

    (1) Bouchard and Pettersen;

    (2) Bouchard, Pettersen, and New York Guide; or

    (3) Bouchard, Pettersen, and Herrod

    (4) Bouchard, Pettersen, and Dorweiler;

    (5) Bouchard, Pettersen, New York Guide, and Dorweiler; or

    (6) Bouchard, Pettersen, Herrod, and Dorweiler.

F. Claim 18 is unpatentable under 35 U.S.C. § 103(a) over:

    (1) Bouchard and Pettersen;

    (2) Bouchard, Pettersen, and New York Guide;

    (3) Bouchard, Pettersen, and Herrod; or

    (4) Bouchard, Pettersen, and Dorweiler.

## II. FINDINGS OF FACTS

The findings of fact in this decision including those in the analysis are supported by a preponderance of the evidence.

### A. Background of The '970 Patent

The background section of the '970 patent describes conventional insurance schemes that use actuarial classes to determine vehicle insurance costs. (Col. 1:17-2:37.) In particular, the background section of the '970

10

Case CBM2012-00004
Patent 6,064,970

patent teaches that conventional insurance cost determination methods involve generating an insured profile for the vehicle operator by gathering relevant historical data from a personal interview and public motor vehicle driving records.  (Col. 1:17-col. 2:37.)  The data results in a classification of the vehicle operator to a broad actuarial class for which insurance rates are assigned based upon the empirical experience of the insurer.  (Col. 1:22-24.)  The conventional insurance system creates groupings of vehicles and drivers (actuarial classes) based on certain types of classifications (*e.g.*, speeding or other traffic violations and number of accidents).  (Col. 1:21-27; col. 2:1-4.)  The classifications are further broken into actuarial classes to develop a unique vehicle insurance cost based on the specific combination of actuarial classes for a particular risk.  (Col. 1:53-56.)   Based on the information in the insured profile (*e.g.*, the value of the vehicle, driver's record, and type of coverage), a unique vehicle insurance cost is determined.  (Col. 1:56-col. 2:12.)  Additionally, conventional insurance rating systems provide discounts and surcharges for certain types of use of the vehicle, equipment on the vehicle, and type of driver.  (Col. 2:22-24.)  For example, discounts are provided to safe drivers, such as those that have low number of speeding violations or accidents.  (Col. 1:17-col. 2:37.)

### B.  Camhi

Camhi discloses an electronic monitoring and recording system installed in a vehicle for detecting unsafe driving conditions (*e.g.*, detecting the actual speed of the vehicle and indicating whether the speed is above or

11

Case CBM2012-00004
Patent 6,064,970

below a predetermined safe value).  (Col. 3:65-col. 4:7.)  The recorded

information would enable insurance companies to evaluate the driving habits

of vehicle operators.  (Col. 1:62-65.)  And vehicle operators would be

motivated to drive more safely by the reward of lower insurance premiums.

(Col. 2:29-32.)  Figure 3 of Camhi, reproduced below, is a block diagram of

an embodiment of Camhi that has a microcontroller multiple input data

acquisition and monitoring unit:



Figure 3 is a block diagram of a device of Camhi.

Camhi's system has a processor 14B, multiple input signal generators

12B, an optional external terminal 36, and a storage unit 26B.  (Col. 5:59-

col. 6:18.)  Using the multiple input signal generators 12B and the

programming stored in the ROM 32, multiple vehicle operating variables

may be monitored, and a variety of unsafe vehicle operating conditions may

12

Case CBM2012-00004
Patent 6,064,970

be predefined and simultaneously monitored for their occurrence.  (Col. 6:5-
18.)  Further, when a predefined unsafe condition occurs, information
pertaining to the predefined unsafe condition occurrence may be transferred
to storage unit 26B.  (*Id*.)  Camhi also discloses that the recorded
information related to driving conditions may be saved in a storage unit for
later review and analysis.  (Col. 3:42-49.)

