Appeal No. 2014-1656

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

PROGRESSIVE CASUALTY INSURANCE CO.

*Appellant,*

V.

LIBERTY MUTUAL INSURANCE CO.,

*Appellee,*

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in No. CBM2012-00004.

**BRIEF FOR INTERVENOR – DIRECTOR OF
THE UNITED STATES PATENT AND TRADEMARK OFFICE**

NATHAN K. KELLEY
*Solicitor*

THOMAS W. KRAUSE
*Deputy Solicitor*

ROBERT J. MCMANUS
SCOTT C. WEIDENFELLER
*Associate Solicitors*

Office of the Solicitor-Mail Stop 8
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, Virginia 22313

February 12, 2015

*Attorneys for the Director of the
United States Patent and Trademark Office*

**Representative Claim**

4.      A method of insuring a vehicle operator for a selected period based upon operator driving characteristics during the period, comprising, steps of:

generating an initial operator profile;

generating an insured profile for the vehicle operator prior to any monitoring of any of the vehicle operator's driving characteristics wherein the insured profile comprises coverage information, including limits and deductibles, for determining a base cost of vehicle insurance for the vehicle operator;

monitoring the vehicle operator's driving characteristics during the selected period; and

deciding a total cost of vehicle insurance for the selected period based upon the vehicle operator's driving characteristics monitored in that selected period and the base cost of insurance.

A7095.

# TABLE OF CONTENTS

**Page**

I.   STATEMENT OF JURISDICTION.................................................................1

II.  STATEMENT OF THE ISSUES................................................................2

III. STATEMENT OF THE CASE ....................................................................3

    A.   Introduction ........................................................................................3

    B.   Statutory And Regulatory Background.............................................4

        1.   AIA Trial Proceedings.............................................................4

        2.   USPTO Rules For Post-Grant Review.................................6

    C.   Facts And Procedural History ..........................................................8

        1.   The '970 Patent.......................................................................8

        2.   Institution Phase.....................................................................8

        3.   Trial Phase...............................................................................9

        4.   Final Written Decision .......................................................11

IV.  SUMMARY OF THE ARGUMENT ......................................................14

V.   ARGUMENT ............................................................................................16

    A.   Standard of Review...........................................................................16

    B.   The New Grounds Of Rejection Doctrine Does Not Apply
       In CBM Review Proceedings .........................................................17

    C.   The Final Written Decision Correctly Adjudicated the Obviousness
       Issues for Claims 1, 3, 11, and 14.................................................27

        1.   The Board Was Not Limited In The Final Written Decision
           To Relying On The Portions Of Bouchard Expressly
           Cited In Liberty's Petition..................................................29

        2.   Progressive's "New-Grounds-Of-Rejection" Theory
           Should Be Rejected ...........................................................31

3.    The Board Did Not Erroneously Group Claims 1, 3, 11, and 14 ......................................................................................................32

D.    The Final Written Decision Articulates Reasons To Combine The References In Concluding That Claims 4, 5, 16, and 17 Are Obvious Under § 103 ...................................................................................34

E.    The Board Followed Its Rules In Denying Progressive's Motion To Exclude Liberty's Reply Evidence ..................................................................38

VI.    CONCLUSION ........................................................................................................40

# TABLE OF AUTHORITIES

**<u>Cases</u>**                                                         **<u>Pages(s)</u>**

*Abbott Labs. v. Cordis Corp.,*
  710 F.3d 1318 (Fed. Cir. 2013) ......................................................................20

*Auer v. Robbins,*
  519 U.S. 452 (1997) ......................................................................................16

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
  467 U.S. 837 (1984) ......................................................................................16

*Cuozzo Speed Techs., LLC, In re,*
  (No 2014-1301) 2015 WL 448667 (Fed. Cir. Feb. 4, 2015) ...............6, 16, 30

*KSR Int'l Co. v Teleflex Inc.,*
  550 U.S. 398 (2007) ...........................................................................36, 37, 38

*Lovin, In re,*
  652 F.3d 1349 (Fed. Cir. 2011) ......................................................................33

*Packard, In re,*
  751 F.3d 1307 (Fed. Cir. 2014) ......................................................................18

*Stepan Co., In re,*
  660 F.3d 1341 (Fed. Cir. 2011) ......................................................................19

*Sullivan, In re,*
  362 F.3d 1324 (Fed. Cir. 2004) ................................................................16, 17


**<u>Statutes</u>**

35 U.S.C. § 6 (pre-AIA) ...................................................................................19

35 U.S.C. § 134 (pre-AIA) ...............................................................................19

35 U.S.C. § 306 (pre-AIA) ...............................................................................19

35 U.S.C. § 314 (pre-AIA) ...............................................................................18

35 U.S.C. § 315 (pre-AIA) ...........................................................................19

5 U.S.C. § 554 ...................................................................................21, 22

5 U.S.C. § 706 ...........................................................................................17

28 U.S.C. § 1295 .........................................................................................1

35 U.S.C. § 6 .............................................................................................20

35 U.S.C. § 103 ....................................................................................*passim*

35 U.S.C. § 131 .........................................................................................18

35 U.S.C. § 132 .........................................................................................18

35 U.S.C. § 133 .........................................................................................18

35 U.S.C. § 143 ...........................................................................................3

35 U.S.C. § 282 ...........................................................................................4

35 U.S.C. § 305 .........................................................................................18

35 U.S.C. § 311 .......................................................................................4, 5

35 U.S.C. § 316 .......................................................................................5, 6

35 U.S.C. § 319 ...........................................................................................5

35 U.S.C. § 321 ...........................................................................................4

35 U.S.C. § 323 ...........................................................................................6

35 U.S.C. § 324 .....................................................................................5, 21

35 U.S.C. § 325 .........................................................................................13

35 U.S.C. § 326 ....................................................................................*passim*

35 U.S.C. § 328 ....................................................................................*passim*

35 U.S.C. § 329 ...............................................................................5, 15, 26

Leahy-Smith America Invents Act  Pub. L. No. 112-29,
  125 Stat. 284 (2011) ............................................................................. 3, 4, 5, 6

## **Regulations**

37 C.F.R. § 41.30 ................................................................................... 17

37 C.F.R. § 41.31 ............................................................................... 17, 19

37 C.F.R. § 41.50 ................................................................................... 17

37 C.F.R. § 41.60 ................................................................................... 17

37 C.F.R. § 41.61 ............................................................................... 17, 19

37 C.F.R. § 41.77 ................................................................................... 17

37 C.F.R. § 42.4 ..................................................................................... 6

37 C.F.R. § 42.20 ................................................................................... 39

37 C.F.R. § 42.23 ............................................................................ 7, 25, 32

37 C.F.R. § 42.24 ................................................................................... 7

37 C.F.R. § 42.108 .................................................................................. 6

37 C.F.R. § 42.208 .................................................................................. 6

37 C.F.R. § 42.220 .................................................................................. 7

37 C.F.R. § 42.300 ............................................................................ 6, 7, 25

37 C.F.R. § 42.304 .............................................................................. 30, 39

37 C.F.R., part 42 .............................................................................. 6, 17

37 C.F.R. § 90.3 ..................................................................................... 1

## Other Authorities

H. Rep. No. 112-98 (2011)..................................................................................... 4, 20

Joe Matal, *A Guide to the Legislative History of the America Invents Act: Part II of II*,
  21 Fed. Cir. B.J. 539 (2012)...............................................................................4

Office Patent Trial Practice Guide,
  77 Fed. Reg. 48,756 (Aug. 14, 2012)....................................................7, 22, 39

*Request for Comments on Trial Proceedings Under the American Invents Act*
*Before the Patent Trial and Appeal Board*,
  79 Fed. Reg. 36,474 (June 27, 2014)............................................................27

## STATEMENT OF RELATED CASES

This Court currently has before it eight (8) appeals arising out of covered business method patent review proceedings between Appellant Progressive Casualty Insurance Co. and Appellee Liberty Mutual Insurance Co., including this appeal. The Director has intervened in all eight appeals. This Court has ordered that six (6) of those appeals, including this one—Appeal Nos. 14-1586, 14-1466, 14-1656, 14-1636, 14-1637, and 14-1639—be treated as companion cases to each other and be assigned to the same panel for oral argument. *See* Appeal No. 14-1586, Dkt. Entry #30 (Oct. 14, 2014). The Director notes that within that grouping, the '970 patent involved in this appeal is also the subject of Appeal No. 14-1466 arising out of CBM2012-00002; this Court ordered that the two appeals be considered companion cases with separate briefing. *See* Appeal No. 14-1466, Dkt. Entry #16 (May 30, 2014).