## C. Bouchard

Bouchard discloses a method and an apparatus for evaluating a
driver's performance under actual real-time conditions and for determining
the driver's ability to safely operate a vehicle.  (Abs.)   Specifically, the
system monitors the driver's performance characteristics such as average
driving speed, braking and acceleration habits, and typical distance from the
vehicle immediately in front.  (Col. 28:47-52.)  The driver's performance is
constantly monitored and compared to that driver's past performance and the
normal driving standards.  (Abs.)

Bouchard's system has an event recording apparatus (ERA) that
records selectable vehicle performance, operational status, and/or
environment information.  (Col. 5:53-57.)  The ERA system is configured to
store a wide variety of vehicle information gathered by sensors dispersed
throughout a vehicle.  (Col. 5:66-col. 6:1.)  The recorded information is used
to determine a baseline performance standard based on the driver's past
performance against which a driver's present performance can be measured.
(Col. 5:60-64.)  Each driver has a personalized ERA that maintains

13

Case CBM2012-00004
Patent 6,064,970

information that identifies the driver and a record of the driver's driving history and performance. (Col. 6:4-8.) A system processing unit, shared by the ERA and the driver fitness evaluating system, generates a profile of the driver based upon the information that is stored in the ERA. (Col. 6:9-15.)

### D. Pettersen

Pettersen discloses an electronic monitoring and reporting system for recording the driving pattern of a motor vehicle. (P. 1-7[4].) In particular, Pettersen's system monitors the speed of the vehicle, the distance driven, and the acceleration of the vehicle, to generate data describing the driving pattern of the motor vehicle. (P. 1-2.) According to Pettersen, it would be advantageous to car insurance companies to use such an electronic monitoring system for recording the driving pattern of the policy holder and set a bonus arrangement that gives a higher bonus to those policy holders having a "careful" driving pattern (*e.g.*, low speeds and low accelerations). (P. 1.) Pettersen also discloses that policy holders can utilize the system to control the amount of disbursements from the insurance companies by reducing driving speed and number of accidents. (*Id.*)

### E. Herrod

Herrod discloses a computer-based monitoring and reporting device that is used in a vehicle to measure driver acceleration patterns and report associated accident risks. (P. 1-2.) Herrod's device uses the measured

---

[4] The page numbers refer to the original page numbers of the references, and not the exhibit page numbers.

14

Case CBM2012-00004
Patent 6,064,970

acceleration data to classify the driver into one of several groups, each of which associates with a different level of accident risk. (*Id*.)  According to Herrod, safe drivers can use the measured acceleration data to demonstrate their competence to insurance companies. (P. 1.)

## F. Florida Guide

The Florida Guide is an automobile insurance shoppers' guide that is designed to help insurance policy holders control some of the costs associated with automobile insurance. (Title and Comm. Message.)  According to the Florida Guide, all drivers in the state of Florida must carry a minimum amount of property damage liability coverage in addition to the required personal injury protection coverage. (P. 3.)  Further, auto insurance premium may vary based on many factors such as the type of coverage the policy holder selects, including liability limits and deductibles (p. 11), and the area where the policy holder garages their car (p. 13).  For example, if the policy holder selects high liability limits and low deductibles, the policy holder is likely to pay more for auto insurance. (P. 11.)  Different premiums are charged in different areas because of frequency of accidents, medical expenses and repair coast. (P. 13.)

## G. New York Guide

The New York Guide is a consumer guide on automobile insurance. In particular, the New York Guide provides ways that the insurance holders may save money on auto insurance, such as increasing the deductibles on physical damage coverage. (P. 17-19.)

15

Case CBM2012-00004
Patent 6,064,970

### III. PRINCIPLES OF LAW

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art, (2) any differences between the claimed subject matter and the prior art, (3) the level of skill in the art, and (4) where in evidence, so-called secondary considerations. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966).

### IV. ANALYSIS

#### A. Claim Construction

In a covered business method patent review, claim terms are given their broadest reasonable construction in light of the specification of the patent in which they appear. 37 C.F.R. § 42.300(b). Thus, we determine the scope of the claims by giving claim terms their broadest reasonable construction in light of the specification as it would be interpreted by one of ordinary skill in the art. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc).