# I.    STATEMENT OF JURISDICTION

This appeal arises from a final written decision of the Patent Trial and Appeal Board in a covered business method patent review proceeding.  The Board entered its Final Written Decision under 35 U.S.C. § 328(a) on January 23, 2014, and issued its decision on Progressive's Request for Rehearing on April 1, 2014.  Progressive filed a Notice of Appeal of the Final Written Decision on June 2, 2014, within the time limit specified by 37 C.F.R. § 90.3(a)(1).  Progressive's Notice purports to seek review of the Board's earlier decision to institute trial proceedings, but Progressive did not pursue any such review in its brief to this Court.  This Court otherwise has appellate jurisdiction over Progressive's appeal of the Final Written Decision under 28 U.S.C. § 1295(a)(4)(A).

## II.    STATEMENT OF THE ISSUES

Liberty petitioned the USPTO for a covered business method patent review of Progressive's U.S. Patent No. 6,064,970, which generally claims methods for "determining a cost of automobile insurance based upon monitoring, recording and communicating data representative of operator and vehicle driving characteristics." A7079 (Abstract).  Liberty's Petition included various proposed grounds of unpatentability for claims 1 and 3-18 under 35 U.S.C. § 103.  The Board instituted the requested trial on some, but not all, requested grounds, and ultimately concluded that Liberty had carried its burden of proving the unpatentability of claims 1 and 3-18.

On appeal, Progressive challenges the unpatentability conclusion, lodging a host of procedural and merits-based allegations against the Final Written Decision. The Director intervened in Progressive's appeal for the limited purpose of responding to Progressive's alleged procedural errors, which are:

1.    Whether the "new-grounds-of-rejection" examination doctrine applies to AIA trials like this CBM review;

2.    Whether the Board improperly grouped claims 1, 3, 11, and 14 when Progressive argued the patentability of those claims collectively based on claims 1 and 3;

3.    Whether the Final Written Decision's articulation of reasons that a person of ordinary skill in the art would have combined Bouchard, Pettersen, and Florida Guide to arrive at claims 4, 5, 16, and 17,

2

along with findings about the references and general knowledge in the art, is legally sufficient; and

4.   Whether the Board abused its discretion by denying Progressive's Motion to Exclude portions of the rebuttal declaration submitted with Liberty's Reply where the Board found that Progressive had failed to demonstrate that the disputed evidence did not respond to Progressive's Patent Owner Response.

## III.   STATEMENT OF THE CASE

### A.   Introduction

Progressive Casualty Insurance Co. ("Progressive") owns U.S. Patent No. 6,064,970 ("the '970 patent"). Liberty Mutual Insurance Co. ("Liberty") filed a Petition with the U.S. Patent and Trademark Office ("USPTO") to institute a transitional post-grant review for covered business method patents ("CBM review") to review the patentability of claims 1 and 3-18 in the '970 patent. The USPTO granted Liberty's Petition, and instituted the CBM review. The Board ultimately issued a Final Written Decision concluding that claims 1 and 3-18 are unpatentable under 35 U.S.C. § 103. The Director of the USPTO intervened in Progressive's appeal to defend against the procedural challenges Progressive indicated it would raise against those decisions. *See* 35 U.S.C. § 143; Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, § 18(a)(1), 125 Stat. 284 (2011) (providing that covered business method patent review proceedings "shall be regarded as, and shall employ

3

the standards and procedures of, a post-grant review under chapter 32 of title 35, United States Code," with exceptions not pertinent here).

### B.     Statutory And Regulatory Background

### 1.     AIA Trial Proceedings

In the AIA Congress substantially altered the USPTO's existing reexamination procedures for reconsidering the validity of issued patents.  The AIA replaced inter partes reexamination with inter partes review, an adversarial proceeding before the new Patent Trial and Appeal Board.  *See* 35 U.S.C. § 311.  The AIA also changed the threshold showing necessary for the USPTO to institute an inter partes proceeding, made all patents subject to such review regardless of the date on which they were issued, broadened the estoppel provisions to which petitioning parties would be subject, imposed strict timelines for completion of the review, and permitted an appeal to this Court only from the Board's final decision as to patentability.  *See* H. Rep. No. 112-98, at 46-47 (2011); Joe Matal*, A Guide to the Legislative History of the America Invents Act: Part II of II*, 21 Fed. Cir. B.J. 539, 598 (2012).

The AIA also introduced an entirely new trial procedure:  "post-grant review." A petition for such review must be filed within nine months after a patent is issued, 35 U.S.C. § 321(c), but "[u]nlike reexamination proceedings, . . . the post-grant review proceeding permits a challenge on any ground related to invalidity under section 282." H. Rep. No. 112-98, at 47-48; *see* 35 U.S.C. § 321(b).  As in an inter partes review, any person other than the patent owner may petition to institute a post-grant review, and

the petitioner may participate in the proceedings and any ensuing appeal.  *See* 35 U.S.C. §§ 311, 316, 319, 326, 329.

In an uncodified portion of the AIA, furthermore, Congress created a special "transitional post-grant review proceeding for review of the validity of covered business method patents."  AIA § 18.  Although this CBM procedure is to "be regarded as, and shall employ the standards and procedures of, a post-grant review," AIA § 18(a)(1), the AIA authorizes the Director to institute a post-grant review of any "covered business method patent" at any time during the term of the patent—*i.e.*, without regard to the normal nine-month window for post-grant review proceedings.  *See* AIA § 18(a)(1)(B), (E), 18(d).  Only a person who has "been sued for infringement of the patent or has been charged with infringement under that patent," however, may petition the Director to institute such a CBM review proceeding.  AIA § 18(a)(1)(B).

Per the statute, only the Board's final written decision as to patentability in a post-grant review proceeding is subject to judicial review in this Court.  *See* 35 U.S.C. §§ 328(a), 329.  Congress provided that the USPTO's threshold decision whether to institute a post-grant review—that is, the agency's determination whether a particular request for review satisfies the statutory criteria for commencement of a proceeding— shall be "final and nonappealable."  *See* 35 U.S.C. § 324(e) ("The determination by the Director whether to institute a post-grant review under this section shall be final and nonappealable.").

### 2.    USPTO Rules For Post-Grant Review

To implement the AIA's new administrative review schemes, Congress provided the USPTO with expanded rulemaking authority. *See generally* 35 U.S.C. §§ 316(a), 326(a); AIA §§ 18(a)(1), 18(d)(2); *In re Cuozzo Speed Techs., LLC*, No. 2014-1301, 2015 WL 448667, at *7-8 (Fed. Cir. Feb. 4, 2015). The AIA authorizes the USPTO to "prescribe regulations . . . establishing and governing" inter partes and post-grant review proceedings and to specify "the relationship of such review to other proceedings under this title," among other matters. 35 U.S.C. §§ 316(a)(4), 326(a)(4). Congress also authorized the USPTO to issue regulations establishing the transitional program for covered business method patents. AIA § 18(a)(1).

Pursuant to these express statutory grants of rulemaking authority, the USPTO has prescribed regulations governing inter partes, post-grant, and CBM proceedings, as well as general rules of practice before the Board. *See generally* 37 C.F.R., part 42. Among other matters, those rules delegate to the Board the Director's authority to determine whether to institute particular proceedings. *See* 37 C.F.R. §§ 42.108, 42.208, 42.300(a); *see also* 37 C.F.R. § 42.4.

Beyond its broad grant of authority over the proceeding generally, the AIA also requires the Director to implement particular procedures. The patent owner must be allowed to file a preliminary response to a petition for review. *See* 35 U.S.C. § 323. If review is nevertheless instituted, the patent owner is then allowed to file "a response to the petition," which must include "any additional factual evidence and expert

6

opinions on which the patent owner relies in support of the response." *Id.*

§ 326(a)(8). The AIA also requires that the petitioner be provided "at least 1

opportunity to file written comments within a time period established by the

Director." *Id.* § 326(a)(12). The AIA requires the Board, with limited exceptions, to

complete all post grant reviews within one year. *Id.* § 326(a)(11).