Here, Liberty states that for the sole purposes of this proceeding, it construes the claim language such that claim terms are given their broadest reasonable interpretation, based upon the interpretation given by the Office

16

Case CBM2012-00004
Patent 6,064,970

during the prior *ex parte* reexamination of the '970 patent (Control
No. 90/011,252).  (Pet. 19-20.)  Specifically, Liberty lists several key terms
and their constructions (reproduced in the table below) as applied during the
prior reexamination.  (Pet. 20-22.)

     Progressive does not oppose those claim constructions.  Upon review
of the record, Liberty's claim constructions seem to be consistent with the
specification.  Further, in the prior reexamination, the Office gave the claim
terms their broadest reasonable construction consistent with the
specification.  *See e.g.*, Ex. 1003 at 755, 3/7/11 OA at 6.  Based on the
record before us, we therefore adopt the constructions provided by Liberty in
the petition.

| Claim Term | Construction |
|---|---|
| Vehicle (claims 1, 3-18) | Operator controlled motor vehicles normally requiring insurance, including, but not limited to, automobiles |
| Initial operator profile/ initial insured profile (claims 4-5, 16-17) | Initial files or information with respect to the operator or the insuring thereof |
| Actuarial class (claims 1,3, 6-15, 18) | A combination/group/groupings related to loss/risk/safety which are determined from classifications/characteristics representative of motor vehicle operational characteristics and driver behavior for which data is gathered |

17

Case CBM2012-00004
Patent 6,064,970

| Cost of insurance/cost of vehicle insurance (claims 1, 3-5, 16-17) | A/one or more or all cost(s) associated with insurance of the vehicle, including, but not limited to, a cost to the insured and/or insurer/underwriter associated with the insurance |
|---|---|
| Safety standard (claims 5, 10-11, 13-14, 16-18) | Value/criteria associated with the promotion of safety/prevention of risk/loss/injury |
| Base cost (claims 4-5, 16-17) | A/one or some cost(s), e.g., not all costs or the final or total cost or gross premium, associated with insurance of the vehicle, e.g., a cost to the insured and/or insurer/underwriter associated with the insurance |
| Extracting (claims 6-15, 18) | Collecting, deriving, generating or calculating |
| Insurance rating (claims 6, 9, 18) | A/some value/cost used to determine an overall cost associated with insurance of the vehicle |
| Storing and transmitting a signal corresponding to the determined triggering event to a receiving system (claim 7) | Storing of information corresponding to the event and transmitting of a signal/information corresponding to the event to a receiving system which system may or may not be remote. |

### B. Claims 4, 5, 16, and 17

Claims 4 and 5 are independent claims, and claims 16 and 17 depend from claim 5.  Claim 4, reproduced below, is representative:

18

Case CBM2012-00004
Patent 6,064,970

> A method of insuring a vehicle operator for a selected period based upon operator driving characteristics during the period, comprising, steps of:
>
>> generating an initial operator profile;
>>
>> *generating an insured profile for the vehicle operator prior to any monitoring of any of the vehicle operator's driving characteristics wherein the insured profile comprises coverage information, including limits and deductibles, for determining a base cost of vehicle insurance for the vehicle operator;*
>>
>> monitoring [operator] *the vehicle operator's* driving characteristics during the selected period; and
>>
>> deciding a *total* cost of vehicle insurance for the selected period based upon the [operating] *vehicle operator's driving* characteristics monitored in that selected period *and the base cost of insurance*.[5]

Liberty argues that claims 4, 5, 16, and 17 are unpatentable under 35 U.S.C. § 103(a) over the combination of Bouchard and Pettersen, by itself, or alternatively in view of Florida Guide or New York Guide. (Pet. 41-50, 71, and 72.)  In particular, Liberty contends that the cited prior art references describe all of the claim elements.  (Pet. 34-38.)  Liberty further provides the rationales for combining the references.  (Pet. 31-34.)