The Director has implemented these requirements through regulations and

guidance that coordinate patent-owner and petitioner filings and discovery. The

patent owner may file a response after review is instituted, which is subject to the

same 80-page limit as the petition for review. *See* 37 C.F.R. §§ 42.220(a),

42.24(a)(1)(iii) & (b)(2); *id.* § 42.300(a) (applying post-grant review rules to CBM

reviews, with exceptions not pertinent here). The petitioner may then file a reply of

15 pages, *id.* §§ 42.23(a), 42.24(c)(1), which "may only respond to arguments raised in

the corresponding . . . patent owner response." *Id.* § 42.23(b). The regulations

contemplate that these papers will be filed according to a schedule set by the Board,

though a default time of three months after institution is set for the patent owner

response. *See id.* § 42.220(b). The USPTO's Office Patent Trial Practice Guide

reflects the regulations. Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756,

48,757 (Aug. 14, 2012) ("Practice Guide"). Finally, the regulations mandate that

review proceedings "shall be administered such that pendency before the Board after

institution is normally no more than one year." 37 C.F.R. § 42.300(c).

### C.    Facts And Procedural History

#### 1.    The '970 Patent

The '970 patent relates to a "method for determining an automobile insurance premium based on data collected from monitored motor vehicle operational characteristics and operator's driving characteristics."  A7002 (citing A7079 (Abstract) & A7088 (col. 3, ll. 61-66)).  Claims 1, 4-6 and 18 are independent; claim 3 depends upon claim 1; claims 7-15 depend upon claim 6; and claims 16 and 17 depend upon claim 5.  Claim 4 is illustrative:

> 4.     A method of insuring a vehicle operator for a selected period based upon operator driving characteristics during the period, comprising, steps of:
>
> generating an initial operator profile;
>
> generating an insured profile for the vehicle operator prior to any monitoring of any of the vehicle operator's driving characteristics wherein the insured profile comprises coverage information, including limits and deductibles, for determining a base cost of vehicle insurance for the vehicle operator;
>
> monitoring the vehicle operator's driving characteristics during the selected period; and
>
> deciding a total cost of vehicle insurance for the selected period based upon the vehicle operator's driving characteristics monitored in that selected period and the base cost of insurance.

A7095.

#### 2.    Institution Phase

The Board instituted the CBM review requested by Liberty.  *See* A10824-855. After considering Liberty's Petition and Progressive's Preliminary Response, the

8

Board determined that "it is more likely than not that the challenged claims are unpatentable." A10825. Trial was authorized on some, but not all, of the grounds contained in the Petition. The issues for trial were whether:

a) claims 1, 3, 6-8, 10, 11, 13, 14, and 18 are unpatentable under § 103 over Bouchard[1], Pettersen[2], and Herrod[3];

b) claims 4, 5, 16, and 17 are unpatentable under § 103 over Bouchard, Pettersen, and the Florida Guide[4];

c) claim 9 is unpatentable under § 103 over Bouchard, Pettersen, Herrod, and Camhi; and

d) claims 12 and 15 are unpatentable under § 103 over Bouchard, Pettersen, Herrod, and Dorweiler.

A10854. Progressive's Blue Brief to this Court argues procedural error regarding grounds (a) and (b).

### 3. Trial Phase

After trial was instituted, Progressive submitted its Patent Owner Response. Among other arguments, Progressive asserted that Herrod did not teach the "actuarial class" limitations required by claims 1, 3, 6-15 and 18 because "nowhere does Herrod state or suggest that any analysis has been (or should be) done to ascertain whether his

---

[1]    Paul Bouchard et al., U.S. Patent No. 5,465,079 (Nov. 7, 1995). *See* A7097-132 ("Bouchard").

[2]    Kjell Pettersen, WO 90/02388 (publ. Mar. 8, 1990). *See* A7133-44 ("Pettersen").

[3]    R.T. Herrod, UK Patent Application GB 2 286 369 A (publ. Aug. 16, 1995). *See* A7145-50 ("Herrod").

[4]    FLA. DEPT. OF INS., *1988 Automobile Shoppers' Guide* (1988). *See* A7151-70 ("Florida Guide").

'behavioral groups' would be predictive of insurance claims losses (or premiums)." A10920-21.  Progressive supported its Patent Owner Response with a Declaration from Michael Miller ("Miller Declaration"), and subsequent Supplemental Declaration from Mr. Miller ("Miller Supplemental Declaration").  *See, e.g., id.*; A11169-81.  The Miller Supplemental Declaration discussed, and included as an exhibit, "Actuarial Standard of Practice No. 12, 'Concerning Risk Classification'" (Oct. 1989) ("ASOP").  *See* A11169-81; Br. at 47 n.14.

Liberty filed its Reply to Progressive's Patent Owner Response, which included a rebuttal declaration by Mary O'Neil ("O'Neil Rebuttal Declaration").  In particular, Liberty responded to Progressive's trial argument that Herrod does not disclose the recited "actuarial classes" because his "behavioral groups" are not predictive of premium losses/costs, including a discussion of ASOP.  *See, e.g.*, A11201-02 (citing, *e.g.*, A11212-16 (¶ 7-13); A11221-22 (¶ 25), A11223-25 (¶¶ 27-29)).

Progressive then filed a Motion to Exclude portions of the O'Neil Rebuttal Declaration responding to Progressive's trial arguments about Herrod.  *See* A11349-52 (seeking to exclude O'Neil Rebuttal Decl. ¶¶ 25, 27-29, 31, and 33).  Progressive argued that the "belatedly-introduced Declaration includes new arguments and constitutes new evidence as to unpatentability that could and should have been introduced with Liberty's Petition rather than in a reply declaration."  A11349.  Liberty opposed, explaining how the contested Reply material responded to

10

arguments in Progressive's Patent Owner Response. *See* A11407-16. Progressive filed a reply. *See* A11515-21.

### 4.    Final Written Decision

The Board issued a Final Written Decision holding that "claims 1 and 3-18 of the '970 patent are unpatentable under 35 U.S.C. § 103(a)." A7001; *see* A7051 ("Liberty has met its burden of proof, by a preponderance of the evidence, in showing that claims 1 and 3-18 of the '970 patent are unpatentable" based on the unpatentability theories identified in the Institution Decision); *see generally* A7000-53.

The Board concluded that claims 4, 5, 16, and 17 are unpatentable under § 103 based on Bouchard, Pettersen, and Florida Guide. *See generally* A7020-29; see A7020 ("[W]e determine that Liberty has demonstrated, by a preponderance of the evidence, that claims 4, 5, 16, and 17 are unpatentable over the combination of Bouchard, Pettersen, and Florida Guide."). The Board made fact-findings regarding the relevant teachings of the three references (*see* A7020-22), then turned to the parties' respective positions regarding whether particular limitations patentably distinguished the claims over the references. *See* A7023-28. The Board also explained that a person of ordinary skill in the art would have been motivated to modify Bouchard in light of Pettersen and Florida Guide, rejecting Progressive's argument to the contrary. *See* A7025-26.

The Board also concluded that claims 1, 3, 6-15, and 18 are unpatentable over Bouchard, Petterson, and Herrod. *See generally* A7029-46; *see* A7029-30 ("[W]e

11

determine that Liberty has demonstrated, by a preponderance of the evidence, that claims 1, 3, 6-15, and 18 are unpatentable over the cited prior art references."). As relevant to this appeal, the Board found that Bouchard accounts for the claim limitations requiring monitoring time, vehicle location, and a "corresponding log of vehicle speed for the time and location," as collectively recited by these claims. *See* 7030-32. In reaching that conclusion, the Board responded to Progressive's trial argument that Bouchard—specifically Figure 18—does not teach the relevant limitations. *See* A7030-31. The Board found that Progressive's argument failed to "consider Bouchard's disclosure, as a whole, from the perspective of one with ordinary skill in the art." A7031 (citations omitted). The Board found that "Bouchard uses an ERA [Event Recording Apparatus] that records selectable vehicle performance, operational status, and environment information, to determine the vehicle operational conditions," including geographical location. A7031. The Board made multiple findings of fact regarding Bouchard's "black box" recorder, and how it applied to the disputed limitations. *See id.*

The Board also found that Herrod taught the "actuarial class" limitation recited in these claims. *See* A7032-43. As part of its analysis, the Board considered, but rejected, Progressive's Patent Owner Response argument that the "behavioral groups" disclosed in Herrod would not have been understood to be an "actuarial class" because they "would not be predictive of insurance claims losses (or premiums)." A7039 (citations omitted). The Board explained that Progressive's argument failed to

12

"account for certain teachings of Herrod, including [that] its device can be used for measuring safety-related features of driving, <u>and the monitored data can be useful to insurance companies</u>." A7040 (citing A7146-47). The Board additionally agreed with Liberty that Herrod's disclosure would have taught the limitation to an ordinarily-skilled artisan, "credit[ing] Ms. O'Neil's [Rebuttal Declaration] testimony (Ex. 1022 ¶¶ 12, 25, 27-29), because her explanations are consistent with Herrod, the disclosure of the '970 patent, and other evidence on record with respect to the level of ordinary skill in the art." A7041. The "other" record evidence included the ASOP document submitted by Progressive with its Patent Owner Response. *See, e.g.*, A7042-43.