Progressive disagrees and counters that the cited prior art references fail to describe the insured-profile claim limitation ("generating an insured profile for the vehicle operator *prior to any monitoring* of any of the vehicle operator's driving characteristics wherein the insured profile comprises coverage information, including limits and deductibles, for determining a

---

[5] Reexam. Cert. at col. 1:50-65.

19

Case CBM2012-00004
Patent 6,064,970

*base cost* of vehicle insurance for the vehicle operator"), and the total-cost claim limitation ("*deciding a total cost* of vehicle insurance for the selected period *based upon* the vehicle operator's driving characteristics monitored in that selected period and the *base cost* of insurance"), as recited in claim 4. (PR 28-36.)  Specifically, Progressive argues that the references do not describe determining a total cost of insurance that is based on a base cost of insurance determined using an insured profile that is generated *prior to any monitoring* of any of the vehicle operator's driving characteristics.  (PR 32, 34, 36.)

We do not agree with Progressive since its arguments are based on an overly narrow reading of the prior art references without sufficient consideration of the knowledge of one with ordinary skill in the art.  We note that an obviousness analysis "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ."  *KSR*, 550 U.S. at 418; *In re Translogic Tech.*, 504 F.3d 1249, 1259 (Fed. Cir. 2007).  Prior art references must be "considered together with the knowledge of one of ordinary skill in the pertinent art."  *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).  Moreover, "it is proper to take into account not only specific teachings of the references but also the inferences which one skilled in the art would reasonably be expected to draw therefrom."  *In re Preda*, 401 F.2d 825, 826 (CCPA 1968).

20

Case CBM2012-00004
Patent 6,064,970

On this record, the evidence shows that the knowledge level of one with ordinary skill in the art is quite advanced.[6]  For instance, conventional insurance schemes that use actuarial classes to determine vehicle insurance costs were well known in the art at the time of the invention.  (*See e.g.*, PR 13-14; 34.)  Further, we agree with Progressive that the Florida Guide and New York Guide cited by Liberty discuss the same conventional prior art knowledge that is disclosed in the background section of the '970 patent.  (*See e.g.*, PR 13 (The Florida Guide and New York Guide "discuss the same subject matter (*i.e.*, the existence of traditional actuarial classes) that is disclosed in the background section of the '970 patent"); PR 34 (The cited portions of the Florida Guide are "essentially identical to the prior art knowledge disclosed in columns 1 and 2 of the '970 patent."))  We therefore conclude that the background section of the '970 patent (specifically col. 1:17-2:37) is admitted conventional prior art.  *In re Nomiya*, 509 F.2d 566, 571 (CCPA 1975).  And thus the knowledge of one with ordinary skill in the

---

[6] The field of the '970 patent is insurance which includes determining a cost of vehicle insurance based on telematics data.  Ex 1011, ¶ 17; Ex 1014, ¶ 17. A person of ordinary skill in the art as to insurance pricing would have at least a B.S. in Mathematics, or equivalent, with at least 5 years of experience in the insurance industry setting premiums for auto insurance, and as an associate in the Casualty Actuarial Society.  Ex 1011, ¶ 17.  A person of ordinary skill in the art as to telematics data would have at least a B.S. degree in electrical engineering, computer engineering, computer science or the equivalent thereof and at least one to two years of experience with vehicle telematics systems.  Ex 1014, ¶ 17.

21

Case CBM2012-00004
Patent 6,064,970

art would include a thorough understanding of using actuarial classes to determine vehicle insurance costs.

We regard the conventional insurance cost determination techniques noted in the background section of the '970 patent (col. 1:17-2:37) as basic knowledge within the level of ordinary skill in the art.  Hence, a person of ordinary skill in the art would have appreciated that when a vehicle operator is applying for an insurance policy from an insurance company, an insured profile for the vehicle operator would be generated to determine a base cost, and such an insured profile includes coverage information such as limits and deductibles.  We also observe that a person of ordinary skill in the art would have recognized that the base cost is the amount that the insurance company charges *prior to applying any discounts or surcharges*, and the total cost is calculated based on the base cost and any applicable discounts or surcharges.