The Board also rejected Progressive's Motion to Exclude portions of the O'Neil Rebuttal Declaration filed with Liberty's Reply to Progressive's Patent Owner Response, including those responding to Progressive's arguments about Herrod. *See* A7047-49. In particular, the Board concluded that Progressive had failed to carry its burden of demonstrating that it was entitled to the relief sought because "Progressive has not demonstrated that Ms. O'Neil's testimony exceeds the proper scope of reply evidence." A7048.

Progressive filed a Request for Rehearing, but raised only the argument that the Board had divested itself of authority under 35 U.S.C. § 325(e)(1) to issue the Final Written Decision because the Decision was "posted electronically <u>50 seconds</u> after the final written decision in CBM2012-00002." A7055. The Board rejected Progressive's

13

argument.  *See* A7054-66.  Progressive does not seek review of the Board's decision

on this issue in its appeal to this Court.

## IV.    SUMMARY OF THE ARGUMENT

Progressive alleges a host of procedural and merits-based errors in the Final

Written Decision in this CBM review in this appeal.  The Director intervened to

address Progressive's procedural arguments.

Progressive's assertion that the Board created "new grounds of rejection" in its

adjudication of (1) the "actuarial class" limitations in claims 1, 3, 6-15, and 18; and (2)

the limitations recited in claims 1 and 3 requiring recordation of time, vehicle location,

and a "corresponding log" of vehicle speed, should be rejected.  The

"new-grounds-of-rejection" doctrine does not apply to AIA trials like this CBM

review.  Neither the applicable statute nor regulations provide for application of the

doctrine.  And the doctrine—which reflects examination-based principles and the

Board's appellate role in reviewing the outcome of examination proceedings—is not

compatible with the trial-like structure of CBM review, where the Board weighs the

evidence adduced by two private parties on issues raised by those parties, and decides

whether the claims are unpatentable.

This case illustrates why the new-grounds doctrine has no place in AIA trials.

The alleged "new grounds" created in the Final Written Decision reflect the Board's

adjudication of the unpatentability issues raised by the parties during trial based on

evidence produced by both parties.  Neither the AIA, governing regulations, nor logic

14

contemplate that the Board creates a "new ground of rejection" in its Final Written Decision by executing its statutory mandate to adjudicate a CBM review based on arguments and evidence of record. Progressive can seek, and has sought, review of the Board's decision to deny its motion to exclude some of the material that forms the alleged "new grounds." But otherwise, the focus of this appeal should be whether the merits arguments properly formulated by Progressive on appeal demonstrate error in the Board's conclusion that these claims are unpatentable under § 103. *See* 35 U.S.C. §§ 328(a), 329.

Progressive's contention that the Board erred in grouping claims 1, 3, 14, and 15 is similarly flawed because it ignores the claim language and Progressive's own trial arguments. All four claims require recording data about time and vehicle location; claims 1 and 3 recite the additional requirement to "log" vehicle speed for a given time and location. Progressive's Patent Owner Response argued all four claims collectively based the shared limitations to record time and location data. Thus, the Board simply adjudicated the trial issues as argued by Progressive, accounting for the disputed claim language per those arguments in the process.

Progressive also incorrectly alleges that the Board erred in it its adjudication of claims 4, 5, 16, and 17 by failing to articulate and support a "reason to combine" Bouchard, Pettersen, and Florida Guide. Progressive's first contention—that no rationale for combining the references was given—is belied by the very text quoted in Progressive's Blue Brief, which articulates a reason. The Board also made additional

motivation-related holdings ignored by Progressive on appeal.  The record equally belies Progressive's related contention that the Board failed to support its combination rationales with evidence.  The Board cited both the references and general knowledge in the art to explain its holdings.

Lastly, the Board did not abuse its discretion in denying Progressive's Motion to Exclude portions of the O'Neil Rebuttal Declaration submitted with Liberty's Reply to Progressive's Patent Owner Response.  As the Board explained, Progressive failed to demonstrate that the contested material was not responsive to the arguments and evidence in Progressive's Patent Owner Response.  Other than disagreeing with the Board's conclusion and generally complaining that it did not get the last word about unpatentability, Progressive fails to demonstrate that the Board's decision was arbitrary or otherwise an abuse of discretion.

## V.    ARGUMENT

### A.    Standard of Review

Regulations issued by the USPTO under a statutory grant of rulemaking authority are entitled to deference unless based on an unreasonable construction of the statute, *see Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984); *Cuozzo*, 2015 WL 448667, at *8.  The USPTO's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation," *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (internal quotation marks omitted).  The Board's actions may not be set aside unless "arbitrary, capricious, an abuse of discretion,

16

unsupported by substantial evidence, or otherwise not in accordance with law." *In re Sullivan*, 362 F.3d 1324, 1326 (Fed. Cir. 2004); 5 U.S.C. § 706(2)(A).

### B.    The New Grounds Of Rejection Doctrine Does Not Apply In CBM Review Proceedings

Progressive argues that the Final Written Decision created "new grounds of rejection" in its adjudication of (1) the "actuarial class" limitations in claims 1, 3, 6-15, and 18 (*see* Br. at 45-47); and (2) the limitations requiring recordation of vehicle location, time, and related "log" of vehicle speed recited in claims 1 and 3. *See* Br. at 43-44.[5] The new-grounds-of-rejection rule does not apply to AIA trial proceedings. And Progressive's new-grounds theories demonstrate why that doctrine should not be imported into AIA trials.

By their own terms, neither § 41.50(b) nor § 41.77(b)—the regulations implementing the new-grounds doctrine in examination and reexamination, respectively—applies to AIA trial proceedings. Those sections apply only to examination and reexamination. *See* 37 C.F.R. §§ 41.30, 41.31(a) (limiting appeals under Subpart B of Part 41 to patent applicants and owners of patents undergoing ex parte reexamination); *id.* §§ 41.60, 41.61(a)(1) (limiting appeals under Subpart C of Part 41 to patent owners and third-party requesters in inter partes reexaminations). Part 42—the portion of title 37 of the Code of Federal Regulations that governs the

---

[5]    Progressive's new-grounds theory based on the recordation limitations is discussed below in conjunction with Progressive's related procedure error contentions for claims 1, 3, 11, and 14. *See*, *infra*, at Section V.C.

new AIA proceedings—does not include a new-grounds-of-rejection provision.

Further, nothing in the AIA statute contemplates that the doctrine should apply. *See,*

*e.g.*, 35 U.S.C. §§ 326, 328.

Moreover, the new-grounds-of-rejection rule is incompatible with the trial-like

structure of post grant review, which differs significantly from the examination regime

that gave birth to the new-grounds doctrine. In the examinational model under 35

U.S.C. § 131, "the initial burden falls on the PTO [examiner] to set forth the basis for

any rejection." *In re Packard*, 751 F.3d 1307, 1312 (Fed. Cir. 2014) (citation omitted).

Examination proceedings under 35 U.S.C. § 131 are conducted by examiners;

whenever an examiner rejects a pending claim during examination or reexamination,

35 U.S.C. § 132 obligates that

> the Director shall notify the applicant thereof, stating the reasons for such
> rejection, or objection or requirement, together with such information and
> references as may be useful in judging of the propriety of continuing the
> prosecution of his application ….