The main difference between conventional insurance cost determination techniques and the disputed limitations is monitoring the vehicle operator's driving characteristics after the insured profile is generated.  Nevertheless, monitoring the vehicle operator's driving characteristics *for determining discounts* (which occurs after the insured profile is generated) is described by the collective teachings of Bouchard and Pettersen.

Bouchard and Pettersen disclose electronic monitoring devices which drivers utilize to demonstrate to insurance companies that they are safe drivers in order to obtain discounts from the insurance companies.  Specifically, Bouchard describes a method and an apparatus for evaluating a

22

Case CBM2012-00004
Patent 6,064,970

driver's performance under actual real-time conditions and for determining the driver's ability to safely operate a vehicle. (Bouchard, Abs.) Pettersen describes an electronic monitoring and reporting system. (Pettersen 1-7.) According to Pettersen, it would be advantageous to insurance companies to use such an electronic monitoring system for recording the driving pattern of the policy holder and setting a bonus arrangement that gives a higher bonus to those policy holders having a "careful" driving pattern (*e.g.*, low speeds and low accelerations). (Pettersen 3.) Pettersen also discloses that policy holders can utilize the system to control the amount of disbursements from the insurance companies by reducing driving speed and number of accidents. (*Id*.)

In light of the collective teachings of Bouchard, Pettersen, and the Florida Guide, it would have been obvious to one with ordinary skill in the art to use *an electronic monitoring device* to determine whether a vehicle operator is a safe driver *for determining discounts. See Leapfrog Ent., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1161 (Fed. Cir. 2007) ("[a]ccommodating a prior art mechanical device that accomplishes [a desired] goal to modern electronics would have been reasonably obvious to one of ordinary skill in designing children's learning devices"). As discussed previously, generating an insured profile *prior to applying any discounts* to the base cost was well known in the art. Accordingly, it would have been obvious to one of ordinary skill in the art to generate an insured profile for determining a base cost *prior to any monitoring* the vehicle operator's driving characteristics to determine the total cost of vehicle

23

Case CBM2012-00004
Patent 6,064,970

insurance based upon the vehicle operator's driving characteristics and the base cost.

For the foregoing reasons, we conclude that Liberty has demonstrated that it is more likely than not that claim 4 would have been obvious over Bouchard, Petterson, and the Florida Guide. As to claims 5, 16, and 17, Progressive relies upon the same arguments presented with regard to claim 4. (PR 36-37, 40.) The explanations provided by Liberty as to how each element of those claims is met by the cited prior art references appear to have merit and are otherwise unrebutted. Therefore, we likewise conclude that Liberty has demonstrated that it is more likely than not that claims 5, 16, and 17 are unpatentable over the same prior art of record.

### C. Claims 1, 3, 6-15, and 18

Claims 1, 6, and 18 are independent claims. Claim 1, reproduced below, is representative:

> A method of generating a database comprising data elements representative of operator or vehicle driving characteristics, the method comprising:
>
> *generating acturial [sic] classes of insurance, which group operators or vehicles having a similar risk characteristic, from actual monitored driving characteristics during a selected time period as represented by recorded data elements representative of an operating state of the vehicles or an action of the operators; and*
>
> monitoring a plurality of the data elements representative of an operating state of a vehicle or an action of [the] *an* operator during a *latter* selected time period; and,

24

Case CBM2012-00004
Patent 6,064,970

> recording selected ones of the plurality of data elements
> into the database when said ones are determined to be
> appropriate for recording relative to determining a cost of
> insurance for the vehicle during the *latter* selected time period,

> said ones including, a time and location of vehicle
> operation and a corresponding log of vehicle speed for the time
> and location.[7]

Liberty alleges that claims 1, 3, 6-15 and 18 are unpatentable under 35 U.S.C. § 103(a) over the combination of Bouchard and Pettersen, by itself, or alternatively in view of Herrod or the New York Guide.  (Pet. 34-41, 50-70, and 73-79.)  Liberty also relies upon Camhi and Dorweiler to satisfy the additional limitations in the dependent claims 9, 12, and 15.  In particular, Liberty contends that the cited prior art references describe all of the claim elements.  (*Id*.)  Liberty further provides the rationales for combining the references.  (Pet. 31-34.)