*See* 35 U.S.C. § 305 (ex parte reexamination "will be conducted according to the

procedures established for initial examination under the provisions of [35 U.S.C. § 132

and 133]"); 35 U.S.C. § 314 (inter partes reexam also conducted according to initial

examination procedures under §§ 132 and 133) (as in effect prior to September 16,

2012). Once the applicant receives an "Office action" laying out the basis for the

Office's rejection(s) of the pending claims, the applicant can elect to continue

pursuing his application. 35 U.S.C. § 132. Once the applicant receives a second

Office action rejecting his claims, 35 U.S.C. § 134 permits him to "appeal" to the Board, whose role is limited to the "review of adverse decisions of examiners upon applications for patents pursuant to section 134(a)." 35 U.S.C. § 6(b); *see* 35 U.S.C. §§ 134, 306, 315 (as in effect prior to September 16, 2012); 37 C.F.R. §§ 41.31(a), 41.61(a). The "new-grounds" precedent cited by Progressive reflects the respective statutory roles of the examiner and the Board in the examination process. *See, e.g.*, *In re Stepan Co.*, 660 F.3d 1341, 1344 (Fed. Cir. 2011) (explaining that new-grounds doctrine reflects that "Board is limited to review of the examiner's decisions during prosecution," citing 35 U.S.C. § 6(b) as it existed before September 16, 2012). Put differently, the rule preserves the rejection-and-response process of examination: it cabins the Board to its appellate role in examination, and ensures that the Office's rejections provide the patent owner with notice why the USPTO believes his claims are unpatentable so that he can evaluate whether it is prudent to continue seeking his patent, even returning to examination if desired. As Progressive puts it, under the examinational model, "<u>applicants</u> have been afforded the right to respond to new <u>rejections</u> raised for the first time by <u>a reviewing board</u>." Br. at 42 (emphasis added).

The problem for Progressive is that AIA trials, by contrast, do not involve "applicants," "rejections," or "a reviewing board." AIA trials do not involve USPTO examiners, nor does the AIA place any burden on the USPTO regarding unpatentability; the petitioner carries the ultimate burden of proving unpatentability by a preponderance of the evidence. 35 U.S.C. § 326(e). And the Board does not act

19

in an appellate role reviewing USPTO Office actions under the AIA. During trial, both petitioner and patent owner offer their contentions and supporting evidence regarding unpatentability during the trial proceeding conducted by the Board. The Board then weighs the evidence, and determines whether the petitioner has met his burden of proof in its Final Written Decision. *See id.* §§ 326(c), 328(a). Notably, § 6 was amended to reflect that the Board's role in adjudicating inter partes and post-grant reviews differs from its appellate role under § 134(a). *See* § 6(b)(4) ("The Patent Trial and Appeal Board shall … (4) conduct inter partes reviews and post-grant reviews pursuant to chapters 31 and 32."). These structural changes are what "converts [Chapter 31] from an examinational to an adjudicative proceeding." *Abbott Labs. v. Cordis Corp.*, 710 F.3d 1318, 1326 (Fed. Cir. 2013) (quoting H. Rep. No. 112-98, at 46-47 (2011)). Given these important and basic differences, the "new-grounds" precedent cited by Progressive does not apply because neither the statute nor the implementing regulations imported the new-grounds doctrine from examination into the AIA trials.

This Court should reject Progressive's invitation to graft the "new-grounds-of-rejection" doctrine onto AIA trials. Progressive's application of the "new-grounds" doctrine would severely constrain the trial process contemplated by the statute and regulations by binding the Board in its Final Written Decision to the issues addressed, and its analysis thereof, in the Institution Decision. *See* Br. at 46. But nothing in the statute requires the Board to offer any substantive patentability

20

analysis when instituting an AIA trial. The only specific pieces of information required under 35 U.S.C. § 324(d) in the trial "notice" is the fact of the Director's determination under subsections (a) and (b), and the day on "which the review shall commence" under subsection (c).

More importantly, limiting the Board's Final Written Decision to any analysis in the Institution Decision ignores the structure of AIA trials discussed above. The Institution Decision will often be written without having even heard from the Patent Owner, who is not obligated to file a Preliminary Response during the institution phase. And during the trial phase, both parties submit arguments and evidence about the unpatentability grounds upon which trial is instituted. The Board, confronted with a full presentation on the issues, will inevitably issue a Final Written Decision that does not mirror the Institution Decision.

Lastly, Progressive also makes a passing reference to 5 U.S.C. § 554(b)(3) in its "new grounds" discussion. *See* Br. at 42. To the extent that Progressive argues that the APA requires incorporating the "new-grounds" doctrine into AIA trials, that contention should be rejected. 5 U.S.C. § 554(b) makes clear that in agency proceedings where "private parties are the moving parties, other parties to the proceeding shall give prompt notice of issues controverted in fact or law." § 554(b) (emphasis added). Given that AIA trials are proceedings between private parties who bear the burden of proof on relevant issues, the text quoted by Progressive from §

21

554(b)(3)—referring to agency-provided notice—proves a faulty basis for grafting the "new grounds" doctrine against the USPTO into such trials.

In any event, Progressive's position that it was not given "notice" regarding the "facts and rationales" that it says are "new grounds" does not bear out. Br. at 42-43. Progressive was clearly aware of both from the trial record prior to the oral hearing held here, as evidenced by the fact that, prior to the hearing, Progressive moved to exclude the material regarding Herrod underlying its "new-grounds" theory. Progressive also deposed Ms. O'Neil on September 13, 2013, after the O'Neil Rebuttal Declaration was filed on August 6, 2013. Progressive then filed "observations" with the Board regarding the O'Neil testimony, which permit a party to "call[] the Board's attention" to relevant testimony solicited "after a party has filed it last substantive paper on an issue." Practice Guide at 48,767-68; *see* A11358-69. In short, the record demonstrates that Progressive had adequate notice of, and ability to address (either substantively or by seeking to exclude) the disputed trial material.

Progressive's new-grounds theory regarding the Final Written Decision's adjudication of issues relating to the "actuarial class" limitation illustrates that the new-grounds doctrine is ill-suited for AIA trials. *See* Br. at 45-47.[6] Progressive argues that the Board created a new ground because the Final Written Decision "relied upon O'Neil's improper supplemental declaration as to the understanding of Herrod from

---

[6]    Progressive made the same argument in companion appeal No. 14-1466. *See* USPTO Br. (Appeal No. 14-1466) at 29-33.

the perspective of a PHOSITA along with the ASOP document." Br. at 45.

Progressive alleges that because the Final Written Decision's analysis is "wholly

different from that presented in Liberty's Petition and the institution decision," the

decision should be vacated and remanded for further trial proceedings. Br. at 46. But

the challenged portion of the Final Written Decision simply reflects the Board's

explanation as to why it was not persuaded by Progressive's trial arguments regarding

Herrod and the "actuarial class" limitation. *See* A7040-43.

After trial was instituted, Progressive filed its Patent Owner Response. Among

other counter-arguments offered to support the patentability of its claims, Progressive

asserted that Herrod did not teach the "actuarial class" limitation because "nowhere

does Herrod state or suggest that any analysis has been (or should be) done to

ascertain whether his 'behavioral groups' would be predictive of insurance claims

losses (or premiums)." A10920-21. Progressive filed the Miller Declaration and

Miller Supplemental Declaration to support its Patent Owner Response, which, in

turn, injected ASOP into the proceedings. *See id.*; A11169-81; Br. at 47 n.14.

Liberty filed its Reply to Progressive's Patent Owner Response that, in

pertinent part, responded to Progressive's arguments about Herrod's "behavioral

groups" and predictive loss. *See* A11201-02. Liberty supported its Reply with the

O'Neil Rebuttal Declaration. Both Liberty's Reply and the O'Neil Rebuttal

Declaration discussed how the ASOP document submitted with Progressive's Patent

Owner Response, as well as the '970 patent, undercut Progressive's Response

23

arguments. *See id.* (citing, e.g., A11212-16 (¶ 7-13); A11221-22 (¶ 25), A11223-25 (¶¶ 27-29)).[7]

In addition to summarizing Liberty's contentions and making findings regarding Herrod's teaching (*see* A7032-34), the Board considered, but rejected, Progressive's trial argument that Herrod's "behavioral groups" did not constitute the recited "actuarial classes" because they "would not be predictive of insurance claims losses (or premiums)." A7039 (citing A10902-03 & A10920-24); *see* A7039-43. The Board first rejected Progressive's argument because it "does not account for certain teachings of Herrod, including [that] its device can be used for measuring safety-related features of driving, and the monitored data can be useful to insurance companies." A7040 (citing A7145-47). Additionally, the Board agreed with Liberty's Reply response to Progressive's argument. *See* A7040-43. In particular, the Board "credit[ed]" the O'Neil Rebuttal Declaration "because her explanations are consistent with Herrod, the disclosure of the '970 patent, and other evidence on record with respect to the level of ordinary skill in the art." A7041. The additional record evidence included the ASOP document submitted with Progressive's Patent Owner Response. *See* A7040; A7042-43.