Progressive counters that the cited prior art references fail to describe the actuarial-class claim limitation ("generating actuarial classes of insurance, which group operators or vehicles having a similar risk characteristic, *from actual monitored driving characteristics* during a selected time period as represented by recorded data elements representative of an operating state of the vehicles or an action of the operators"), as recited in claim 1.  (PR 22.)  According to Progressive, Herrod's disclosure of a particular behavioral group based on the driver's driving characteristics are

---

[7] Reexam. Cert. col. 1:27-48.

Case CBM2012-00004
Patent 6,064,970

not "actuarial classes of insurance" because Herrod uses the behavioral groups for providing in-car advice for safe driving practices, not for generating "actuarial classes of insurance" as required by the actuarial-class claim limitation. (PR 23-25.) Progressive also asserts that Herrod's disclosure of behavioral groups is a "vague, high-level disclosure [that] includes no enabling disclosure" of generating actuarial classes of insurance as required by claim 1. (PR 26-28.)

We are not persuaded by Progressive's arguments. Specifically, Progressive fails to recognize that prior art references must be "considered together with the knowledge of one of ordinary skill in the pertinent art." *In re Paulsen*, 30 F.3d at 1480.

To conduct a proper obviousness analysis, Herrod's disclosure must be read in light of the knowledge of one with ordinary skill in the art. As discussed previously, generating actuarial classes of insurance which group operators or vehicles having a similar risk characteristic was well known in the art. Further, the requirement that the actuarial classes are generated *from actual monitored driving characteristics* is described by Herrod. (Pet. 39, citing to Herrod Abs. and 1-2.)

Herrod discloses a computer-based monitoring and reporting device that is used in a vehicle to measure driver acceleration patterns and report associated accident risks. (Herrod 1-2.) Herrod's device uses the measured acceleration data to classify the driver into one of several groups, each of which associates with a different level of accident risk. (*Id.*) According to

26

Case CBM2012-00004
Patent 6,064,970

Herrod, safe drivers can use the measured acceleration data to demonstrate
their competence to insurance companies.  (Herrod 2.)

Under the broadest reasonable construction standard, as discussed
previously, the term "actuarial class" is interpreted as "a
combination/group/groupings related to loss/risk/safety which are
determined from classifications/characteristics representative of motor
vehicle operational characteristics and driver behavior for which data is
gathered."  Applying that claim construction, Herrod's driver accident-risk
groups clearly satisfy that the "actuarial class" element since Herrod's driver
behavioral/accident-risk groups are determined based on the actual measured
acceleration data and each group is associated with a different level of
accident risk.  In light of the collective teachings of Bouchard, Pettersen, and
Herrod, it would have been obvious to one with ordinary skill in the art to
generate actuarial classes *from actual monitored driving characteristics*.

Progressive's argument that Herrod's disclosure of driver behavioral
groups is limited to providing in-car advice is without merit.  (PR 23-25.)
Herrod describes that through monitoring equipment safe drivers are able to
demonstrate their competence to insurance companies (Herrod 2,
Background).  *See KSR*, 550 U.S. at 416 (A reference may be read for all
that it teaches, including uses beyond its primary purpose.).