There is nothing improper about the procedure employed here. The Board adjudicated the issues placed before it by the parties during trial using the evidence

---

[7]    Progressive then moved to exclude, among other things, O'Neil Rebuttal Decl. ¶¶ 27-29 from the trial record. *See* A11351-52. Progressive's motion, and the Board's adjudication of the motion, are discussed below. *See*, *infra*, at Section V.E.

adduced by the parties during trial—which is exactly what the AIA contemplates. Progressive would have it that the Final Written Decision could not respond to Progressive's trial arguments about Herrod, or rely on ASOP—which Progressive submitted during trial—without creating a "new ground" because neither occurred earlier in the Institution Decision. But, by definition, Progressive's trial argument and evidence were available to the Board only <u>after</u> trial had been instituted. The Board must be able to carry out its statutory mandate to conduct AIA trials and arrive at its patentability conclusions without creating a "new ground." The alternative would be that the Board would either have to presage a Patent Owner's trial arguments and supporting evidence at the institution phase, or find a way to adjudicate the trial without addressing arguments and evidence properly presented to it during the trial phase, lest it risk creating a "new ground" that results in continuing trial proceedings that Congress commanded should be completed in one year. *See* 35 U.S.C. § 326(a)(11); 37 C.F.R. § 42.300(c). It is difficult to square that restrictive regime with any logical reading of the AIA and implementing regulations. *See id.*; *see, e.g.*, 35 U.S.C. §§ 326(b), 328(a); 37 C.F.R. § 42.23(b).

Stripped of its "new-grounds" framework, Progressive's arguments are veiled, impermissible collateral challenges to other facets of this trial and AIA trial proceedings generally, and provide no basis for incorporating the "new-grounds" doctrine into AIA trials. Progressive's "new-grounds" theory based on the Final Written Decision's reliance on the O'Neil Rebuttal Declaration really seeks to

challenge whether the Board properly denied Progressive's motion to exclude that material in the first instance. *See* Br. at 45-46 (complaining that the O'Neil Rebuttal Declaration and related Reply material should have been presented in Liberty's Petition); Br. at 48 (asserting that the Board "relied heavily" on the material that Progressive sought to exclude during trial). The proper mechanism for this Court to address that concern is through review of Progressive's appellate challenge to the Board's denial of Progressive's exclusion motion, not by importing examination's new-grounds doctrine into AIA trial proceedings. *See*, *infra*, at Section V.E. If this Court concludes that the Board did not abuse its discretion in denying Progressive's attempt to exclude the contested O'Neil Rebuttal Declaration material, then the only remaining issue should be Progressive's appellate challenges to whether the Board correctly determined that Herrod teaches the "actuarial class" limitation. *See* 35 U.S.C. §§ 328(a), 329; *see also* Br. at 25-34.[8]

More globally, Progressive's grievance here, properly understood, is that neither the AIA, nor the regulations promulgated to govern AIA proceedings, contemplate that the patent owner will have the last word during the trial phase. *See, e.g.*, Br. at 47 (asserting that "fairness dictates" that the case be remanded "so that Progressive may have an opportunity to respond") (citations omitted). The solution to that concern is

---

[8] And even if this Court concluded that the Board abused its discretion in considering the portions of the O'Neil Rebuttal Declaration discussing the ASOP document injected into trial by Progressive's Patent Owner Response, that would not speak to whether the Board erred in independently considering ASOP for what it teaches on its face in reaching its patentability conclusions.

through Congressional action or possibly notice-and-comment rulemaking, not to wedge the "new-grounds-of-rejection" doctrine from examination into AIA trials. *See Request for Comments on Trial Proceedings Under the American Invents Act Before the Patent Trial and Appeal Board*, 79 Fed. Reg. 36,474 (June 27, 2014).

### C.    The Final Written Decision Correctly Adjudicated the Obviousness Issues for Claims 1, 3, 11, and 14

Progressive lodges a number of challenges to the Board's holding that claims 1, 3, 11, and 14 are unpatentable under § 103.  None have merit.

Independent claim 1 requires recording selected "data elements … including, a time and location of vehicle operation and a corresponding log of vehicle speed for the time and location."  A7095.  Claim 3 recites similar requirements by virtue of its dependency on claim 1.  *See* A7092; Br. at 37.  Claims 11 and 14 require "the separate recording of 'location and time' as data elements;" they do not expressly recite the additional vehicle speed "log" limitation.  Br. at 37; *see* A7093.

Liberty's Petition cited Bouchard for these limitations, with specific citations to Bouchard's written description and Fig 18.  *See* A7258-59 (claim 1); A7285-86 (claim 11); A7289-90 (claim 14).  While Progressive filed a Preliminary Patent Owner Response, it did not address the merits of Liberty's position regarding these limitations.  *See* A10703-15.

After trial was instituted, Progressive filed its Patent Owner Response that included counter-arguments regarding these limitations, with a particular focus on

Bouchard's Fig. 18. *See* A10916-18. Progressive's Patent Owner Response argued claims 1, 3, 11, and 14 collectively, focusing on the shared limitations relating to location and time data. *See* A10916-18 (claims 1 and 3); A10928 (claims 11 and 14). Specifically, Progressive argued that claims 1 and 3 "require that both time of operation and location of operation be monitored and that data elements regarding these aspects of vehicle operation be recorded when appropriate for determining a cost of insurance for the vehicle." A10916. Progressive argued that Liberty had failed to demonstrate that the prior art taught these "location limitations." *Id.*; *see* A10916-18. The sole counter-argument offered by Progressive for claims 11 and 14 and their "location and time data" limitations simply relied on its earlier arguments for claims 1 and 3:

> As discussed above with respect to claims 1 and 3, the cited references do not disclose monitoring location, or using monitored location data to adjust the cost of insurance. For these additional reasons, judgment should be entered for Progressive on claims 11 and 14.

A10928. Liberty filed a Reply to Progressive's Patent Owner Response addressing Progressive's counter-argument. *See* A11193-95.

In its Final Written Decision, the Board concluded that "Liberty has demonstrated that one of ordinary skill in the art would have recognized that Bouchard's system records 'a time and location of vehicle operation and a corresponding log of vehicle speed for the time and location,' as recited in claims 1, 3, 11, and 14." A7032. The Board considered and rejected Progressive's arguments that

Bouchard did not teach the recording of "location" information, or the "corresponding log of vehicle speed for the time and location."  A7030; *see* A7030-32. The Board reasoned that "Progressive's argument narrowly focuses on Bouchard's 'environment classification' step shown in Figure 18, and fails to consider Bouchard's disclosure, as a whole, from the perspective of one with ordinary skill in the art." A7031 (citation omitted).  The Board then explained that "Bouchard uses an ERA [Event Recording Apparatus] that records selectable vehicle performance, operational status, and environment information, to determine the vehicle operational conditions," including geographical location.  *Id.*  In so doing, the Board made multiple findings of fact regarding Bouchard's "black box" recorder, and how it applied to the disputed limitations.  *Id.*

### 1.    The Board Was Not Limited In The Final Written Decision To Relying On The Portions Of Bouchard Expressly Cited In Liberty's Petition

Progressive charges that the Board erred by relying on Bouchard's "black box" disclosure in the Final Written Decision because, according to Progressive, the Board should have limited itself to relying only on the specific passages from Bouchard expressly cited in Liberty's Petition for a given limitation.  Br. at 36-37.