As to Progressive's arguments regarding non-enabling disclosure of
Herrod, we are not convinced.  (PR 25-27.)  Prior art publications and
patents are presumed to be enabled.  *In re Antor Media Corp.,* 689 F.3d
1282, 1287-88 (Fed. Cir. 2012); *Amgen Inc. v. Hoechst Marion Roussel,*

27

Case CBM2012-00004
Patent 6,064,970

*Inc.*, 314 F.3d 1313, 1355 (Fed. Cir. 2003) (both claimed and unclaimed materials disclosed in a prior art patent are presumptively enabling, placing the burden on the patentee to show that unclaimed disclosures in a prior art patent are not enabling). Progressive fails to demonstrate that Herrod does not provide an enabling disclosure for the disputed claim limitation. Specifically, Progressive has not provided sufficient factual basis to support a showing that undue experimentation would be needed to practice the disputed claim limitation based on Herrod disclosure. *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

For the foregoing reasons, we conclude that Liberty has demonstrated that it is more likely than not that claim 1 would have been obvious over Bouchard, Petterson, and Herrod. As to claims 3, 6-15, and 18, Progressive relies upon the same arguments presented with regard to claim 1. (PR 38-40.) Liberty's explanations as to how each element of those claims is met by the cited prior art references appear to have merit and are otherwise unrebutted. (Pet. 39-41; 50-70; 73-77.) Therefore, we likewise conclude that Liberty has demonstrated that it is more likely than not that claims 3, 6-15, and 18 are unpatentable over the prior art of record.

## V. OTHER CONSIDERATIONS

Progressive requests the Office to exercise its authority under 35 U.S.C. § 325(d) to deny the petition because the asserted prior art references and arguments were considered by the Office in the prior *ex parte* reexamination (Control No. 90/011,252). (PR 10-16.) In Progressive's

28

Case CBM2012-00004
Patent 6,064,970

view, to rehear grounds already considered would be contrary to the AIA
and its legislative history, which foreclose repeated petitions that rely on the
same or substantially the same prior art or arguments.  (*Id.)*

We agree that the Office has the authority under 35 U.S.C. § 325(d) to
reject a petition when the same or substantially the same prior art or
arguments previously were presented to the Office.  The relevant portions of
35 U.S.C. § 325(d) are reproduced as follows:

> In determining whether to institute or order a proceeding under
> this chapter, chapter 30, or chapter 31, the Director **may** take
> into account whether, and reject the petition or request because,
> the same or substantially the same prior art or arguments
> previously were presented to the Office.  (Emphasis added.)

The legislative history also recognizes that 35 U.S.C. § 325(d) "***allows*** the
Patent Office to reject any request for a proceeding, including a request for
*ex parte* reexamination, if the same or substantially the same prior art or
arguments previously were presented to the Office with respect to that
patent."  157 Cong. Rec. S1042 (daily ed. Mar. 1, 2011) (statement of
Sen. Kyl) (emphasis added).

It is important to note that the Office is <u>not</u> required to reject a petition
merely for the reason that the same or substantially the same prior art or
arguments were previously considered by the Office.  Both the statutory
provision and its legislative history include *permissible* language (*e.g.*,
"may" and "allows"), rather than *mandatory* language (*e.g.*, "must" or
"requires").

29

Case CBM2012-00004
Patent 6,064,970

While we are cognizant of the burden on the patent owner and Office to rehear the same or substantially the same prior art or arguments that were considered by the Office in a prior proceeding, there are sufficient reasons in the instant proceeding to exercise our discretion to institute a review. Notably, we observe that Liberty, as the third-party requester in the prior *ex parte* reexamination, did not have the opportunity to submit arguments or evidence with respect to the amended or new claims in the prior proceeding. (Pet. 10-17.)  Those claims are now being challenged in the instant proceeding.  And Herrod, which is relied upon by Liberty in the petition, was not previously considered by the Office.  (Pet. 29.)  Moreover, a preponderance of the evidence supports that it is more likely than not that the challenged claims are unpatentable in view of the prior art of record.