There is nothing improper about the Final Written Decision here.  The premise of Progressive's argument—that the Final Written Decision relied on disclosure in Bouchard completely different from that cited in Liberty's Petition—is debatable. Bouchard teaches that Fig. 18 (discussed in Liberty's Petition) employs the ERA

29

database (discussed in the Final Written Decision).  *See* A7130 (col. 29, l. 66 – col. 30, l. 6); A7131 (col. 31, l. 30 – col. 32, l. 12) ("ERA 5" records "each action taken" in algorithm depicted by Fig. 18, "along with the continuing stream of information from the sensors 4a and the radar system").  Indeed, it appears that the ERA is depicted <u>in</u> Fig. 18.  *See* A7114 (Fig. 18; "Event Recorder" in Box 1808); A7099 (Fig. 2; referring to ERA 5 as "Operational Event Recorder").  Further, the Final Written Decision and Liberty's Petition share additional common citations to Bouchard regarding why the disputed limitations would have been known in the art at the time of the invention.  *Compare, e.g.*, A7031 (Final Written Decision citing Bouchard at 9:21-50 & 11:1-2) *with* A7258-59 (Petition citing Bouchard at 9:39-47 & 11:1-2).

But even accepting Progressive's contention that the "Board reached beyond Liberty's Petition and cited to new portions of Bouchard" (Br. at 36), there is no error.  Nothing in the statute or the regulations limits the Board in issuing its Final Written Decision to relying only on those portions of a reference expressly cited in the initial Petition.  *See Cuozzo*, 2015 WL 448667, at *3 (parallel provision for IPR does not "expressly limit the Board's authority at the final decision stage to the grounds alleged in the IPR petition"); *id.* ("The failure to cite [references relied on in Final Written Decision] in the petition provides no ground for setting aside the final decision.").  Progressive cites 37 C.F.R. § 42.304(b)(4) – (b)(5) (*see* Br. at 36), but those regulations govern the petitioner and the contents of its petition, not the Board and the contents of its final written decision on patentability.  Instead, Congress

authorized the Board to "issue a final written decision with respect to the patentability of any patent claim challenged by the petitioner and any new claim added under section 326(d)" once trial is instituted. 35 U.S.C. § 328(a). The Board's patentability inquiry is limited only to the claims challenged; nothing in § 328, or anywhere else in the Patent Act, limits the scope of material that the Board may consider in responding to the parties' contentions during trial and rendering its patentability conclusions. The procedure employed here in the Final Written Decision was eminently proper. *See* 35 U.S.C. § 328(a).

> **2.     Progressive's "New-Grounds-Of-Rejection" Theory Should Be Rejected**

Progressive's related theory—that the Final Written Decision's adjudication of the limitations requiring recordation of time, vehicle location, and related "log" of vehicle speed—created a "new-ground-of-rejection" proves equally unavailing. As discussed above, the new-grounds doctrine has no place in AIA trials. *See, supra*, at Section V.B. And like Progressive's new-grounds argument as to the "actuarial class" limitation, its argument here similarly illustrates why that is the case.

Progressive argues that the Board's discussion of Bouchard's "black box" in conjunction with these limitations in its Final Written Decision should have been made earlier in the Institution Decision. Because it was not, Progressive argues that it is entitled to vacatur and remand of the Final Written Decision. *See* Br. at 43. But the Board's "black box" discussion in the Final Written Decision was offered to explain

why the Board was unpersuaded by Progressive's trial arguments.  It should be unsurprising, then, that the disputed analysis in the Final Written Decision was not also made in the Institution Decision.  Given that a similar scenario will likely play out in virtually every AIA trial given the structure of those trials, the Board cannot be constrained in the Final Written Decision to choosing between simply parroting the Institution Decision or risk creating a "new ground of rejection."  For all the reasons discussed above, the Board should be able to explain its trial patentability conclusions without having its analysis thereof result in vacatur and remand.[9]

### 3.    The Board Did Not Erroneously Group Claims 1, 3, 11, and 14

Progressive also argues that the Board incorrectly grouped claims 1, 3, 11, and 14 together in its Final Written Decision.  *See* Br. at 37.  Progressive's argument fails because it ignores the relationship between the claim language and the manner in which Progressive argued its case to the Board.

---

[9]     Liberty's Reply pointed out that Progressive's Patent Owner Response argument here "flies in the face of Bouchard's express disclosure," citing to some of the same disclosure cited in the Final Written Decision now urged by Progressive to be off-limits to the Board.  *Compare* A7031 (citing, e.g., Bouchard at col. 9, ll. 21-50; and col. 11, ll. 1-2) *with* A11193 (citing, e.g., Bouchard at col. 9, ll. 39-47; col. 9, ll. 47-49; and col. 11, ll. 1-2).  Progressive filed a Motion to Exclude various portions of Liberty's Reply and supporting material, but did not seek to exclude Liberty's response to Progressive's trial arguments on this issue.  *See* A11345-55.  Thus, to the extent that Progressive's argument here is an attempt to fix its failure to timely seek to exclude that material during the proceedings below under § 42.23(b), it should be rejected for that additional reason.

As discussed above, independent claim 1 requires recording selected "data elements … including, a time and location of vehicle operation and a corresponding log of vehicle speed for the time and location." A7095. Claim 3 depends upon claim 1. *See* A7092; Br. at 37. Claims 11 and 14 require "the separate recording of 'location and time' as data elements," but do not expressly recite the additional vehicle speed "log" limitation. Br. at 37; *see* A7093. Progressive's Patent Owner Response argued claims 1, 3, 11, and 14 collectively during trial, focusing on the shared limitations relating to location and time data. *See* A10916-18 (claims 1 and 3); A10928 (claims 11 and 14). Progressive did not make a separate argument based on the vehicle speed log limitation in claim 1.

The Board thus did nothing improper in adjudicating the patentability of claims 1, 3, 11, and 14 collectively; it simply adjudicated the issue as argued by Progressive. *Cf. In re Lovin*, 652 F.3d 1349, 1356-57 (Fed. Cir. 2011). Per Progressive's arguments made to the Board during trial, the Board properly accounted for the claim language. The Board concluded that "one of ordinary skill in the art would have recognized that Bouchard's system records 'a time and location of vehicle operation and a corresponding log of vehicle speed for the time and location,'" making related fact-findings regarding Bouchard's disclosure. A7032; *see* A7030-31 (finding, for example, that Bouchard "<u>records</u> selectable vehicle performance, operational status, and environment information, to determine the vehicle operational conditions") (emphasis added) (citations omitted). Thus, the Board concluded that

33

claims 1 and 3 would have been known to one of ordinary skill in the art at the time of invention.  As Progressive's argument to the Board asserted, having found that Bouchard teaches the relevant "location" limitations of claims 1 and 3, the Board equally found that the similar limitations in claims 11 and 14 were accounted for.

And Progressive's theory of error here is confusing.  It is not clear how Progressive extrapolates from the Board's obviousness analysis that the Board "[found] that the 'log' limitation disclosed by the prior art met only the separate data element requirements of <u>claims 11 and 14</u>, [meaning] the Board improperly read the 'log' limitation out of claims 1 and 3."  Br. at 37 (emphasis added).  A fair reading of the Final Written Decision indicates that the Board focused on the limitations in claims 1 and 3 as argued by Progressive, rather than ignored them.

### D. The Final Written Decision Articulates Reasons To Combine The References In Concluding That Claims 4, 5, 16, and 17 Are Obvious Under § 103

Progressive argues on appeal that the Final Written Decision "failed to articulate" a reason to combine Bouchard, Pettersen, and Florida Guide in finding claims 4, 5, 16, and 17 unpatentable under § 103.  Br. at 38.  Alternatively, Progressive argues that, even if the Board articulated a reason to combine the references (*see* Br. at 39 (quoting A7025)), the Board "provided no evidentiary support – not even a single citation to any of the references – for why a PHOSITA at the time of invention" would have done so.  Br. at 40; *see* Br. at 38-40.  Either theory of error fails.

34

First, the Board articulated why one of ordinary skill in the art would have been motivated to combine the references. Indeed, the language quoted by Progressive in its Blue Brief explains why the ordinarily-skilled artisan would have combined Bouchard, Pettersen, and Florida Guide:

> "[A person of ordinary skill in the art] would have found it obvious to implement Bouchard's system of monitoring vehicle data in view of Pettersen's teachings of using monitored driving characteristics to determine insured risk and premiums with Florida Guide's teachings that insurers are required, in issuing policies, to generate an insured profile comprising coverage information, including limits and deductibles, for determining a base cost of vehicle insurance, because insurance companies are required, in issuing policies, to do so."