Accordingly, taking into account the burden on the patent owner and the considerations set forth in 35 U.S.C. § 326(b) (*e.g.*, the efficient administration of the Office), we grant the petition as to those grounds that are authorized below, but we exercise our discretion to deny all other grounds as cumulative.  *See also* 37 C.F.R. § 42.208.  Progressive has the opportunity to file a response with supporting evidence to those grounds that are authorized, but such a patent owner response must be filed within three months from the date of institution (the entry date of this decision). 35 U.S.C. § 326(a)(8); 37 C.F.R. § 42.220.  Progressive is not required to address the denied grounds, and should not do so.

30

Case CBM2012-00004
Patent 6,064,970

VI. ORDER

For the forgoing reasons, it is

**ORDERED** that pursuant to 35 U.S.C. § 324 and section 18(a) of the AIA, a covered business method review is hereby instituted as to claims 1 and 3-18 of the '970 patent for the following grounds:

A. Claims 1, 3, 6-8, 10, 11, 13, 14, and 18 are unpatentable under 35 U.S.C. § 103(a) over Bouchard, Pettersen, and Herrod;

B. Claims 4, 5, 16, and 17 are unpatentable under 35 U.S.C. § 103(a) over Bouchard, Pettersen, and the Florida Guide;

C. Claim 9 is unpatentable under 35 U.S.C. § 103(a) over Bouchard, Pettersen, Herrod, and Camhi; and

D. Claims 12 and 15 are unpatentable under 35 U.S.C. § 103(a) over Bouchard, Pettersen, Herrod, and Dorweiler;

**FURTHER ORDER** that no other ground is authorized for the covered business method review;

**FURTHER ORDER** that pursuant to 35 U.S.C. § 324(d) and 37 C.F.R. § 42.4, notice is hereby given of the institution of trial; the trial is commencing on the entry date of this decision; and

**FURTHER ORDER** that an initial conference call with the Board is scheduled for 2 PM Eastern Time on February 25, 2013; the parties are directed to the Office Trial Practice Guide, 77 *Fed. Reg.* at 48765-66, for guidance in preparing for the initial conference call, and should come prepared to discuss any proposed changes to the Scheduling Order entered herewith and any motions the parties anticipate filing during the trial.

31

Case CBM2012-00004
Patent 6,064,970

PETITIONER:

J. Steven Baughman
Nicole M. Jantzi
Ropes & Gray
Email: steven.baughman@ropesgray.com
Email: nicole.jantzi@ropesgray.com

PATENT OWNER:

Calvin P. Griffith
James L. Wamsley, III
John V. Biernacki
Jones Day
Email: cpgriffith@jonesday.com
Email: jlwamsleyiii@jonesday.com
Email: jvbiernacki@jonesday.com

32

A10855

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of October 2014, I caused the foregoing brief to be electronically filed using the CM/ECF system, which will send notification of such filing to all parties of record.

I further certify that pursuant to Fed. R. App. P. 25(a)(2)(D) and 25(c), Federal Circuit Rule 25(a), and ECF-10(B) of the Court's Administrative Order Regarding Electronic Case Filing, dated May 17, 2012, I shall cause six paper copies of the foregoing brief to be filed at the address provided below within five days of the court's acceptance of the foregoing brief in ECF:

Office of the Clerk
United States Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

October 31, 2014

Respectfully submitted,

*/s/ Gary M. Ropski*
Gary M. Ropski
Cynthia A. Homan
James A. Collins
Laura A. Lydigsen
Nicholas A. Restauri
BRINKS GILSON & LIONE
455 N. Cityfront Plaza Drive
Suite 3600
Chicago, Illinois 60611

*Counsel for Appellant,*
*Progressive Casualty Insurance Co.*

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), because it contains 11,056 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14 point font.

October 31, 2014                                Respectfully submitted,

*/s/ Gary M. Ropski*
Gary M. Ropski
Cynthia A. Homan
James A. Collins
Laura A. Lydigsen
Nicholas A. Restauri
BRINKS GILSON & LIONE
455 N. Cityfront Plaza Drive
Suite 3600
Chicago, Illinois 60611

*Counsel for Appellant*,
*Progressive Casualty Insurance Co.*