A7025 (quoting A7024); *see* Br. at 39.

The Board adopted additional reasons presented in Liberty's Petition as to why the references would have been combined on the next page of the Final Written Decision:

> Furthermore, upon reviewing the parties' arguments and supporting evidence, we hold that Liberty's rationale for modifying Bouchard's system in light of Pettersen and Florida Guide constitutes an articulated reason with a rational underpinning to justify the legal conclusion of obviousness. Pet. 33, 43-44, 46-47, 50.

A7026 (citing A7254, A7264-65, A7267-68, A7271). The pages of Liberty's Petition endorsed by the Board articulate both the rationale quoted above regarding the combination of Bouchard, Pettersen, and Florida Guide, as well as reasons unique to Bouchard and Pettersen. *See* A7252-53. The latter reasons include that a person of ordinary skill in the art would have recognized "advantages" to using Bouchard's

35

"sophisticated" system for collecting driver data and evaluating driver safety, with

Pettersen's relatively simpler system for monitoring that data for use with insurance

costs, to produce a better system. *See* A7252 ("A POSITA would thus have

recognized that Bouchard's sophisticated driver safety monitoring and analysis

techniques could advantageously be implemented using Pettersen's teachings of

determining insurance costs using a similar system."). As Liberty additionally

explained, an artisan's interest in combining Bouchard and Pettersen would have been

that much stronger given the two systems share similar purposes. *See* A7252-53.

Progressive's Blue Brief does not account for these additional motivation-related

findings and conclusions.

Second, the Board made evidentiary findings supporting those rationales. As

an initial matter, Progressive incorrectly asserts on appeal that the references

themselves must justify the combination. *See* Br. at 40. The reason to combine

references need not come from the prior art. *See KSR Int'l Co. v Teleflex Inc.*, 550 U.S.

398, 419 (2007) (rejecting "overemphasis on the importance of published articles and

the explicit content of issued patents" and noting that "it often may be the case that

market demand, rather than scientific literature, will drive design trends"). In any

event, the rationales articulated by the Board in the Final Written Decision reflect the

teachings of the relevant references, as well as the general knowledge in the art.

The explanations for combining Bouchard and Pettersen offered by Liberty

and endorsed by the Board echo the Board's findings regarding the teachings of those

references.  *Compare* A7252 *with* A7021-22 (Bouchard teaches "a system for evaluating

a driver's performance under actual, real-time conditions and using such evaluations

to determine the driver's ability to operate a vehicle safely") *and* A7022 ("Pettersen

discloses an electronic monitoring and reporting system for recording the driving

pattern of a motor vehicle" and that it would be "advantageous to insurance

companies to use such an electronic monitoring system ….").

The rationale to combine Bouchard, Pettersen, and Florida Guide then

incorporates, and builds upon, these findings and reasoning to explain why the artisan

would add the Florida Guide teachings to the combination.  *See* A7025.  The Board

found that the Florida Guide teaches that the "cost to a driver for auto insurance will

depend on an initial collection (profile) of information about the insured driver,

including the driver's selected coverage limits and deductibles, together with other

profile information about the driver."  A7025 (quoting A7264-65); *see* A7026 (holding

that Liberty had articulated legally-valid obviousness conclusion).  The Board

explained that an artisan would have incorporated the insured profile from the Florida

Guide into the system of Bouchard and Pettersen in light of the Florida Guide's

teaching that insurers were "required, in issuing policies" to have such a profile.

A7025; *see* A7264-65.  Additionally, the Board agreed with Progressive that the Florida

Guide "reflect[s] conventional or basic knowledge of one with ordinary skill in the art,

and include[s] the conventional insurance determination methods disclosed in the

background section of the '970 patent."  A7016; *see KSR*, 550 U.S. at 418 ("[T]he

37

[obviousness] analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ.").

Progressive attempts to avoid the Board's findings about the references as it relates to the combination rationale by recasting them as "the Board's opening paraphrasing of the 'insured profile' limitations." Br. at 39. That proves too much. The sentences Progressive seeks to excise from the Board's combination rationale communicate relevant teachings that explain why artisans would have been motivated to combine the references. To wit, it seems unsurprising that the Board's statement of what the references teach reflects the limitations of claim 4 since those teachings are the reason claim 4 is unpatentable.

### E.    The Board Followed Its Rules In Denying Progressive's Motion To Exclude Liberty's Reply Evidence

Progressive argues that the Board "abused its discretion" by denying Progressive's motion to strike portions of Liberty's Reply and accompanying O'Neil Rebuttal Declaration regarding "a PHOSITA's understanding of Herrod." Br. at 48. Progressive alleges that the Board's conclusion that Progressive had failed to demonstrate that the relevant evidence was not proper rebuttal evidence "is contrary to the Board's strict rules regarding introduction of evidence." Br. at 49.

The Final Written Decision adhered to the applicable regulations and guidance. Progressive argues that the Board should have excluded the disputed material because

it should have been presented in Liberty's Petition.  *See* Br. at 49-50 (citing 37 C.F.R.

§ 42.304(b)(4) and (5), and Practice Guide, 77 Fed. Reg. at 48,767)).  But the Board

explained why Liberty's evidence did not violate those regulations and guidance.  *See*

A7047-48.  The Board explained that "each section of Ms. O'Neil's testimony first

directs our attention to the testimony of Progressive's expert, Mr. Miller, and then

presents her rebuttal testimony as to Mr. Miller's assertions."  A7048 (internal

citations omitted); *see id.* (using O'Neil rebuttal testimony to Progressive's arguments

about Herrod as example).  The Board thus concluded that Progressive had failed to

demonstrate that "Ms. O'Neil's testimony exceeds the proper scope of reply

evidence."  *Id.*; *see* 37 C.F.R. § 42.20(c) (movant has burden of proving entitlement to

requested relief).

Thus, Progressive's contention that "[t]he disclosure of Herrod has not

changed, so Liberty should not now be permitted to argue belatedly that it needs to

rely on the knowledge of a PHOSITA to explain the teachings of this reference"

misses the point.  Br. at 49.  Whether the Board properly rejected Progressive's

attempt to exclude portions of the O'Neil Rebuttal Declaration does not turn on

whether Herrod's disclosure had changed; the salient question is whether the rebuttal

declaration responded to contentions about Herrod in Progressive's Patent Owner

Response.  Other than reiterating its contrary position that Liberty could have offered

the evidence earlier (*see* Br. at 48), Progressive does not demonstrate how the Board's

conclusion that "Ms. O'Neil's testimony ([A11222-27] ¶¶ 25, 27-29, 31, 33) properly

responded to issues raised by Progressive in the patent owner response"—including counter-arguments about Herrod—was somehow arbitrary or an abuse of discretion. A7048. Viewed properly, Progressive's grievance here is not with the Board's application of the rules to Liberty's Reply or supporting evidence—Progressive's issue is with the fact that Liberty got to reply at all. This appeal is not the proper forum for addressing that concern. *See* 35 U.S.C. § 326(a)(12).

## VI.  CONCLUSION

For the foregoing reasons, this Court should reject Progressive's procedural challenges to the Final Written Decision in this CBM review.

Respectfully submitted,

/s/ Robert J. McManus
NATHAN K. KELLEY
*Solicitor*

THOMAS W. KRAUSE
*Deputy Solicitor*

ROBERT J. MCMANUS
SCOTT C. WEIDENFELLER
*Associate Solicitors*

Office of the Solicitor-Mail Stop 8
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, Virginia 22313

February 12, 2015

*Attorneys for the Director of the*
*United States Patent and Trademark Office*

40

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of February, 2015, I electronically filed the

foregoing BRIEF FOR INTERVENOR – DIRECTOR OF THE UNITED

STATES PATENT AND TRADEMARK OFFICE using the Court's CM/ECF

filing system.  Counsel for the parties was electronically served via e-mail per Fed. R.

App. P. 25 and Fed. Cir. R. 25(a) and 25(b).

/s/ Robert J. McManus
Associate Solicitor
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, VA 22313-1450
571-272-9035

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

The brief contains 9,789 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

This brief has been prepared in a proportionally-spaced typeface using Microsoft® Office Word 2010 in fourteen-point Garamond font.

/s/ Robert J. McManus
Associate Solicitor
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, VA 22313-1450
571-272-9035